CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ, (1216)
djc@cwlawlv.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@cwlawlv.com
700 South 7th Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

CONSOVOY MCCARTHY PLLC
WILLIAM S. CONSOVOY, ESQ.**
Virginia Bar No. 47704
will@consovoymccarthy.com
THOMAS R. MCCARTHY, ESQ.*
Virginia Bar No. 47145
tom@consovoymccarthy.com
TYLER R. GREEN, ESQ.*
Utah Bar No. 10660
tyler@consovoymccarthy.com
CAMERON T. NORRIS, ESQ.**
Virginia Bar No. 91624
cam@consovoymccarthy.com
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
*Attorneys for Plaintiffs*
*Admitted pro hac vice*
**Pro hac vice pending*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; and NEVADA REPUBLICAN PARTY,

          Plaintiffs,

    v.

BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,

          Defendant.

No. 2:20-cv-01445-JCM-VCF

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

Plaintiffs Donald J. Trump for President, Inc., the Republican National Committee, and the Nevada Republican Party bring this action to challenge Assembly Bill 4—a bill passed on Sunday, August 2, 2020, during the 32nd Special Session of the Nevada Legislature. Plaintiffs allege as follows:

## INTRODUCTION

1.    Every American who is eligible to vote should be able to freely do so. Robust participation in our biennial elections strengthens the Nation's civic fibers, allowing the United States of America to retain its place as the world's preeminent constitutional republic. Thus, Republicans have always supported efforts to make it easier for voters to cast their ballot. At the same time, however, the electoral process cannot function properly if it lacks integrity and results in chaos. Put simply, the American people must be able to trust that the result is the product of a free and fair election.

2.    Nevada's recently enacted election laws—collectively, AB4—fall far short of this standard. On a straight-party-line vote taken on a Sunday afternoon, the Nevada Legislature passed a 60-page, single-spaced bill first introduced shortly after noon the previous Friday. AB4 adds more than 25 new election-related sections to the Nevada Revised Statutes and amends more than 60 others. Many of those provisions will undermine the November election's integrity. Some go beyond that, crossing the line that separates bad policy judgments from enactments that violate federal law or the United States Constitution.

3.    Hence this lawsuit. Our elections must occur under valid laws. Under the U.S. Constitution, states have broad discretion to decide how to conduct their elections. But their election laws must comply with the higher law of the U.S. Constitution and with federal laws enacted under it.

4.    Exercising its constitutional power under the Elections Clause and the Electors Clause, Congress has established a uniform, national day to elect members of Congress and to appoint presidential electors. *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. §1. AB4 contravenes those valid federal laws by requiring elections officials to accept and count ballots received after Election Day *even when* those ballots lack objective evidence that voters cast them on or before Election Day. In short,

2

Amended Complaint for Declaratory and Injunctive Relief

AB4 effectively postpones and prolongs Nevada's 2020 general election past the Election Day established by Congress.

5.      Other provisions in AB4 lack clear standards to guide the actions of county and city officials administering certain parts of Nevada's elections. AB4 thus will result in the State treating Nevada voters differently based on nothing more than their county of residence. That disparate treatment violates their Fourteenth Amendment right to the equal protection of the laws.

6.      The combined effect of those problems, and others described below, will be to dilute the votes of some Nevada voters, thereby infringing their right to vote under the Fourteenth Amendment.

7.      New York's June 2020 primary election confirms that these are not hypothetical concerns. "Elections officials in New York City widely distributed mail-in ballots for the primary on June 23." Jesse McKinley, *Why the Botched N.Y.C. Primary Has Become the November Nightmare*, N.Y. Times (Aug. 3, 2020), https://nyti.ms/3fvDrhx. "Now, nearly six weeks later, two closely watched congressional races remain undecided, and major delays in counting a deluge of 400,000 mail-in ballots and other problems are being cited as examples of the challenges facing the nation as it looks toward conducting the November general election during the pandemic." *Id.* Yet as those very problems unfolded, Nevada's Democratic leadership still introduced and passed AB4 on a weekend, straight-party-line vote. No one should be surprised that such a process produced legislation bearing constitutional flaws.

8.      For all these reasons and those alleged below, AB4 is illegal and must be enjoined.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States. 28 U.S.C. §§1331 & 1343.

10.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and the Defendants reside in this District. *Id.* §1391.

## PARTIES

11.     Plaintiff Donald J. Trump for President, Inc. is the principal committee for President Donald J. Trump's reelection campaign. The committee spends resources, including hiring

3

campaign staff, in Nevada to encourage Nevadans to reelect the President. It also spends significant sums of money in Nevada to further those interests. The committee will devote its resources, including its campaign staff in Nevada, to monitor the results of the presidential election in Nevada. Changes to Nevada election laws require the committee to change how it allocates its resources, and the time and efforts of its campaign staff, to achieve its electoral and political goals.

12.    Plaintiff Republican National Committee (RNC) is a national political party with its principal place of business at 310 First Street S.E., Washington D.C., 20003.

13.    The RNC organizes and operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States.

14.    The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations, including three members who are registered voters in Nevada.

15.    The RNC works to elect Republican candidates to state and federal office. In November 2020, its candidates will appear on the ballot in Nevada for most federal and state offices. In elections for the U.S. House of Representatives, for example, the Cook Political Report lists two of Nevada's four house races as "competitive," with one of those as "likely Democratic" and the other as "lean Democratic."

16.    The RNC has a vital interest in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Nevada elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates.

17.    The RNC also has an interest in preventing AB4's constitutionally problematic changes to Nevada election law. Major or hasty changes confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls. Thus, AB4 forces the RNC to divert resources and spend significant amounts of money educating Nevada voters on those changes and encouraging them to still vote.

18.    Plaintiff Nevada Republican Party (NVGOP) is a political party in Nevada with its principal place of business at 2810 West Charleston Blvd. #69, Las Vegas, NV 89102. The Nevada

4

Republican Central Committee (NRCC) is the NVGOP's governing body. The NVGOP and NRCC exercise their federal and state constitutional rights of speech, assembly, petition, and association to "provide the statutory leadership of the Nevada Republican Party as directed in the Nevada Revised statutes," to "recruit, develop, and elect representative government at the national, state, and local levels," and to "promote sound, honest, and representative government at the national, state and local levels." NRCC Bylaws, art. II, §§1.A-1.C.

19.     The NVGOP represents over 600,000 registered Republican voters in Nevada as of August 2020.

20.     The NVGOP has the same interests in this case as the RNC, and seeks to vindicate those interests in the same ways.

21.     Defendant Barbara Cegavske is the Secretary of State of Nevada. She serves "as the Chief Officer of Elections" for Nevada and "is responsible for the execution and enforcement of the provisions of title 24 of NRS and all other provisions of state and federal law relating to elections in" Nevada. NRS 293.124. She is sued in her official capacity.

## **BACKGROUND**

**I.     State laws that set the time, place, and manner of elections for federal offices cannot conflict with contrary federal law or with federal constitutional commands.**

22.     The U.S. Constitution's Elections Clause vests state legislatures with power to set the time, place, and manner of congressional elections. U.S. Const., art. I, §4, cl. 1.

23.     But the Elections Clause also reserves to "Congress" the power to "at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id.*

24.     A law governs "'the election' of a Senator or Representative" when it "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997).

25.     Exercising its constitutional power to pass laws governing elections for federal offices, Congress has established one specific day as the uniform, national Election Day for members of the United States House of Representatives and of the United States Senate. For both offices, the "Tuesday next after the 1st Monday in November" is "the day for the election." 2 U.S.C.

Amended Complaint for Declaratory and Injunctive Relief

§7 (elections for members of the House of Representatives held on that day "in every even numbered year"); *see also id.* §1 (Senators to be elected "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which a Representative to Congress is regularly by law to be chosen").

26.     The U.S. Constitution also vests in "Congress" the power to "determine the Time of chusing the Electors" for the offices of President and Vice President. U.S. Const. art. II, §1, cl. 4.

27.     Exercising that power, Congress has established that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. §1.

28.     Combined, 2 U.S.C. §§1, 7, and 3 U.S.C. §1 establish the Tuesday after the first Monday in November as the uniform, national Election Day for members of Congress and as the uniform, national day for appointing electors for President and Vice President.

29.     Those "uniform rules for federal elections" are both "binding on the States" and superior to conflicting state law: "'[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.'" *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1879)). In other words, if a state law governing elections for federal offices "conflicts with federal law," that state law is "void." *Id.* at 74.

30.     State election laws must also comport with federal constitutional requirements. For example, state election laws may not "deny to any person within" the state's "jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.

31.     According to the Supreme Court, the Fourteenth Amendment of the U.S. Constitution protects the "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 77 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S.

Amended Complaint for Declaratory and Injunctive Relief

at 555 n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

32.    Thus, both direct denials and practices that otherwise promote fraud and dilute the effectiveness of individual votes can violate the Fourteenth Amendment. *See id.* at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

33.    *"*Every voter in a federal ... election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

34.    Fraudulent votes "debase[]" and "dilute" the weight of *each* validly cast vote. *See Anderson*, 417 U.S. at 227. When it comes to "'dilut[ing] the influence of honest votes in an election,'" whether the dilution is "'in greater or less degree is immaterial'"; it is a violation of the Fourteenth Amendment. *Id.* at 226.

35.    The Equal Protection Clause of the U.S. Constitution requires States to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000)); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions.").

36.    "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for nonarbitrary treatment of voters [is] necessary to secure the fundamental right" to vote. *Bush*, 531 U.S. at 105.

37.    The use of "standardless" procedures can violate the Equal Protection Clause. *Bush*, 531 U.S. at 103. "The problem inheres in the absence of specific standards to ensure ... equal application" of even otherwise unobjectionable principles. *Id.* at 106. Any voting system that

Amended Complaint for Declaratory and Injunctive Relief

involves discretion by decisionmakers about how or where voters will vote must be "confined by specific rules designed to ensure uniform treatment." *Id.* at 106.

**II.     Nevada law regulates the time, place, and manner of elections for federal offices.**

38.     The Nevada Legislature has exercised its power under the Elections Clause to pass laws regulating the time, place, and manner of elections for federal officers from Nevada. *See, e.g.*, NRS Chapters 293, 298, 304.

39.     For example, Nevada law regulates the administration of primary elections, including setting rules for becoming a candidate for federal and state office and for how those candidates qualify for the primary-election ballot. *See, e.g.*, NRS 293.175-293.190.

40.     Nevada law also regulates the administration of general elections. Among other things, Nevada law establishes at least five different ways that Nevadans may vote in a general election: by in-person voting at the polls, NRS 293.270-293.307; by provisional ballot, NRS 293.3078-293.3086; by absent ballot voting, NRS 293.3088-293.340; by voting in mailing precincts, NRS 293.343-293.355; and by early in-person voting, NRS 293.356-293.361. Nevada law also establishes how ballots are to be counted and the returns are to be canvassed. NRS 293.3625-293.397.

41.     Thus Nevada law itself distinguishes between absent ballot voting and mail-in ballot voting. Absent ballot voting occurs when a voter affirmatively asks, on his or her own initiative, the voter's election official to mail a ballot to the voter. If the voter does not initiate that request, the election official will not mail an absent ballot to the voter. In contrast, voters in mail-in precincts automatically receive a ballot from their election official without having to affirmatively request one.

42.     Those distinctions implicate important election-integrity interests. Absent ballots correspond to voters who have specifically requested that type of ballot—and who have provided information in their request that allows elections officials to verify that the voter is who he or she purports to be. Election officials in mail-in precincts, however, send ballots to every active registered voter on the precinct's voter list—without first confirming whether those voters are still alive and still live at their listed address, and thus remain eligible to vote in that precinct's election.

8

43.     Among Nevada's available voting options, Nevadans historically have chosen overwhelmingly to vote in person. Consider just the past two election cycles, where the Secretary's own data show that 9 of every 10 ballots cast have been in-person votes.

44.     In Nevada's 2016 primary election, 89.49% of the total ballots cast were in-person votes cast during early voting (50.53% of total ballots) or on Election Day (38.96% of total ballots). Absent ballots constituted just 9.30% of total ballots cast, and the remaining 1.21% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara K. Cegavske, 2016 Primary Election Turnout (June 23, 2016), https://bit.ly/31dPyux.

45.     In Nevada's 2016 general election, 93.02% of the total ballots cast were in-person votes cast during early voting (62.41% of total ballots) or on Election Day (30.61% of total ballots). Absent ballots constituted just 6.41% of total ballots cast, and the remaining 0.57% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara K. Cegavske, 2016 General Election Turnout (Feb. 10, 2017), https://bit.ly/3a0U9nS.

46.     Nevadans' overwhelming preference for voting in person remained unchanged two years later. In Nevada's 2018 primary election, 92.1% of the total ballots cast were in-person votes cast during early voting (47.75% of total ballots) or on Election Day (44.35% of total ballots). Absent ballots constituted just 7.21% of total ballots cast, and the remaining 0.69% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara K. Cegavske, 2018 Primary Election Turnout (July 10, 2018), https://bit.ly/3fyX6NH.

47.     So too for Nevada's 2018 general election. There, 91.04% of the total ballots cast were in-person votes cast during early voting (56.80% of total ballots) or on Election day (34.24% of total ballots). Absent ballots constituted just 8.57% of total ballots cast, and the remaining 0.39% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara K. Cegavske, 2018 General Election Turnout (Nov. 20, 2018), https://bit.ly/31kS81E.

**III.    With little advance notice, Nevada holds a by-mail 2020 primary election.**

48.     For Nevada's 2020 primary election, however, all that changed. On March 24, 2020, Secretary Cegavske announced that Nevada's June 9, 2020, primary election would be an all-mail election due to "the many uncertainties surrounding the COVID-19 pandemic." *Secretary*

*Cegavske Announces Plan to Conduct the June 9, 2020 Primary Election by All Mail* (Mar. 24, 2020), https://bit.ly/33mZt3p. The Secretary directed county and city elections officials to mail absent ballots to all active registered voters, who could return those ballots by mail in a postage-prepaid envelope or by dropping the ballot in person at a designated county location. *See id.* But the Secretary assured Nevadans that despite the move to an all-mail election, "at least one in-person polling location will be available in each county for the June 9, 2020 primary election" to "accommodate same-day voter registration" and to help "voters who have issues with the ballot that was mailed to them." *Id.*

49.    Nearly a month later, the Democratic National Committee, the Nevada State Democratic Party, related entities, and four individual Nevadans sued Secretary Cegavske, the Clark County Registrar of Voters, the county clerks of Washoe and Elko Counties, and Nevada Attorney General Aaron Ford in Nevada state court. *See* Compl., *Corona et al. v. Cegavske et al.*, No. 20-OC-00064-I-B (1st Judicial Dist. Apr. 16, 2020). Those plaintiffs contended, among other things, that the Secretary's plan unconstitutionally burdened Nevadans' right to vote. They sought an order requiring elections officials (1) to open *more* in-person voting places, and (2) to mail absent ballots not just to active registered voters but also to *inactive* voters—persons the State had learned, principally from return-mail notices from the U.S. Postal Service, no longer lived at the address where they had registered to vote. The Republican National Committee and the Nevada Republican Party successfully intervened as defendants in the *Corona* case.

50.    The plaintiffs in *Corona* moved for a preliminary injunction. Secretary Cegavske and Attorney General Ford, the Washoe and Elko County Clerks, and the RNC and NVGOP opposed the motion.

51.    But on the day his opposition brief was due, the Clark County Registrar told the plaintiffs and other parties that the Clark County Commission had instructed him both to open additional in-person voting places in Clark County and to mail ballots to all Clark County active *and inactive* registered voters.

52.    After receiving notice of Clark County's concessions, the *Corona* plaintiffs withdrew their motion for a preliminary injunction. And Clark County conducted the primary

10

election as it said it would.

53.     The consequences of this hurried switch—from Nevada elections occurring 90% by in-person voting to an all-mail election—should surprise no one. The *Las Vegas Review-Journal* reported that, within the first week of voting in Nevada's first-ever all-mail primary, photographic evidence surfaced of numerous ballots "tossed in trash cans and littering apartment mailbox areas" in Clark County.

54.     On May 8, 2020, one Clark County voter found "about a dozen ballots pinned to the complex's bulletin board or otherwise thrown around." Over the next few days, he found many more in nearby trash cans.

55.     In a different apartment complex, another voter saw ballots "sticking out of residents' mailboxes and 'at least a dozen' were sitting in nearby garbage cans."

56.     Another resident received a ballot at her home addressed to her deceased mother.

57.     A U.S. Postal Service worker serving the area witnessed the breadth of the problem. She recounted that, over the course of multiple days, she saw an "influx of absentee ballots"—as many as 100 in a single day—that were "'no good,'" often because they had been sent to recipients who had moved or died. "In all, she said there were thousands [of ballots] sitting in crates with no additional safeguards and marked to be sent back to the county."

58.     Recent media reports confirm just how widespread those problems were. For the 2020 primary election, Clark County mailed out 1,325,934 ballots. Of that total, 223,469 were returned as undeliverable. Rory Appleton, *More than 223k mailed ballots returned undeliverable in primary*, Las Vegas Review-Journal (Aug. 14, 2020), https://bit.ly/3kWeEXB.

59.     Of those 223,469 undeliverable ballots, 58 percent belonged to inactive voters. But "93,585 undeliverable ballots belonged to voters classified as active in Clark County's voter rolls." *Id.*

60.     Clark County Registrar of Voters Joseph Gloria intends to mail general election ballots to those more than 93,000 active registered voters whose primary-election ballots were returned to Clark County as undeliverable.

61.     Those more than 93,000 ballots returned as undeliverable from registered voters do

11

not include the countless numbers of not-returned-as-undeliverable ballots observed strewn about apartment complexes, garbage cans, and other locations in Clark County as described above. The number of those kinds of ballots—which also should have been returned as undeliverable, but were not—will never be known.

62.    Clark County's voter rolls also contain more than 2,200 people who are deceased. *Id.*

**IV.    Other states rush to implement mail-in elections in 2020, with similarly problematic results.**

63.    Nevada is not the only jurisdiction that experienced those types of problems after a hurried switch to mail-in voting for its Spring 2020 elections.

64.    First, consider Wisconsin. For its April 2020 primary election, "the Wisconsin Election Commission received over 1.3 million requests for absentee ballots…, almost 1 million of which were completed and returned by mail to the election offices. This was an increase of over 440 percent from the April 2016 election." Office of Inspector General, U.S. Postal Service, Management Alert: Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area, Report No. 20-235-R20, at 3 (July 7, 2020), https://bit.ly/2YbjBT0.

65.    Given the substantial increase in absent voting, it's no surprise that errors occurred in processing those absent ballots. For example, "[t]hree tubs of absentee ballots from Appleton and Oshkosh were found at the Milwaukee Processing & Distribution Center (P&DC) after polls closed on April 7, 2020." *Id.* "Absentee ballots requested on March 22 and 23, 2020, were not delivered to voters." *Id.* And—despite Postal Service guidance stating that "all ballots should be postmarked by machine or by hand"—the Milwaukee Election Office received "about 390 voter completed ballots with varying postmark issues including illegible postmarks, lack of a postmark, undated postmarks, or hand-stamped postmarks." *Id.* at 5.

66.    Next, consider reports from New Jersey media about similar problems that occurred in Paterson, New Jersey in the May 12 election for Second Ward City Council—the "first election in state history that was contested only by mail-in voting."

67.    More than 800 mail-in ballots were set aside in Paterson due to suspicion that they

Amended Complaint for Declaratory and Injunctive Relief

were gathered illegally.

68.     Hundreds of mail-in ballots were collected from *single* mailboxes. In one case, 366 ballots were picked up from the same mailbox.

69.     In some cases, "large quantities of mail-in ballots were fastened together with a rubber-band and dropped at the same location."

70.     There have been reports of Paterson voters not receiving their ballots as well as reports of "letter carriers leaving massive numbers of ballots in a bin at a particular apartment building."

71.     In addition, one candidate reported that many people's "votes were paid for and still others who had no idea that they voted or who they voted for because someone filled out a mail-in ballot for them." Things are so bad that a court has temporarily blocked the winning candidate from taking office. *See* Joe Malinconico, *Paterson councilman-elect charged with election fraud can't take office, judge rules*, Patterson Press (June 30, 2020), https://njersy.co/3gsZarF.

72.     Third, consider Connecticut. "Nearly 300,000 voters, about 20% of all registered Democrats and Republicans in the state, requested absentee ballots" for the state's August 2020 primary election. Joseph De Avila, *Connecticut's Expanded Mail-In Voting System Off to a Choppy Start*, Wall St. Journal (Aug. 9, 2020), https://on.wsj.com/3216bdd. That's up from "about 10,000 or 15,000 absentee ballots" for a typical primary election. *Id.* Early returns of those ballots suggested voter confusion could depress participation: four days before the election, only 500 of the 3,500 voters in New Britain, Connecticut who requested absentee ballots had returned them, as had only 1,800 of the 11,000 voters who requested absentee ballots in West Hartford. *Id.*

73.     Finally, consider New York's June 2020 primary election. "More than 414,000 New York City residents voted by absentee ballot in the June 23 primary, which is more than 10 times the number of absentee ballots cast in the 2016 primary, according to court documents." Katie Honan, *Judge's Decision to Count Invalidated N.Y. Primary Ballots Shows Need for Improved Voting Procedures*, Wall St. Journal (Aug. 5, 2020), https://on.wsj.com/348fnPw. On August 3—more than six weeks after the election—results of the primary election between Rep. Carolyn Maloney and Suraj Patel for New York's 12th District remained unknown. On that day, a federal

13

district judge in New York "ordered the counting of certain mail ballots that arrived after Election Day but without a postmark to prove when they were sent." *An Autopsy of New York's Mail-Vote Mess*, Wall St. Journal (Aug. 7, 2020), https://on.wsj.com/3kT7d3y.

74.     It is still not known why absentee ballots were delivered without a postmark to election offices in New York even though the Postal Service's "policy is to postmark all ballots, and the city was assured it would happen." *Id.* But a manager at a New York postal processing facility testified during the lawsuit over the absentee ballots and "offered two possibilities." *Id.* "First, postmarking machines can reject mail if, for example, it isn't 'folded over properly.' On Election Day, USPS staff were ready to grab bypassed ballots and postmark them by hand." *Id.* That happened "'for thousands of ballots'" on Election Day, but the manager "wasn't sure…if this happened before June 23." *Id.* Second, "most prepaid mail usually skips postmarking altogether and goes 'directly to a sortation machine.'" *Id.* "On Election Day, USPS staff overrode that procedure and forced everything through the postmarking system. But again, [the manager] wasn't sure about before June 23, saying it was 'very possible' that some ballots went straight to sorting." *Id.*

75.     News reports do not disclose whether the Postal Service would invoke those manual-override processes on days *after* an Election Day to ensure postmarks were affixed both to improperly folded mail and to prepaid ballots placed in the mail after an election. Even so, the Postal Service's pre-election performance alone led the co-chair of the New York State Board of Elections to testify that he "'do[esn't] have a great deal of confidence in the U.S. Postal Service.'" *Id.*

76.     The facts from those examples confirm the common-sense conclusion of the Commission on Federal Election Reform—a bipartisan commission chaired by former President Jimmy Carter and James Baker, and cited extensively by the U.S. Supreme Court—that absentee voting is "the largest source of potential voter fraud." *Building Confidence in U.S. Elections* 46, https://bit.ly/3dXH7rU (*Carter-Baker Report*). Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, https://bit.ly/3e59PY1 (Morley,

Amended Complaint for Declaratory and Injunctive Relief

*Redlines*). Such fraud is easier to do and harder to detect. As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

77.     "Absentee balloting is vulnerable to abuse in several ways." For one, ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. For another, absentee voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* For example, "[i]ndividuals can sign and sell their absentee ballot," or "[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently."

78.     This risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate." Morley, *Redlines* 2.

79.     A 2012 study from the Pew Center on the States—which the U.S. Supreme Court cited in a recent case—found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state."

80.     Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that roughly 9% of listed registration records in the United States are invalid." On top of those invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant is listed multiple times." The same study found that "[i]n the typical state, 1 in 40 counted votes in the 2008 general election cannot be matched to a registrant listed as having voted" and that "1 in 100 listed registrants is likely to be deceased."

81.     Federal law recognizes those risks of voting by mail and thus requires certain first-time voters to present identification. *See* 52 U.S.C. § 21083(b).

**V.     In a special session on a weekend vote, the Nevada Legislature passes AB4.**

82.     After Nevada's June 2020 primary election, the *Corona* plaintiffs amended their complaint. The plaintiffs' new claims raised constitutional challenges to Nevada laws that banned

15

ballot harvesting—the process of third parties unrelated to a voter collecting and returning that voter's absent ballot. They also challenged the Nevada laws requiring election officials to verify a voter's signature on an absent ballot against the signature on the voter's registration. The parties conducted expedited discovery on those claims throughout July 2020 to prepare for a one-week trial on them scheduled to begin on Monday, August 17, 2020.

83.     On Friday, July 31, 2020, the Nevada Legislature convened its 32nd Special Session in response to a call from Governor Sisolak.

84.     One of the bills the Nevada Legislature considered during that special session was Assembly Bill 4.

85.     The Democratic majority in the Nevada Assembly introduced AB4 on the afternoon of July 31, 2020. AB4 runs more than 60 single-spaced pages. Even so, the Assembly passed AB4 on a straight party-line vote mere hours after it was introduced.

86.     AB4 then went to the Nevada Senate, which considered it near midnight on Friday, July 31, 2020, and again on Saturday, August 1, 2020, before passing it on Sunday, August 2, 2020, on a straight party-line vote.

87.     Governor Sisolak signed AB4 into law on Monday, August 3, 2020.

88.     AB4 contains 88 sections. Sections 2 through 29 enact entirely new provisions in the Nevada Revised Statutes. Within those, Sections 2 through 27 create a new framework for primary or general elections held during a declared emergency or state of disaster, defined under AB4 as an "affected election." AB4, §§5, 8. Sections 30 through 83, in turn, amend scattered existing provisions of NRS Chapters 293 and 293C. Sections 84 through 88 appropriate money to implement the bill and establish effective dates for its provisions.

89.     Many of AB4's provisions are head-scratching—particularly given the stark irregularities in Nevada's June 2020 primary election, and because AB4 changes so many election laws so close to the 2020 general election. Indeed, Defendant herself recently acknowledged that Nevada could (and should) successfully hold its 2020 general election without changing its election laws. Barbara K. Cegavske, *Nevada's voting laws do not need to be changed*, The Nevada Independent (July 29, 2020), https://bit.ly/30qA4UO. But this lawsuit does not challenge AB4's

16

wisdom (or lack thereof). *Cf. New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring) ("'The Constitution does not prohibit legislatures from enacting stupid laws.'"). Rather, this lawsuit challenges the parts of AB4 that violate the Constitution or contradict federal law enacted under it, and that are thus invalid and must be enjoined.

90.     First among AB4's unconstitutional provisions is Section 20. It effectively delays the day for electing members of Congress and for appointing presidential electors that Congress has established in 2 U.S.C. §§1, 7 and 3 U.S.C. §1.

91.     The "election" established in those federal statutes is "the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997).

92.     Section 20.2 "deem[s]" ballots "received by mail not later than 5 p.m. on the third day following the election" "to have been postmarked on or before the day of the election" when "the date of the postmark cannot be determined."

93.     Section 20.2 resembles a provision of Nevada law that applies to absent ballots cast in elections not held in a declared emergency. *See* NRS 293.317(2). But that provision became effective only on January 1, 2020, and has thus never governed a general election.

94.     AB4 increases the likelihood that mail ballots will lack a legible postmark showing when voters mailed them. AB4 instructs county and city clerks to send mail ballots to voters along with "a return envelope" that "must include postage prepaid by first-class mail." AB4, §16.3. The U.S. Postal Service's apparent policy of postmarking prepaid ballot-return envelopes is a stark exception to its general policy of not applying postmarks to postage prepaid envelopes. *See* United States Postal Serv., §1-1.3 Postmarks ("Postmarks are not required for mailings bearing a permit, meter, or precanceled stamp for postage, nor to pieces with an indicia applied by various postage evidencing systems."), https://bit.ly/3kftt7l. And as Wisconsin's and New York's experiences confirm, the Postal Service cannot uniformly apply that exception to its default no-postmark policy when the number of mail ballots returned exceeds historical levels by orders of magnitude. Indeed, as the Postal Service's New York trial testimony confirms, postmarking a postage prepaid ballot requires specific oversight of, and manual overrides to, the Postal Service's ordinary processes—a

series of day- or week-specific decisions at each individual mail processing and distribution facility. So any given mail ballot may not be postmarked due to human, mechanical, or other oversights or errors. And election officials cannot determine whether a mail ballot without a postmark was timely cast unless they receive it on or before Election Day.

95. In addition, the U.S. Postal Service delivers the overwhelming majority of first-class mail sent from a Clark County address to another Clark County address, or from a Washoe County address to another Washoe County address, within one or two business days. That means mail sent within Clark County or Washoe County on a Wednesday or Thursday will usually be received within Clark County or Washoe County by the next Friday.

96. As a result, a ballot mailed in Clark or Washoe Counties in a state-provided, postage prepaid first-class envelope on the Wednesday or Thursday after Election Day will likely be received at the Clark County Registrar's Office or Washoe County Clerk's Office before 5:00 pm on the Friday after the election. Those ballots almost certainly will arrive without bearing a postmark because the Postal Service has no need after Election Day to invoke the manual override processes necessary to trigger its apparent ballot-specific exception to its default no-postmark-for-prepaid-mail rule. And under Section 20.2, those ballots that arrive without a postmark must be counted. Section 20.2 thus effectively extends the congressionally established Election Day.

97. The opening that Section 20.2 creates for ballots to be cast *after* Election Day and still counted is not just unlawful—it is unnecessary. Nevadans have ample time to request, receive, fill out, return, and have their ballots counted by Election Day. On July 31, 2020, the Postal Service General Counsel sent a letter to the Defendant stating the Postal Service's opinion that Nevadans "should have sufficient time to receive, complete, and return their ballots." The president of the American Postal Workers Union said it will be a "'[p]iece of cake for postal workers'" to "handle the country's mail-in ballots with proper planning." Erin Cox et al., *Postal Service warns 46 states their voters could be disenfranchised by delayed mail-in ballots*, Wash. Post (Aug. 14, 2020), https://wapo.st/2PYGt3o. Similarly, the Postal Service's spokeswoman "said the agency 'is well prepared and has ample capacity to deliver America's election mail.'" *Id.* If those assertions are correct, Section 20.2's postmark-free safe harbor, which violates federal law, is both illegal and

1   unnecessary.

2       98.   Beyond that, Dr. Anthony Fauci, director of the National Institute of Allergy and

3   Infectious Diseases, "said this week he believed Americans should be able to safely cast a ballot

4   in-person, so long as they follow necessary social distancing protocols." Connor Perret, *Fauci says*

5   *'there's no reason' in-person voting shouldn't be safe with masks and proper social distancing*,

6   Business Insider (Aug. 15, 2020), https://bit.ly/3iNaL5F. "Fauci compared the safety of casting a

7   ballot in person to that of an in-person shopping trip to the grocery store in 'counties and cities that

8   are doing it correctly.'" *Id.* "'They have X's every six or more feet,' he added. 'And it says, "Don't

9   leave this spot until the person in front of you left their spot." And you can do that, if you go and

10   wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no

11   reason why you shouldn't be able to do that.'" *Id.*

12       99.   Dr. Fauci's comments are consistent with a CDC report finding "[n]o clear increase

13   in cases, hospitalizations, or deaths" due to COVID-19 "after the election" in Wisconsin. Heather

14   Paradis, M.D. et al., *Notes from the field: Public Health Efforts to Mitigate COVID-19*

15   *Transmission During the April 7, 2020, Election—City of Milwaukee, Wisc., Mar. 13-May 5, 2020*

16   (July 31, 2020), https://bit.ly/3g5464X.

17       100.   Sections 11 and 12 of AB4 are also unconstitutional. Those sections set forth the

18   number of in-person polling places for early voting (Section 11) and vote centers for day-of-election

19   voting (Section 12). Under those sections, the number of in-person voting places a county must

20   establish is tied to the county's population, resulting in more in-person voting places per capita for

21   voters in urban counties than in rural counties. This disparate treatment of Nevada voters based on

22   county population violates rural voters' rights under the Equal Protection Clause.

23       101.   Section 22 of AB4 is also unconstitutional. It provides that "the county or city clerk,

24   as applicable, shall establish procedures for the processing and counting of ballots." Beyond that

25   general instruction, it provides only that counties "[m]ay authorize mail ballots to be processed and

26   counted by electronic means." This lack of uniform standards to be applied across counties means

27   that Nevada counties will necessarily adopt different procedures for processing and counting

28   ballots, which could produce differences in rejection rates. This unequal, standardless treatment of

Amended Complaint for Declaratory and Injunctive Relief

1   Nevada voters across counties constitutes an equal protection violation.

2       102.    Finally, Section 25 of AB4 requires county or city clerks to count potentially

3   fraudulent or invalid ballots, thereby diluting the votes of honest citizens and depriving them of

4   their right to vote in violation of the Fourteenth Amendment. Section 25 provides that "[i]f two or

5   more ballots are found folded together to present the appearance of a single ballot, they must be

6   laid aside. If a majority of the inspectors are of the opinion that the mail ballots folded together

7   were voted by one person, the mail ballots must be rejected and placed in an envelope, upon which

8   must be written the reason for their rejection." But Section 25 establishes no standard by which the

9   inspectors should assess whether the ballots were voted by one person. Neither does Section 25

10  require inspectors to reject either of two or more ballots folded together when a majority of the

11  inspectors are of the opinion that the mail ballots were voted by *more than* one person. In that case,

12  Section 25 appears to contemplate that inspectors will count *all* of the ballots, even though at least

13  one of the voters has not complied with the bill's signature-verification process. This loophole

14  invites fraud, coercion, theft, or otherwise illegitimate voting that dilutes the votes of honest citizens

15  and deprives them of their right to vote in violation of the Fourteenth Amendment.

16      103.    On March 12, 2020, Governor Sisolak declared a state of emergency in Nevada due

17  to COVID-19. That makes Nevada's 2020 general election an "affected election" to which Sections

18  2 through 27 of AB4 apply. *See* AB4, §§5, 8.

19                              **CAUSES OF ACTION**

                                    **COUNT I**
20  **Violation of 3 U.S.C. §1, 2 U.S.C. §7, 2 U.S.C. §1; Elections Clause (U.S. Const. art. I, §4, cl.**
21  **1); Electors Clause (U.S. Const. art. II, §1, cl. 4); Supremacy Clause (U.S. Const. art. VI, §2)**

22      104.    Plaintiffs incorporate all their prior allegations.

23      105.    3 U.S.C. §1 provides that "[t]he electors of President and Vice President shall be

24  appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth

25  year succeeding every election of a President and Vice President."

26      106.    2 U.S.C. §7 provides that "[t]he Tuesday next after the 1st Monday in November, in

27  every even numbered year, is established as the day for the election, in each of the States and

28  Territories of the United States, of Representatives and Delegates to the Congress commencing on

                                        20

Amended Complaint for Declaratory and Injunctive Relief

1    the 3d day of January next thereafter."

2          107.    2 U.S.C. §1 provides that, "[a]t the regular election held in any State next preceding

3    the expiration of the term for which any Senator was elected to represent such State in Congress,

4    at which election a Representative to Congress is regularly by law to be chosen, a United States

5    Senator from said State shall be elected by the people thereof for the term commencing on the 3d

6    day of January next thereafter."

7          108.    This trio of statutes "mandates holding all elections for Congress and the Presidency

8    on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997).

9          109.    The word "election" in 3 U.S.C. §1 means the "combined actions of voters and

10   officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71.

11         110.    It is the consummation of the process of electing an official.

12         111.    By its terms then, 3 U.S.C. §1 requires that the 2020 general election be

13   consummated on Election Day (November 3, 2020).

14         112.    A mail ballot is not a legal vote unless it is marked and cast on or before Election

15   Day. Whatever latitude state legislatures retain under federal law to define the process of casting

16   mail ballots through the U.S. Postal Service, they cannot create a process where ballots mailed *after*

17   Election Day can be considered timely.

18         113.    Consistent with 3 U.S.C. §1, "the Voting Rights Act Amendments of 1970 require

19   that citizens be allowed to vote by absentee ballot in Presidential elections on or before the day of

20   the election." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 778 (5th Cir. 2000). *See* 52

21   U.S.C. §10502(d).

22         114.    "The regulations made by Congress are paramount to those made by the State

23   legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be

24   operative." *Foster v. Love*, 522 U.S. 67, 69 (1997). *See* U.S. Const. art VI, cl. 2 (Supremacy Clause).

25         115.    Section 20.2 of AB4 conflicts with 3 U.S.C. §1 by permitting absent ballots that

26   have not been postmarked to be counted if they are received by 5:00 pm three days after Election

27   Day (based on a presumption that those ballots were mailed on or before Election Day).

28         116.    Absent ballots are mailed to the county clerk for the county in which the voter

Amended Complaint for Declaratory and Injunctive Relief

1    resides.

2         117.    Absent ballots are delivered by the U.S. Postal Service via First Class mail.

3         118.    The estimated delivery time for First Class mail from one place in any Nevada

4    county to another place within the same county is typically less than three days.

5         119.    Section 20.2 of AB4 thus allows absent ballots to be cast after Election Day but still

6    counted as lawfully cast votes in the 2020 general election.

7         120.    Section 20.2 of AB4 is a particularly egregious violation of 3 U.S.C. §1 because it

8    allows for absentee ballots to be *cast* after Election Day.

9         121.    Federal law thus preempts Section 20.2 of AB4.

10        122.    Defendant has acted and will continue to act under color of state law to violate the

11   3 U.S.C. §1.

12        123.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

13   harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing

14   Section 20.2 of AB4.

15                              **COUNT II**
        **Violation of the Equal Protection Clause (42 U.S.C. §1983)**

16        124.    Plaintiffs incorporate all their prior allegations.

17        125.    "The right to vote is protected in more than the initial allocation of the franchise.

18   Equal protection applies as well to the manner of its exercise. Having once granted the right to vote

19   on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's

20   vote over that of another. It must be remembered that the right of suffrage can be denied by a

21   debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting

22   the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

23        126.    Sections 11 and 12 of AB4 violate the right to vote of rural voters by inhibiting their

24   ability to vote in person. More specifically, Sections 11 and 12 of AB4 authorize disparate treatment

25   of voters in rural counties with respect to the placement of polling places and vote centers for in-

26   person voting.

27        127.    Section 11 of AB4 outlines three categories of counties based upon total county

28

Amended Complaint for Declaratory and Injunctive Relief

population and directs the county clerk in each county to provide for a particular number of polling

places for early voting by personal appearance.

    a.  In a county whose population is 700,000 or more, at least 35 polling places for early

        voting by personal appearance, which may be any combination of temporary or

        permanent polling places for early voting.

    b.  In a county whose population is 100,000 or more but less than 700,000, at least 15

        polling places for early voting by personal appearance, which may be any

        combination of temporary or permanent polling places for early voting.

    c.  In a county whose population is less than 100,000, at least 1 permanent polling place

        for early voting by personal appearance.

128.    Section 12 of AB4 outlines three categories of counties based upon total county

population and directs the county clerk in each county to establish a particular number of polling

places as vote centers for the day of the election.

    a.  In a county whose population is 700,000 or more, [the county clerk] must establish

        at least 100 vote centers for the day of the election.

    b.  In a county whose population is 100,000 or more but less than 700,000, [the county

        clerk] must establish at least 25 vote centers for the day of the election.

    c.  In a county whose population is less than 100,000, [the county clerk] may establish

        one or more vote centers for the day of the election.

129.    Sections 11 and 12 discriminate against voters in rural counties by authorizing more

polling places and vote centers per capita in urban areas.

130.    For example, data from the Secretary of State shows that there are 319,212

registered voters in Washoe County. AB4 authorizes a minimum of 15 polling places in Washoe

County, or at least 1 polling place for every 21,281 registered voters in Washoe County.

131.    Several rural counties—where AB4 authorizes only 1 polling place each—have

substantially higher numbers of registered voters per polling place. For example, Lyon County (1

polling place per 40,816 registered voters) and Douglas County (1 polling place per 41,649

registered voters) have approximately twice as many registered voters per polling place as Washoe

Amended Complaint for Declaratory and Injunctive Relief

County. Several other rural counties have substantially higher numbers of registered voters per polling place than Washoe County:  Carson City: 1 polling place per 37,624 registered voters; Elko County: 1 polling place per 29,131 registered voters; Nye County: 1 polling place per 34,431 registered voters.

132.   Similarly, AB4 authorizes a minimum of 25 vote centers in Washoe County, or at least 1 vote center for every 12,768 registered voters.

133.   Several rural counties—where AB4 authorizes only 1 vote center each—have substantially higher numbers of people per vote center. For example, Lyon County: (1 vote center per 40,816 registered voters), Douglas County (1 vote center per 41,649 registered voters), and Carson City (1 vote center per 37,624 registered voters) all have approximately three times as many registered voters per vote center as Washoe County. Several other rural counties have substantially higher numbers of registered voters per vote center than Washoe County: Elko County: 1 vote center per 29,131 registered voters; Nye County: 1 vote center per 34,431 registered voters; Churchill County: 1 vote center per 15,987 registered voters.

134.   By limiting their ability to cast ballots via in-person voting through reduced numbers of polling places and vote centers, Sections 11 and 12 of AB4 engage in disparate treatment with respect to rural voters.

135.   "A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). AB4 infringes "the basic principle of equality among voters within a State … that voters cannot be classified, constitutionally, on the basis of where they live." *Id.* at 560.

136.   Sections 11 and 12 of AB4 thus violate the Equal Protection Clause.

137.   Defendant has acted and will continue to act under color of state law to violate the Equal Protection Clause of the Fourteenth Amendment.

138.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing Sections 11 and 12 of AB4.

Amended Complaint for Declaratory and Injunctive Relief

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III
### Violation of the Equal Protection Clause (42 U.S.C. §1983)

139.   Plaintiffs incorporate all their prior allegations.

140.   "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

141.   In particular, the Equal Protection Clause imposes a "minimum requirement for nonarbitrary treatment of voters" and forbids voting systems and practices that distribute election resources in "standardless" fashion, without "specific rules designed to ensure uniform treatment." *Bush v. Gore*, 531 U.S. 98, 105-06 (2000); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477-78 (6th Cir. 2008).

142.   The Supreme Court has instructed that the "formulation of uniform rules" is "necessary" because the "want of" such rules may lead to "unequal evaluation of ballots." *Bush v. Gore*, 531 U.S. 98, 106 (2000).

143.   Section 22 of AB4 requires each "county or city clerk" (as applicable) to "establish procedures for the processing and counting of mail ballots."

144.   Section 22 of AB4 provides no guidance or guardrails of any kind for the establishment of "procedures for the processing and counting of mail ballots."

145.   Section 22 thus violates the "minimum requirement for nonarbitrary treatment of voters" by authorizing "standardless" procedures for the processing and counting of mail ballots, without "specific rules designed to ensure uniform treatment." *Bush v. Gore*, 531 U.S. 98, 105-06 (2000).

146.   Further, Section 22 provides no "minimal procedural safeguards" to protect against the "unequal evaluation" of mail ballots. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

147.   Section 22 of AB4 instructs each county or city clerk that they "may authorize mail

Amended Complaint for Declaratory and Injunctive Relief

1    ballots to be processed and counted by electronic means."

2         148.    Nevada's counties thus have the option of processing and counting mail ballots by

3    either electronic means (of any kind, apparently) or manually.

4         149.    Section 22 thus expressly authorizes Nevada's counties to "use[] varying standards

5    to determine what [i]s a legal vote," contrary to the Equal Protection Clause. *Bush v. Gore*, 531

6    U.S. 98, 107 (2000).

7         150.    Section 22 of AB4 thus violates the Equal Protection Clause.

8         151.    Defendant has acted and will continue to act under color of state law to violate the

9    Equal Protection Clause of the Fourteenth Amendment.

10        152.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

11   harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing

12   Section 22 of AB4.

13                                   **COUNT IV**
                **Violation of the Equal Protection Clause (42 U.S.C. §1983)**

14        153.    Plaintiffs incorporate all their prior allegations.

15        154.    "The right to vote is protected in more than the initial allocation of the franchise.

16   Equal protection applies as well to the manner of its exercise. Having once granted the right to vote

17   on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

18   over that of another. It must be remembered that the right of suffrage can be denied by a debasement

19   or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free

20   exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

21        155.    In particular, the Equal Protection Clause imposes a "minimum requirement for

22   nonarbitrary treatment of voters" and forbids voting systems and practices that distribute election

23   resources in "standardless" fashion, without "specific rules designed to ensure uniform treatment."

24   *Bush v. Gore*, 531 U.S. 98, 105-06 (2000); *League of Women Voters of Ohio v. Brunner*, 548 F.3d

25   463, 477-78 (6th Cir. 2008).

26        156.    The Supreme Court has instructed that the "formulation of uniform rules" is

27   "necessary" because the "want of" such rules may lead to "unequal evaluation of ballots." *Bush v.*

28

Amended Complaint for Declaratory and Injunctive Relief

1    *Gore*, 531 U.S. 98, 106 (2000).

2        157.    Section 25 of AB4 provides that "[i]f two or more mail ballots are found folded

3    together to present the appearance of a single envelope," and "a majority of the inspectors are of

4    the opinion that the mail ballots folded together were voted by one person, the mail ballots must be

5    rejected." §25.2.

6        158.    Section 25 provides no guidance or guardrails of any kind for the establishment of

7    standards "a majority of inspectors" should apply to determine whether "the mail ballots folded

8    together were voted by one person."

9        159.    Section 25 thus violates the "minimum requirement for nonarbitrary treatment of

10   voters" by authorizing "standardless" procedures for determining the validity of multiple ballots

11   within a single envelope, without "specific rules designed to ensure uniform treatment." *Bush v.*

12   *Gore*, 531 U.S. 98, 105-06 (2000).

13       160.    Further, Section 25 provides no "minimal procedural safeguards" to protect against

14   the "unequal evaluation" of multiple ballots within a single envelope. *Bush v. Gore*, 531 U.S. 98,

15   109 (2000).

16       161.    Section 25 thus will result in Nevada's counties "us[ing] varying standards to

17   determine what [i]s a legal vote," contrary to the Equal Protection Clause. *Bush v. Gore*, 531 U.S.

18   98, 107 (2000).

19       162.    Section 25 of AB4 thus violates the Equal Protection Clause.

20       163.    Defendant has acted and will continue to act under color of state law to violate the

21   Equal Protection Clause of the Fourteenth Amendment.

22       164.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

23   harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing

24   Section 25 of AB4.

25                                 **COUNT V**
26                  **Violation of the Right to Vote (42 U.S.C. §1983)**

27       165.    Plaintiffs incorporate all their prior allegations.

28       166.    AB4, which upends Nevada's election laws and requires massive changes in

                                        27

Amended Complaint for Declaratory and Injunctive Relief

1    election procedures and processes, makes voter fraud and other ineligible voting inevitable.

2    167.   AB4 requires counties to accept and count ballots received after Election Day—

3    including ballots that may have been mailed after Election Day. §§20.1(b)(2), 20.2. It establishes a

4    disparate number of in-person places for early voting and Election Day voting throughout Nevada

5    based on a county's population, resulting in fewer in-person voting places for rural voters. §§11,

6    12. It fails to establish uniform statewide standards for processing and counting ballots, §22, or for

7    determining whether multiple ballots received in one envelope must be rejected, §25. It also

8    authorizes ballot harvesting. §21.

9    168.   The combined effect of those problematic provisions is to dilute Nevadans' honest

10   votes. Dilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes

11   violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226-27; *Baker*, 369

12   U.S. at 208.

13   169.   The aspects of AB4 identified above facilitate fraud and other illegitimate voting

14   practices for the reasons described above. Those provisions thus dilute the value of honest, lawful

15   votes and therefore violate the Fourteenth Amendment to the U.S. Constitution.

16   170.   Defendant has acted and will continue to act under color of state law to violate the

17   Fourteenth Amendment.

18   171.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

19   harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing

20   AB4.

21   **WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and provide the

22   following relief:

23   a.  A declaratory judgment that AB4 violates 2 U.S.C. §§1, 7 and 3 U.S.C. §1, the Elections

24       Clause, the Electors Clause, the Supremacy Clause, and the Fourteenth Amendment.

25   b.  A permanent injunction prohibiting Defendant from implementing and enforcing AB4;

26   c.  A temporary restraining order and preliminary injunction granting the relief specified

27       above during the pendency of this action;

28   d.  Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

Amended Complaint for Declaratory and Injunctive Relief

e.   All other preliminary and permanent relief that Plaintiffs are entitled to, and that the Court deems just and proper.

Dated: August 20, 2020                    Respectfully submitted,


                                          */s/ J. Colby Williams*
                                          CAMPBELL & WILLIAMS
                                          DONALD J. CAMPBELL, ESQ. (1216)
                                          J. COLBY WILLIAMS, ESQ. (5549)
                                          700 South 7th Street
                                          Las Vegas, Nevada 89101
                                          Telephone: (702) 382-5222
                                          Facsimile: (702) 382-0540
                                          djc@cwlawlv.com
                                          jcw@cwlawlv.com

                                          CONSOVOY MCCARTHY PLLC
                                          WILLIAM S. CONSOVOY, ESQ.**
                                          Virginia Bar No. 47704
                                          THOMAS R. MCCARTHY, ESQ.*
                                          Virginia Bar No. 47145
                                          TYLER R. GREEN, ESQ.*
                                          Utah Bar No. 10660
                                          CAMERON T. NORRIS, ESQ.**
                                          Virginia Bar No. 91624
                                          1600 Wilson Boulevard, Suite 700
                                          Arlington, VA 22209
                                          Telephone: (703) 243-9423
                                          will@consovoymccarthy.com
                                          tom@consovoymccarthy.com
                                          tyler@consovoymccarthy.com
                                          cam@consovoymccarthy.com

                                          *Attorneys for Plaintiffs*

                                          **Admitted pro hac vice*
                                           ***Pro hac vice pending*

Amended Complaint for Declaratory and Injunctive Relief

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of August, 2020 a true and correct copy of the foregoing Amended Complaint for Declaratory and Injunctive Relief was served via the United States District Court's CM/ECF system on all parties or persons requiring such notice.

By: _/s/ J. Colby Williams_____
An employee of Campbell & Williams

30

Amended Complaint for Declaratory and Injunctive Relief