AARON D. FORD
 Attorney General
GREGORY L. ZUNINO, Bar No. 4805
 Deputy Solicitor General
CRAIG A. NEWBY, Bar No. 8591
 Deputy Solicitor General
State of Nevada
100 N. Carson Street
Carson City, Nevada 89701-4717
Tel: (775) 684-1237
E-mail:  gzunino@ag.nv.gov

*Attorneys for Barbara Cegavske*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; and NEVADA REPUBLICAN PARTY,<br><br>                    Plaintiffs,<br><br>vs.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,<br><br>                    Defendant. | Case No.  2:20-cv-01445<br><br>**DEFENDANT SECRETARY OF STATE BARBARA CEGAVSKE'S MOTION TO DISMISS** |

Defendant Barbara Cegavske, in her capacity as Nevada Secretary of State, by and through counsel, Aaron D. Ford, Attorney General, Gregory L. Zunino, Deputy Solicitor General, and Craig Newby, Deputy Solicitor General, hereby moves to dismiss Plaintiffs' Amended Complaint (ECF No. 29).  Dismissal is sought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiffs have failed to satisfy Article III's standing and ripeness requirements, thus divesting the Court of jurisdiction over their claims·

…

…

…

**POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiffs filed their original Complaint on August 4, 2020 (ECF No. 1). Defendant Secretary of State Barbara Cegavske (Secretary) filed a Motion to Dismiss their Complaint on August 10, 2020 (ECF No. 10), arguing that Plaintiffs lack standing to challenge Nevada's vote-by-mail election system. Instead of responding to the Motion to Dismiss, Plaintiffs filed an Amended Complaint on August 20, 2020 (ECF No. 29). But it fares no better, and it, too, must be dismissed for the reasons stated below.

Indeed, the debate over voting by mail now dominates the 24-hour news cycle. Advocates for vote-by-mail legislation argue that it is necessary to fully enfranchise voters and mitigate the public health threat posed by the current pandemic.  Opponents argue that vote-by-mail processes are vulnerable to voter fraud.  These competing arguments amount to a public policy debate, not a legal debate.  And when this case is stripped of the legal jargon and litigious tone, it becomes clear that the Amended Complaint (ECF No. 29) presents a simple policy disagreement about how best to balance voter access concerns against election integrity concerns.

Of course, there is value in public debate about the policy wisdom of vote-by-mail election systems.[1]  But any assertion that the legislation will substantially increase voter fraud is speculative.  Consequently, the debate about vote-by-mail should be carried out in a non-judicial forum, allowing the Secretary to use critical public resources to ensure a free and fair 2020 election, rather than be consumed by discord. Avoiding generalized policy disputes is precisely what the standing requirement of Article III, § 2 of the U.S. Constitution requires.

…

---

[1] In fact, the Secretary opposed the legislation at issue in this case due, in part, to the high cost of mailing ballots to all active, registered voters while simultaneously standing up a significant number of physical polling locations relative to previous elections.

For example, other states, such as Utah, Colorado, Oregon, Hawaii and Washington have adopted vote-by-mail election processes. Utah Code Ann. § 20A-3a-302; Colo. Rev. Stat. § 1-5-401; Ore. Rev. Stat. § 254.465; Hawaii Stat. § 11-101; Rev. Code of Wash. 29A.40.010. And Florida, among many other states,[2] has adopted a no-excuse absentee system whereby any voter may cast a vote by mail after having simply requested a paper ballot. Fl. Stat. § 101.62. Given the fears surrounding the pandemic, these voting systems have great potential to prompt widespread voting by mail in the 2020 general election, whether by absentee ballot or vote-by-mail processes.

In this lawsuit, President Donald J. Trump draws a distinction between absentee voting, which he apparently finds unobjectionable, and vote-by-mail election systems (ECF No. 29 at ¶ 41). Without evidence, he claims that vote-by-mail systems are vulnerable to voter fraud because of how voters receive their paper ballots. According to the President, the voter's affirmative request for an absentee ballot allows election officials to verify the identity of the voter, while a ballot mailed unsolicited to a voter can be intercepted by fraudsters (ECF No. 29 at ¶43). This speculative assertion about ballot interception ignores the processes that are in place to verify a person's identity after the person returns the ballot to election officials. Given Nevada's processes for verifying voter identity at the polls, the distinction between absentee voting and vote-by-mail is meaningless. Indeed, this case in unique among other lawsuits filed by President Trump around the country because it challenges the constitutionality of legislation, not administrative action or executive orders. Here, the legislation is consistent in all materials respects with the laws of the other vote-by-mail states mentioned above.

Recently enacted by Assembly Bill No. 4 of the 32nd (2020) Session of the Nevada Legislature (AB 4), Nevada's vote-by-mail processes replace the "mailing precincts" that were implemented for the 2020 primary election. *Compare* NRS §§ 293.343-.355 *with* AB

---

[2] The website of the National Conference of State Legislatures lists twenty-nine states in addition to Florida as offering no-excuse absentee voting. *See* https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx, last accessed on August 10, 2020.

4 at §§ 2-27. Further complicating election preparation, the Republican National Committee (RNC) and the Nevada Republican Party (NVGOP) have joined this litigation. Collectively, Trump, Inc., the RNC and the NVGOP (Plaintiffs) allege that the votes of Republican voters will be unconstitutionally diluted by Nevada's vote-by-mail election processes (ECF No. 29 at ¶¶ 6, 31, 32, 34, 102, 125, 140, 154, 168 and 169). Additionally, Plaintiffs allege that a lack of uniformity in Nevada's election processes and procedures will cause differential treatment of voters, thus violating their rights under the Equal Protection Clause (ECF No. 29 at ¶¶ 5, 30, 35-37, 100, 101, 125, 135-137, 140, 141, 149-151, 154, 155, 161-163). Finally, Plaintiffs allege that Nevada law conflicts with federal law by changing the date of the national Election Day, as established by 2 U.S.C. §§ 1, 7, and 3 U.S.C. § 1 (ECF No. 29 at ¶¶ 94-97, 104-123).

None of these claims gives rise to a cognizable injury, as required by Article III's standing requirement, because none is accompanied by factual allegations supporting a reasonable inference that a person's vote will actually be diluted as a result of the processes and procedure under scrutiny in Nevada. None of the claims gives rise to a cognizable injury for the additional reason that none is accompanied by factual allegations supporting a reasonable inference that Nevada voters will be subject to differential treatment.[3] Furthermore, because their claims lack legal merit, Plaintiffs cannot meet Article III's standing requirement even if they were to make yet another amendment to their original complaint. To the extent Plaintiffs' equal protection claims suggest that Nevada will experience unforeseeable problems with election administration at the local level, these claims are not ripe for review. Additionally, because the claims seek to have this Court impose upon Nevada a top-down system of election administration, they are barred by the Tenth Amendment and principles of federalism.

---

[3] As discussed below, Plaintiffs lack standing because they speculate, without factual support, that various administrative problems will arise during the 2020 general election due to discretionary decisions by election officials. Though it is conceivable that some administrative challenges may arise during the 2020 election, as they do in every election, Plaintiffs' claims cannot reasonably be stated with any factual specificity until after the election. For this reason, their claims fail both the standing and ripeness requirements of Article III.

**A.**     **Summary of Allegations and Defenses.**

Plaintiffs challenge specified sections of AB 4 as they relate to the 2020 general election.   Plaintiffs are not Nevada voters, but they clearly seek to represent Nevada Republican voters by way of this lawsuit (ECF No. 29 at ¶¶ 14-20). They allege five causes of action.

**Count I** argues that section 20(2) of AB 4 is preempted by federal law (ECF No. 29 at ¶¶ 104-123).   As discussed below, section 20(2) has a companion provision that predates the enactment of AB 4. NRS § 293.317.  Plaintiffs concede that state law governs election processes for federal elections unless preempted by Congressional enactment (ECF No. 29 at ¶¶ 22 and 23). Section 20(2) establishes a presumption that a mailed ballot received within 3 days after the election was cast on or before the date of the election if the ballot envelope bears no postmark.  Plaintiffs argue that section 20(2) conflicts with federal law because it effectively pushes back national Election Day.  Even if this strained reading of federal law were correct, which it is not, section 20(2) has caused no injury to Plaintiffs yet, if ever.

**Count II** argues that sections 11 and 12 of AB 4 violate the Equal Protection Clause because they treat rural voters differently than urban voters.  Sections 11 and 12 do this, according to Plaintiffs, by affording urban voters more physical polling places on a per capita basis (ECF No. 29 at ¶¶ 100, 124-138).   But sections 11 and 12 require only that a *minimum* number of physical polling locations be placed in each of Nevada's counties. Sections 11 and 12 do not preclude local election officials in the rural counties from establishing a greater number of physical polling places than the required minimums. Far from discriminating against rural voters, sections 11 and 12 give local elections officials the flexibility to adapt to rural needs and conditions.  Sections 11 and 12 have caused no injury to Plaintiffs yet, because there is no evidence or allegation that rural election officials will fail to establish physical polling places sufficient in number to meet the needs of in-person voters.

**Count III** argues that section 22 of AB 4 violates the Equal Protection Clause because it gives local election officials too much discretion to "establish procedures for the processing and counting of mail ballots" (ECF No. 29 at ¶¶ 101, 139-152). Plaintiffs speculate that local election officials will adopt counting and processing rules that differ significantly from those adopted by their colleagues in other counties, thus subjecting voters to arbitrary treatment in the aggregate. Far from subjecting voters to arbitrary treatment in the aggregate, section 22 facilitates uniformity in the application of statutes that might otherwise have a remote potential to burden or disenfranchise voters in certain counties or localities. Section 22 facilitates uniformity in the application of the law by giving local elections officials the flexibility to adapt to local needs and conditions as they administer Nevada's election statutes. Section 22 has caused no injury to Plaintiffs.

**Count IV** argues that section 25 of AB 4 violates the Equal Protection Clause because it provides a vague directive to local elections officials regarding the obligation to discard two ballots that have been folded together in a single envelope (ECF No. 29 at ¶¶ 102, 153-164). As with their claim in Count III, Plaintiffs speculate that local election officials will, from one county to the next, apply inconsistent standards for determining whether to discard or accept certain ballots received in the mail under rare and unusual circumstances. As discussed below, section 25 has an obscure companion provision that predates the enactment of AB 4 by sixty years. NRS § 293.363. As a practical matter, section 25 will rarely if ever result in the acceptance of two ballots that are folded together in a single envelope. Accordingly, it does not yet pose a threat of vote dilution. Moreover, Plaintiffs do not complain that section 25 has the potential to disenfranchise voters who improperly enclose two or more ballots in a single envelope. Section 25 has caused no injury to Plaintiffs.

**Count V** alleges that sections 11, 12, 20(2), 22 and 25, when considered together in light of a modification to an existing criminal prohibition against using ballot couriers, see AB 4 at § 21, collectively present a threat of vote dilution (ECF No. 29 at ¶¶ 165-171).

1   Plaintiffs speculate that these sections of AB 4 increase the risk of voter fraud, thereby

2   diluting "honest" votes (ECF No. 29 at ¶ 168).   Plaintiffs fail to acknowledge, however,

3   that existing provisions of Nevada law provide ample deterrents to, and protections

4   against, voter fraud. Plaintiffs' objections to AB 4 are based upon policy arguments, not

5   constitutional infirmities in state law.   Sections 11, 12, 20(2), 21, 22 and 25 have caused

6   no injury to Plaintiffs.

7        **B.     Summary of AB 4.**

8        Due to the COVID-19 pandemic, the Nevada Legislature made changes to Nevada's

9   existing mail-in processes through its enactment of AB 4.   These modest changes apply to

10   an election occurring during a declared state of emergency or disaster, including the 2020

11   general election. AB 4 at §§ 5 and 8.   Prior to the pandemic, Nevada offered voters the

12   ability to vote absentee without providing an excuse or justification.   To cast a vote by

13   mail, voters simply had to request an absentee ballot. NRS §§ 293.3038-.340.

14   Additionally, voters in remote rural areas could be grouped together in "mailing

15   precincts" and automatically mailed their paper ballots. NRS §§ 293.343-.355.   For the

16   2020 primary election, Nevada's state and local election officials expanded mailing

17   precincts to encompass the entire state.   The decision to expand mailing precincts was the

18   subject of a similar lawsuit asserting vote dilution as the source of alleged injuries to

19   individual voters.   In that case, Judge Miranda Du denied the voters' request for a

20   preliminary injunction.   Judge Du denied the request for injunctive relief because the

21   voters were unable to demonstrate their standing to challenge mail-in voting processes

22   under a theory of vote dilution.   *Paher v. Cegavske*, __F. Supp.3d __, 2020 WL 2089813, *5

23   (D. Nev. 2020). Judge Du described Nevada's preparations for the 2020 primary election

24   as follows:

25            Under the Plan, all active registered voters will be mailed an
             absentee ballot (mail-in ballot) for the primary election. If a
26            voter is registered to vote at his or her current address, they
             need not take any further action to receive an absentee ballot. ...
27            Nevada's governing statutes provide for mailing precincts—
             specifically NRS §§ 293.343 through 293.355. Through these
28            provisions, the Nevada Legislature has given the Secretary and

> county clerks authority to mail ballots to registered voters rather than requiring voters to request those ballots through the absent ballot process.

*Id*. at *2, *3.

Little has changed since the *Paher* plaintiffs attempted to disrupt the 2020 primary election by advancing claims such as those at issue here. Although Nevada's vote-by-mail processes have now been enacted through legislation, as opposed to being implemented through administrative action, the details for the 2020 general election remain essentially the same as those for the 2020 primary election. Rather than approving another temporary expansion of mailing precincts for the 2020 general election, AB 4 simply directs local election officials to mail paper ballots to all active registered voters in the state whenever the Governor has declared a state of emergency or disaster. AB 4 at § 15. As a practical matter, AB 4 adopted a plan like that which had been used for the primary election. Plaintiffs parse what they perceive to be modifications that undermine the uniformity of election administration from one county to the next. These include sections 11, 12, 20(2), 22 and 25 of AB 4 (ECF No. 29 at ¶¶ 5, 100, 101, 136, 149 and 161).

While they couch their lawsuit as a challenge to AB 4, Plaintiffs attack two provisions of existing Nevada law. Sections 20(2) and 25 already appeared in statute at NRS §§ 293.317 and .363. While NRS § 293.317 became effective on January 1, 2020, *see* Act of June 14, 2019, ch. 619, §§ 45 and 152, 2019 Nev. Stat. 4079 and 4144, the provisions of NRS § 293.363 date all the way back to 1960, *see* Act of March 14, 1960, ch. 157, §131, 1960 Nev. Stat. 259. Respectively, these sections address the 3-day postal delivery presumption for ballots that bear no postmark, and the rare situation where two ballots are folded together in a single envelope. To support their nebulous argument that AB 4 increases the probability of voter fraud, Plaintiffs claim that these unremarkable provisions of *existing* law: (1) "provide[] no guidance or guardrails for the establishment of standards" (ECF No. 29 at ¶144), *see* NRS 293.363; and (2) "allow[] absent ballots to be cast after Election Day but still counted as lawfully cast votes in the 2020 general

election" (ECF No. 29 at ¶ 119), *see* NRS 293.317.   However, sections 20(2) and 25 of AB 4 merely duplicate the provisions of existing law, such that they are now applicable to affected elections in addition to regular elections.   As duplicate provisions of existing law, they cannot logically be the source of an increased risk of fraud resulting from the enactment of AB 4.

Although sections 11, 12 and 22 are new, they do not increase or decrease the risk of voter fraud.   They merely establish a minimum number of physical polling locations in each county (§§ 11 and 12), and give discretion to local election officials regarding the adoption of procedures for counting and processing paper ballots (§ 22). And section 25, which duplicates existing law, addresses the rare situation where two voters enclose their ballots in a single envelope.   Ironically, sections 11, 12 and 22 have nothing to do with ballot verification, and section 25 is only tangentially related to ballot verification. Plaintiffs' argument that these provisions increase the risk of voter fraud is based upon an unintelligible thread of causation which assumes that local election officials will not capably perform their jobs.

## II.     STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows defendants to seek dismissal of a claim or action for a lack of subject matter jurisdiction.   Dismissal under Rule 12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on its face that are sufficient to establish subject matter jurisdiction.   *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 984–85 (9th Cir. 2008).

Although the defendant is the moving party in a motion to dismiss brought under Rule 12(b)(1), the plaintiff is the party invoking the court's jurisdiction.   As a result, the plaintiff bears the burden of proving that the case is properly in federal court. *McCauley v. Ford Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).   Federal courts are courts of limited …

1   jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  A federal

2   court is presumed to lack jurisdiction in a case unless the contrary affirmatively appears.

3   *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225

4   (9th Cir. 1989).  Thus, federal subject matter jurisdiction must exist at the time an action

5   is commenced.  *Mallard Auto. Grp., Ltd. v. United States*, 343 F. Supp. 2d 949, 952 (D.

6   Nev. 2004).

7          Article III, § 2 of the U.S. Constitution states that the federal courts may only

8   adjudicate "Cases" and "Controversies".  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

9   559 (1992). The case-or-controversy requirement of Article III requires that Plaintiffs

10  establish their "standing" as a jurisdictional prerequisite to the prosecution of this

11  lawsuit.  *Clapper v. Amnesty International USA*, 586 U.S. 398, 408 (2013).  As Judge Du

12  previously held, *see Paher*, 2020 WL 2089813, *5, plaintiffs who express policy-based

13  concerns about voter fraud do not typically have standing, in advance of an election, to

14  pursue claims that that their votes will be diluted in violation of rights guaranteed by the

15  Fourteenth Amendment.  This is because such claims are "speculative, unsupported, and

16  not particularized." *Id*.  At this early point in the election cycle, no votes have even been

17  counted.  Until the votes have been counted and the 2020 general election has run its

18  course, it is impossible to know whether anyone's vote will have been diluted.  Plaintiffs

19  imply that the election-integrity and anti-fraud measures in place for the 2020 general

20  election are not sufficiently robust to prevent voter fraud (ECF No. 29 at ¶ 42).  However,

21  having failed to articulate an injury that is sufficiently concrete and particularized to

22  justify a radical judicial intervention in the 2020 general election, Plaintiffs offer no good

23  reason why the Court should entertain their causes of action.

24         Ultimately, the search for the proper balance between voter access and election-

25  integrity considerations is a matter for policy makers and legislators, not federal courts.

26  Plaintiffs' Complaint should be dismissed on the ground that the Court lacks subject

27  matter jurisdiction over their claims.

28  …

-10-

## III.    ARGUMENT

### A.    Plaintiffs Fail to Satisfy Basic Principles of Standing.

Article III, § 2 empowers the federal judiciary to hear only "Cases" and "Controversies", not policy debates. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). To demonstrate standing, Plaintiffs must articulate enough facts to show that their alleged injury is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). Additionally, they must show a "causal connection" between the alleged injury and the conduct about which they complain. *Id.* As a final matter, Plaintiffs may not offer mere speculation that a decision in their favor, namely a decision enjoining the implementation of AB 4, will redress the supposed vote dilution and disparate voter treatment that will occur if voters are permitted to cast their votes by mail. *Id.* at 561. *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 110–112 (1983).

According to Plaintiffs, it is a "common-sense conclusion" that increased voting by mail increases the probability of voter fraud (ECF No. 29 at ¶ 76). Yet, there is no evidence of voter fraud in other states that have increased voting by mail, even in these emotionally-charged, hyper-partisan times. Indeed, there are countless variables that can theoretically contribute to increased voter fraud in any given election. Consequently, standing must be based upon a particularized injury, not a presumed injury that is common to the electorate in general. The alleged injury in this case is hypothetical, not actual or imminent, and cannot possibly be traced from individual voters to increased vote-by-mail participation by the Nevada electorate.

Based upon past experience, and given Nevada's long history of voting in person coupled with the significant number of physical polling places that will be open during early voting and on Election Day, *see* AB 4 at §§ 11 and 12, it is likely that the vast majority of Nevada voters will choose to surrender their paper ballots to poll workers and vote in person. This surrender process, described at section 18 of AB 4, undermines Plaintiffs' argument that unsecured or discarded ballots will find their way into the hands

of fraudsters.   Plaintiffs' argument assumes that fraudsters will not only intercept unsecured and discarded ballots, but sign and deposit them in the mail in violation of multiple criminal prohibitions.   This assumption is not the type of "fairly traceable" scenario that *Lujan* contemplates as a condition of standing.   According to *Lujan*, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." 504 U.S. at 560-61 (brackets in original, *quoting Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)).   Here, the thread of causation between AB 4 and vote dilution is much too tenuous to support standing.

Additionally, the signature verification process described at section 23 of AB 4 further undermines Plaintiffs argument that fraudulent votes will be accepted by poll workers even if their assumption about discarded ballots is given minimal credence.   In summary, it is virtually impossible to predict with a reasonable degree of confidence, and there is no evidence from other states, that voting by mail will result in an statistically-significant increase in voter fraud.   Far too many variables influence human behavior to warrant the Court's pre-election intervention in the 2020 general election.

Finally, Plaintiffs must demonstrate standing separately for each form of relief sought.   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC), Inc., 528 U.S. 167, 185 (2000).   Plaintiffs seek injunctive and declaratory relief with respect to each of their five causes of action (ECF No. 29 at pp. 28-29).   These are prospective remedies that assume voter fraud will occur specifically as the result of AB 4, and that it will impact discrete voters and not simply the electorate as a group.   Cited repeatedly by Plaintiffs in support of their claims (ECF No. 29 at ¶¶ 35-37, 125, 123, 124, 140-142, 145, 146, 149, 154-156 and 159-161), *Bush v. Gore* has little persuasive value because it was issued *per curiam*, indicating that it was fact specific.   *See* 531 U.S. 98 (2000). Further, *Bush v. Gore* addressed a post-election situation, specifically the now infamous "hanging chad" situation, which was qualitatively different than any conceivable election outcome in

1   Nevada. *Id.* at 105-07.  *Bush v. Gore* does not even remotely support Plaintiffs' request for

2   a pre-election order enjoining the distribution of mail-in ballots to Nevada's voters.

3         *Bush v. Gore* is inapposite because Plaintiffs have identified no situation where

4   election officials would conceivably be counting paper ballots, with perforations as

5   indicators of candidate selection, while using no clear standards for evaluating the

6   significance of those perforations.  Indeed, Nevada's elections officials universally employ

7   electronic scanning equipment to evaluate candidate selections on paper ballots.  *See* AB

8   4 at § 22.  There is no factual basis for Plaintiffs' speculative assertion that election

9   officials will use arbitrary methods of counting ballots or discarding ballots.  Plaintiffs'

10  Complaint should be dismissed on the ground that they have failed to demonstrate

11  standing.

12        **B.    Trump, Inc. Fails to Satisfy the Requirements for Organizational**
            **Standing.**
13

14        Despite the addition of new allegations in the Amended Complaint, plaintiff

15  organization Trump, Inc. still fails to establish standing.  As an organization, Trump, Inc.

16  bears the burden of showing either direct standing based on an injury to the organization,

17  or representative standing based on an injury to its members.  *See, e.g., Havens Realty*

18  *Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Hunt v. Wash. State Apple Advertising*

19  *Comm'n*, 432 U.S. 333, 342 (1977).

20        Trump, Inc. appears to assert a theory of direct standing based on a supposed

21  injury to the organization, as opposed to the presidential candidate whom the

22  organization represents (ECF No. 29 at ¶ 11).  "An organization has 'direct standing to

23  sue [when] it show[s] a drain on its resources from both a diversion of its resources and

24  frustration of its mission.'"  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir.

25  2013) (quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666

26  F.3d 1216, 1219 (9th Cir. 2012)).  The apparent mission of Trump, Inc., "the principal

27  committee for President Donald J. Trump's reelection campaign," is to secure President

28  Trump's reelection (ECF No. 29 at ¶ 11) ("The committee spends resources . . . in Nevada

to encourage Nevadans to reelect the President.")).   However, the Amended Complaint fails to explain how AB 4 frustrates this mission.

In particular, there are no allegations that any supposed vote dilution will disadvantage the Trump campaign in the upcoming general election.   An organization cannot establish direct standing by "simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.   It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol Inc.*, 732 F.3d at 1018 (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).   Even if the prospect of vote dilution and/or disparate treatment of voters were more than conjecture, the Amended Complaint contains no explanation as to why this disadvantages the Trump campaign and not the Biden campaign.

Insofar as Trump, Inc. suggests that it may have standing to sue in a representative capacity, it has failed to satisfy the requirements for representative standing.   An organization has representative standing to "sue on behalf of its members when 'its members would otherwise have standing to sue in their own right,' and when 'the interests it seeks to protect are germane to the organization's purpose.'" *Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020) (*quoting Hunt*, 432 U.S. at 343).[4]   The Amended Complaint fails to identify any Trump, Inc. members with standing, and further fails to explain how Trump, Inc. is seeking to protect interests germane to its purpose of ensuring President Trump's reelection.   By its own admission, Trump Inc. does not represent Nevada voters. With a mission "to achieve its electoral and political goals" of reelecting President Trump (ECF No. 29 at ¶ 11), President Trump's campaign organization represents Donald J. Trump and only Donald J. Trump.   By definition, a campaign organization that serves as the "principal committee" for a candidate for federal office is simply a pot of money earmarked for the support of its namesake's candidacy.

---

[4] There is also a third, prudential element: "neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt*, 432 U.S. at 343; *Sierra Club*, 963 F.3d at 884 n.10.

*See* 52 U.S.C. § 30102. Since Trump, Inc. has not alleged any electoral or political disadvantage resulting from AB 4, the Court should dismiss Trump, Inc. from this action.

### C. Nevada's Postmark Presumption Has Not Caused Plaintiffs an Injury.

In Count I of the Complaint, Plaintiffs argue that section 20 of AB 4 conflicts with federal law in regards to the timing of Election Day (ECF No. 29 at ¶¶ 104-123). Section 20 sets forth the timelines for when a mail ballot in an affected election will be counted, including those ballots which lack a legible postmark. Notably, the timelines in AB 4 mirror those for mail ballots in normal elections,[5] and Plaintiffs did not challenge those provisions when they were adopted, nor do they challenge them now.

Section 20 requires mail ballots to be delivered by hand to the election official, dropped in a designated drop box, or mailed to the election official by the date of the election. *Id.* If a ballot has a legible postmark showing that it was mailed after Election Day, it will not be counted. *Id.* Subsection 2 provides a procedure to process ballots without a legible postmark, a situation that Plaintiffs assert may be more prevalent when a person mails an envelope where the postage was prepaid, as is the case with mail ballots. AB 4, § 20. Specifically, if a ballot without a determinable postmark is received by 5 p.m. on the third day following the election, it will "be deemed to have been postmarked on or before the day of the election." *Id.*

Plaintiffs' first cause of action challenges the straightforward and commonsense provisions of subsection 2, arguing that it *might* allow ballots mailed after Election Day to be counted. They base this speculative conclusion on the unsupported "estimated" delivery time of mail within counties in Nevada to "typically" be less than 3 days (ECF No. 29 at ¶ 118). Plaintiffs' unsubstantiated assertions fail to show that they have suffered "an invasion of a legally protected interest" that is "concrete and particularized"

---

[5] *See* NRS 293.317(2) ("If an absent ballot is received not more than 3 days after the day of the election and the date of the postmark cannot be determined, the absent ballot shall be deemed to have been postmarked on or before the day of the election.").

and "actual or imminent, not conjectural or hypothetical," and thus fail to establish an injury in fact. *Lujan,* 504 U.S., at 560 (internal quotation marks omitted).

Plaintiffs do not assert—nor can they—any personal injury to them by Nevada election officials deeming ballots without a determinable postmark and received by the third day after the election as having been postmarked by Election Day. *Id.* at n.1; *see also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins,* 578 U.S. ___, ___, 136 S. Ct. 1540, 1548 (2016) (citing *Black's Law Dictionary* 479 (9th ed. 2009)).   Abstract conjecture is not sufficient.   *Id.*   Plaintiffs' argument that some completed ballots *may* be mailed after election day, *may* not be postmarked, *may* be received before 5 p.m. on the third day following election day, and then *may* somehow dilute the votes of Nevada voters—a group to which no Plaintiff belongs—does not demonstrate a concrete injury to anybody, and certainly not to Plaintiffs.[6]

There are any number of alternative hypothetical scenarios that are as likely, or more so, than Plaintiffs' assertion of what *may* happen with respect to mail ballots in the 2020 election.   These alternatives underscore the speculative nature of their claims. Plaintiffs' own assertion—unsupported by any authority—is that most mail sent from one address in a county to another address in that county will arrive in one to two days. Thus, Plaintiffs presumably admit the validity of ballots that are received within that window of time.   There is no way to know before the election exactly how many ballots lacking an identifiable postmark will arrive on the third day after the election—the number may well be zero, in which case, under Plaintiffs' own theory, no injury would

---

[6] Indeed, if speculation about possible outcomes could be said to demonstrate concrete injuries, it must be noted that Plaintiffs' suggested remedy has the potential to inflict injury by disenfranchising voters who timely cast their ballots. According to Plaintiffs' own assertions and desired outcome, if a voter mails his completed ballot on election day and that ballot is not postmarked but is received by the election official within a day or two, as Plaintiffs assert it "typically" would, his vote would not be counted.

occur.  To the extent engaging in speculation is entertained, it should be noted that this scenario appears more likely than one in which a vast number of ballots arrive on the third day after the election with no legible postmark: "[A]lthough the USPS does not generally postmark prepaid mail, the USPS has a longstanding policy of postmarking election mail, including absentee ballot return envelopes."  *Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *4 (S.D.N.Y. Aug. 3, 2020).

Further, "a person's right to vote is individual and personal in nature," and only "voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." *Gill v. Whitford*, 585 U.S. ___, ___, 138 S. Ct. 1916, 1929 (2018) (internal quotation marks omitted). Plaintiffs, who are entities, not individuals, will not be voting in any election, much less Nevada's.

Even if Plaintiffs were allowed to pursue their speculative claims on behalf of actual Nevada voters, their professed concern about the "dilution" of votes is a general concern about the conduct of government, which cannot create standing to challenge subsection 2.  *Paher*, 2020 WL 2089813, at *5 ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter.  Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury.").

Finally, none of the statutes or constitutional provisions relied upon by Plaintiffs confer any federal rights nor provide a private right of action to litigants.  *See Alexander v. Sandoval,* 532 U.S. 275, 286-87 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").  Nor does the Supremacy Clause confer upon Plaintiffs the right to litigate an alleged conflict between section 20(2) of AB 4 and the federal laws setting the date of Election Day.  *Armstrong v. Exceptional Child Care, Inc.*, 575 U.S. 320, 324-26 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action.").  Accordingly, as Plaintiffs have no basis on which to pursue a claim based upon principles of federal preemption, Count I must be dismissed.

**D.** **Sections 11 and 12 of AB 4 Do Not Violate Equal Protection; They Simply Afford Local Election Officials the Discretion to Establish an Appropriate Number of Polling Locations in Their Respective Counties.**

In Count II of the Complaint, Plaintiffs argue that sections 11 and 12 of AB 4 violate the Equal Protection Clause by requiring fewer polling places in rural counties than in urban counties.   According to Plaintiffs, these sections "authorize disparate treatment of voters in rural counties with respect to the placement of polling places and vote centers for in person voting" (ECF No. 29 at ¶ 126).  To the contrary, these provisions authorize election officials to establish as many polling places and vote centers as are necessary to comfortably accommodate the needs of voters in rural counties.  The figures in question set a floor, not a ceiling, on the number of physical polling places that must be established in each county.  This gives each of Nevada's rural counties the flexibility to adjust to local conditions and circumstances without unnecessarily consuming public resources.

In a rural county, for example, there may be relatively predictable voter turnout from one election cycle to the next.   In urban counties, the opposite may be true. Additionally, there may be a relatively large percentage of voters in rural counties who are already accustomed to voting by mail because of mailing precincts and consistent absentee voting.   Population density, population growth, traffic congestion and other physical and geographic factors may also influence in-person voter turnout.   Simply stated, in-person voter turnout may be more predictable in rural counties than in urban counties.  In counties with more predictable turnout, the local election officials have a better grasp of the physical resources they will need to accommodate in-person turnout. It makes perfect sense that such counties would be subject to lower minimum requirements.

In summary, local election officials must have the discretion to establish an appropriate number of polling locations at or above the minimums described in sections 11 and 12 of AB 4.  It does not follow that smaller per-capita minimums will have a

disparate impact upon rural voters.   Indeed, there is no inequity in setting a larger minimum requirement, on a per capita basis, in urban counties.   This simply reflects a legislative determination that greater population density exacerbates the spread of the Coronavirus, while a wider distribution of polling locations and vote centers will tend to mitigate that spread.   Clearly, there is a rational basis for setting higher minimum requirements in urban counties.   For challenged voting statutes to have a rational basis, "all that is required is that the restrictions 'bear some rational relationship to a legitimate state purpose.... [T]he Equal Protection Clause is offended only if the state's classification rests on grounds wholly irrelevant to the achievement of the State's objective.'" *St. Louis County, Mo. v. City of Town and Country*, 590 F. Supp. 731, 738   (E.D. Mo. 1984) (brackets in original, *quoting Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70-71 (1978)).

Plaintiffs' preference for per-capita equality in polling location numbers is a misplaced oversimplification of a complex system of election administration, not to mention poor public policy.   Nevada's system of election administration is partially decentralized because it works for Nevada.   There is no factual basis for Plaintiffs' assertion that sections 11 and 12 of AB 4 will have a disparate impact upon rural voters. Plaintiffs' assume that local election officials will not capably perform their duty to establish an appropriate number of polling places in their respective counties.   Insofar as they have offered no facts to support this assumption, Plaintiffs have failed to articulate a concrete and particularized injury.   Count II of the Complaint must be dismissed on these grounds.

   **E.      Section 22 of AB 4 Does Not Violate Equal Protection; It Simply Affords Local Election Officials the Discretion to Adopt Counting and Processing Procedures that are Compatible with Local Resources.**

   In Count III of the Complaint, Plaintiffs argue that section 22 of AB 4 violates the Equal Protection Clause because it gives local election officials too much discretion to adopt "standardless" procedures for counting and processing mailed ballots (ECF No. 29

at ¶ 141).  As with the other equal protection claims, this claim assumes local elections officials will adopt arbitrary procedures that will dilute votes and subject different groups of voters to disparate treatment.  Yet Plaintiffs have not identified a single fact to support their assumption.  As a practical matter, Plaintiffs express a policy preference for a top-down, centrally-planned system of election administration (ECF No. 29 at ¶¶ 100-102).  Nevada statutes, however, contemplate a significant role for county clerks in the administration of Nevada's election laws, particularly with respect to the counting and processing of ballots.  *See, e.g.*, NRS §§ 293.056 (submission of initiative and referendum petitions to county clerks), 293.1277 (verification of signatures by county clerks), 293.4689 (maintenance of website by county clerk for public information relating to elections), 293.5235 (preregistration and registration of voters by county clerks), 293.530 (authority of county clerks to correct statewide registration list), 293.3625-.397 (returns and canvass).  Plaintiffs' policy preference for top-down administration, and their request here for the Court to fundamentally alter Nevada's system of election administration, conflicts at a high level with many provisions of state law in addition to section 22 of AB 4.

Moreover, Nevada's existing statutes establish specific guidance and detailed standards for county clerks to follow when counting and processing mailed ballots.  These statutes establish the necessary uniformity to ensure that voters are treated equally in all materials respects.  *See* NRS §§ 393.363-.389.  While Plaintiffs suggest that section 22 of AB 4 gives county clerks virtually unfettered discretion to decide how to count and process ballots, they conveniently ignore section 9 of AB 4.  Subsection 1 of section 9 states, "The provisions of any other statute or charter, ordinance, interpretation, regulation or rule governing the election which do not conflict with the provisions of sections 2 to 27, inclusive, of this act must be applied to the election, including, without limitation: [p]rovisions relating to … conducting the election [] and [p]rovisions relating to the compilation and canvass of election returns and ties, recounts and contests of election."

…

Section 9 is important because it underscores the limited scope of section 22, which deals only with "procedures" for counting and processing ballots. Procedures exist to maximize efficiency in counting and processing ballots, including "by electronic means". AB 4 at § 22(2)(a). Viewed in the proper context, section 9 does not give the county clerks the discretion to decide how or when to accept or reject a mailed ballot. Various provisions of statute already address that topic. Section 9 addresses automation for the simple reason that some counties may have more automation equipment than others for the processing and counting of mail ballots.

For example, urban counties may have the equipment to run all signatures on ballot return envelopes through a scanner to make a preliminary determination whether a signature on the ballot envelope matches the signature on file for the voter. An electronic flag would lead to a visual examination of signatures as the second step in the process. On the other hand, some counties may have to perform a visual examination of signatures as the first step in the signature verification process. Such a minor difference in procedures would have little if any potential to treat voters in a way that violates the Equal Protection Clause. To the extent that there exists some abstract potential for the disparate treatment of voters, it does not qualify as an injury in fact for purposes of Article III's standing requirement. Accordingly, Count III of the Complaint must be dismissed.

**F.      Section 25 Does Not Violate Equal Protection; It Has Virtually No Potential to Result in the Disparate Treatment of Voters.**

In Count IV of the Complaint, Plaintiff argue that section 25 of AB 4 violates the Equal Protection Clause because it contains a vague directive to county clerks about when to discard ballots that have been folded together in a single envelope (ECF No. 29 at ¶¶ 157-160). For purposes of an affected election, section 25 merely duplicates the provisions of NRS § 293.363. This statute, which has been in effect since 1960, *see* §131, 1960 Nev. Stat. 259, indicates that local election officials must discard paper ballots that have been folded together in a single envelope unless they can determine that the ballots were voted

by two different voters.  As a practical matter, the ballots themselves will rarely if ever have markings to suggest that they were voted by two different people, spouses or roommates for example, because the ballots do not include signature lines are places to include personal identifiers.  For obvious reasons, mailed ballots do not contain signature lines or personal identifiers because signatures and personal identifiers would wholly eliminate ballot secrecy.  Therefore, unless the return envelope contains two signatures on the single signature line, the folded-together ballots will be universally discarded.

Although it is conceivable that two persons might fold their ballots together in a single envelope and affix their signatures to the signature line of the return envelope, it is highly improbable.  Indeed, the degree of probability is so low that it can scarcely qualify as an injury for purposes of Article III's standing requirement.  Accordingly, Count IV of the Complaint must be dismissed.

### G.    Plaintiffs Speculative Claims Do Not Become Any Less Speculative When Considered in Their Entirety.

In Count V of the Complaint, Plaintiffs cobble together Counts I through IV to support their argument that AB 4 violates the right to vote by diluting "honest" votes (ECF No. 29 at ¶¶ 166-169).  As discussed above, the central premise for this argument is that vote-by-mail processes increase the likelihood of voter fraud.  The subtext of the argument is that various provisions of AB 4, identified above, exacerbate the alleged problem.  Ironically, Counts I through IV of the Complaint, which address the supposed objectionable provisions of AB 4, are wholly unrelated to Plaintiffs' arguments about how ballots will be discarded and then intercepted by fraudsters before the ballots ever reach the polls (ECF No. 29 at ¶¶ 53-62).  To the contrary, the provisions of AB 4 to which Plaintiffs object relate to the processes and procedures that election officials will apply after the ballots have already reached the polls.  Because the identified processes and procedures do not make it any more or less likely that election officials will mistakenly accept a person's ballot that has been intercepted and cast by an imposter, the basis for Count V is virtually incomprehensible.

Furthermore, the injury alleged in Count V is no less speculative than the injuries alleged in Counts I through IV.  The speculation continues unabated in Count V because Count V is simply an amalgamation of Counts 1 through IV.  Each is highly speculative standing alone, and no less speculative when considered together. In short, four multiplied by zero equals zero, not four.

The gist of County V is that Plaintiffs demand greater uniformity in Nevada's election processes and procedures.  But they do not explain how the alleged lack of uniformity will dilute votes, other than to speculate that local elections officials might apply arbitrary standards when they receive, examine, count and process mailed ballots. In addition to not meeting Article III's standing requirement, Plaintiffs predictions about the conduct of poll workers are not ripe for review.  "This type of review threatens the kind of abstract disagreements over administrative policies … that the ripeness doctrine seeks to avoid." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998) (internal citations and quotation marks omitted).  "Where a dispute hangs on future contingencies that may or may not occur … it may be too "impermissibly speculative" to present a justiciable controversy."  *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009) (internal citations and quotations marks omitted). Accordingly, all of Plaintiffs' claims fail to satisfy Article III's ripeness requirement for essentially the same reasons that they fail to satisfy the standing requirement.  *See Wolfson v. Brammer*, 616 F.3d 1045, 1058 (2010) ("Whether framed as an issue of standing or ripeness, the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract.") (internal citations and quotations marks omitted).

Finally, to the extent that Plaintiffs seek an order imposing greater uniformity upon Nevada's election processes and procedures, their claims are barred by the Tenth Amendment and principles of federalism.  "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992).  And, as Plaintiffs concede, "The U.S. Constitution's Elections Clause vests state legislatures

with power to set the time, place, and manner of congressional elections. U.S. Const., art. I, §4, cl. 1." (ECF No. 29 at ¶ 22).  Likewise, the Presidential Electors Clause gives the States' the authority to prescribe the manner of selecting presidential electors. U.S. Const., art. II, §1, cl. 2.  Indeed, the Presidential Electors Clause "gives the States far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo v. Washington*, __U.S.__, 140 S. Ct. 2316, 2323 (2020).

Although an act of Congress may supersede state election laws as applied to federal elections, *see Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013), Plaintiffs have identified no federal statutes that would supersede sections 11, 12, 22 and 25 of AB 4. Nor have they made a persuasive argument that section 20 conflicts with federal law regarding the timing of Election Day.

For the reasons detailed above, the Complaint must be dismissed.

## IV. CONCLUSION

Plaintiffs ask this Court to scrutinize the policy wisdom of choices made by the Nevada Legislature during its 32nd (2020) Session. These choices were made amid a pandemic in preparation for the 2020 general election. Absent a concrete and particularized injury to Plaintiffs, the Court has no jurisdiction to intervene in election preparations. Because Plaintiffs have failed to plead facts from which one might reasonably infer that an injury is actual and imminent, not hypothetical, the Court should dismiss their claims for lack of jurisdiction.

DATED this 24th day of August, 2020.

AARON D. FORD
Attorney General

By: *Gregory L. Zunino*
GREGORY L. ZUNINO, Bar No. 4805
Deputy Solicitor General
CRAIG A. NEWBY, Bar 8591
Deputy Solicitor General
BRANDEE MOONEYHAN, Bar No. 7451
Deputy Attorney General
LAENA ST-JULES. Bar No. 15156C
Deputy Attorney General

*Attorneys for Defendant Barbara Cegavske*

-24-

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on this 24th day of August, 2020, I filed with this Court's CM/ECF electronic filing system, **DEFENDANT SECRETARY OF STATE BARBARA CEGAVSKE'S MOTION TO DISMISS,** and served the following by electronically address listed below and any others who have petitioned this Court to participate:

Donald J. Campbell, Esq.
djc@cwlawlv.com
J. Colby Williams, Esq.
jcw@cwlawlv.com

*Counsel for Plaintiffs*


William S. Consovoy, Esq.
Thomas R. McCarthy, Esq.
Tyler R. Green, Esq.
Cameron T. Norris, Esq.
Consovoy McCarthy, PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
will@consovoymccarthy.com
tom@consovoymccarthy.com
tyler@consovoymccarthy.com
cam@consovoymccarthy.com

*Pro Hac Vice – Pending*



An employee of the Office
of the Attorney General