MARC E. ELIAS, ESQ. (D.C. Bar No. 442007) (*pro hac vice*)
COURTNEY A. ELGART, ESQ. (D.C. Bar No. 1645065) (*pro hac vice*)
HENRY J. BREWSTER, ESQ. (D.C. Bar No. 1033410) (*pro hac vice*)
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005-3960
Tel: (202) 654-6200
melias@perkinscoie.com
celgart@perkinscoie.com
hbrewster@perkinscoie.com

ABHA KHANNA, ESQ. (Wash. Bar No. 42612) (*pro hac vice*)
REINA A. ALMON-GRIFFIN, ESQ. (Wash. Bar No. 54651) (*pro hac vice*)
JONATHAN P. HAWLEY, ESQ. (Wash. Bar No. 56297) (*pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com
ralmon-griffin@perkinscoie.com
jhawley@perkinscoie.com

BRADLEY SCHRAGER, ESQ. (SBN 10217)
DANIEL BRAVO, ESQ. (SBN 13078)
**WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP**
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Tel: (702) 341-5200
bschrager@wrslawyers.com
dbravo@wrslawyers.com

*Attorneys for Intervenor-Defendants DNC
Services Corporation/Democratic National
Committee, DCCC, and Nevada State
Democratic Party*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, and NEVADA REPUBLICAN PARTY,<br><br>                   Plaintiffs,<br><br>    v.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, | Case No.: 2:20-cv-01445-JCM-VCF<br><br>**INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

| | |
|---|---|
| | Defendant, |
| and | |
| DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE, DCCC, and NEVADA STATE DEMOCRATIC PARTY, | |
| | Intervenor-Defendants. |

Pursuant to Federal Rule of Civil Procedure 12, Intervenor-Defendants DNC Services Corporation/Democratic National Committee, DCCC, and the Nevada State Democratic Party (collectively, "Intervenors") move to dismiss the amended complaint filed by Plaintiffs Donald J. Trump for President, Inc., Republican National Committee, and Nevada Republican Party.

### POINTS AND AUTHORITIES

Recognizing that the novel coronavirus will impact the November 3, 2020 general election, and that a mail-based infrastructure coupled with meaningful opportunities to vote in person is necessary to ensure that all Nevadans can safely cast ballots, the Legislature enacted Assembly Bill 4. This legislation largely incorporates and supplements the State's existing election code, extending and tweaking these laws to safeguard the franchise in November and during future crises.

Inexplicably and without merit, Plaintiffs now seek to undo the reforms enacted by Assembly Bill 4. But their case is fatally flawed. They lack standing to bring their claims, having alleged no actual injury at the hands of Nevada's election officials that would be redressed by the relief they seek, and having failed to articulate how a law that makes it easier for eligible Nevadans to vote causes harm to them or their supporters. Their causes of action also fail as a matter of law. For these reasons and those that follow, Intervenors respectfully request that this Court dismiss Plaintiffs' amended complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

**I.      Assembly Bill 4**

On August 3, 2020, Governor Steve Sisolak signed Assembly Bill 4 into law. *See* Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl."), ECF No. 29, ¶ 87.[1] Assembly Bill 4 makes several updates to the Nevada election code, only some of which are at issue in this case. Sections 2 to 27 codify procedures for conducting elections like the November 2020 general election (the "November Election") affected by declared states of emergency—so-called "affected elections." The stated purpose of these sections is to ensure that "[e]lection officials have certainty concerning the procedures to prepare for and conduct" an affected election and that "voters have faith and confidence that they can participate in [an] affected election and exercise their right to vote without fear for their health, safety and welfare under such circumstances." *See* Assembly Bill 4 ("A.B. 4") § 2.[2]

Sections 2 to 10 set forth the general principles governing interpretation of Assembly Bill 4, and when the law applies. For example, Sections 5 and 8 define an "affected election" subject to Sections 2 to 27 as one occurring when either the Governor or the Legislature has proclaimed a state of emergency or declaration of disaster, while Section 9 clarifies that the other, non-conflicting provisions of the State's election code (Chapter 293 of the Nevada Revised Statutes) continue to apply to affected elections. Sections 11 to 13 respond to the long lines experienced in the State's most populous counties during the June 2020 primary election by requiring Nevada counties to offer a minimum number of vote center polling locations during early voting and on election day, with the specific number of locations based on each county's population. Sections

---

[1] The full text of Assembly Bill 4 can be accessed on the Legislature's website. *See* AB4, Nev. Elec. Legis. Info. Sys., https://www.leg.state.nv.us/App/NELIS/REL/32nd2020Special/Bill/7150/Text (last visited Sept. 3, 2020).

[2] Sections 28 through 88 of Assembly Bill 4 make permanent changes to Nevada law outside the context of affected elections. None of these provisions is challenged in Plaintiffs' amended complaint.

15 and 16 modify Nevada's current election laws—which previously *allowed* counties to mail ballots to voters with the permission of the Secretary of State (the "Secretary"), *see* Nevada Revised Statutes ("N.R.S.") 293.213(4)—to *require* counties to do so if the Governor or Legislature has declared a state of emergency. In other words, Assembly Bill 4 moves the discretion to set a mail-based election from the Secretary and county officials to the Governor and Legislature. Finally, Sections 17 to 27 provide an infrastructure for affected elections based on existing election laws. For example, Section 20 applies to mail ballots the same postmark law that already exists for absent ballots—*compare* A.B. 4 § 20 *with* N.R.S. 293.317—and Section 22 codifies the authority county election officials already possess and exercise to create procedures for processing ballots during affected elections. By incorporating and building upon preexisting election laws, Assembly Bill 4 ensures that the State can administer affected elections consistent with other, non-affected Nevada elections.

**II.      Present Litigation**

Before Assembly Bill 4 was even signed into law, President Trump responded to the prospect of mail-based voting in Nevada with a Twitter outburst accusing the Nevada Legislature of "an illegal late night coup" and promising a legal challenge. Donald J. Trump (@realDonaldTrump), Twitter (Aug. 3, 2020 7:37 AM), https://twitter.com/realDonaldTrump/status/1290250416278532096. The next day, Plaintiffs filed this lawsuit. *See* ECF No. 1.

Less than one week later, the Secretary moved to dismiss Plaintiffs' complaint in full. *See* ECF No. 10. Rather than respond, Plaintiffs filed their amended complaint on August 20, asserting claims identical to those in the original complaint filed nearly three weeks earlier.

The amended complaint lodges five challenges to Assembly Bill 4's provisions pertaining to affected elections. Count I contends that Nevada's law setting a standard for judging the timeliness of mail ballots is preempted by federal laws setting the dates of elections. Am. Compl. ¶¶ 104–23. Count II asserts a constitutional entitlement to have polling locations allocated according to Plaintiffs' preferred metric—registered voters—as opposed to the metric used by the Nevada Legislature—population. *Id*. ¶¶ 124–38. Count III argues that the U.S.

Constitution requires the Nevada Legislature to dictate the counties' internal operating procedures for processing and counting mail ballots. *Id.* ¶¶ 139–52. Count IV challenges as insufficiently specific the guidelines on how to process mail ballots that are folded together in the same envelope. *Id.* ¶¶ 153–64. And Count V challenges all four of these provisions, as well as Assembly Bill 4's purported "authoriz[ation of] ballot harvesting," as constituting a violation of the right to vote based on the premise that they "make[] voter fraud and other ineligible voting inevitable." *Id*. ¶¶ 165–71.

In adding various factual allegations, the amended complaint also introduces new contradictions. For example, Plaintiffs cull from other states examples of the postal service's struggles to meet absentee voting demands in the face of the pandemic, *see id.* ¶¶ 64–66, 72–75, while also claiming that the novel coronavirus will *not* impact the postal service's ability to handle absentee ballots, *see id.* ¶ 97, and asking the Court to require the State to return to its pre-pandemic absentee voting system, *see id.* ¶ 171.

On August 24, the Secretary moved to dismiss Plaintiffs' amended complaint. *See* ECF No. 37. Despite seeking dramatic changes in how Nevada will administer the November Election, as of the date of this filing, Plaintiffs have taken no steps to expedite consideration or resolution of their claims.

## LEGAL STANDARD

"Article III limits federal judicial power to 'Cases' and 'Controversies,' and standing to sue 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *LaVelle v. City of Las Vegas*, No. 2:19-CV-1251 JCM (DJA), 2020 WL 1433524, at *3 (D. Nev. Mar. 23, 2020) (citation omitted) (quoting U.S. Const. art. III, § 2; *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. "'[A]t the pleading stage, the plaintiff must "clearly . . . allege facts

demonstrating" each element' of standing," *Williams v. TLC Casino Enters., Inc.*, No. 2:17-CV-2810 JCM (GWF), 2018 WL 3484042, at *3 (D. Nev. July 19, 2018) (alterations in original) (quoting *Spokeo*, 136 S. Ct. at 1547), and must demonstrate standing for each form of relief sought. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Where, as here, a "facial" challenge is brought under Federal Rule of Civil Procedure 12(b)(1), the moving parties "assert[] that the allegations contained in [the] complaint are insufficient on their face to invoke federal jurisdiction." *Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court must "take all of the factual allegations in the complaint as true," *id.* (citing *Twombly*, 550 U.S. at 555), "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Rule 12(b)(6) permits dismissal on the basis of either (1) the 'lack of a cognizable legal theory,' or (2) 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Newlands Asset Holding Tr. v. SFR Invs. Pool 1, LLC*, No. 3:17-cv-00370-LRH-WGC, 2017 WL 5559956, at *2 (D. Nev. Nov. 17, 2017) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

## ARGUMENT

**I.    Count I should be dismissed for lack of standing and for failure to state a claim.**

In Count I, Plaintiffs ask this Court to strike down Section 20(2) of Assembly Bill 4, which ensures that ballots that are timely mailed are counted during affected elections. Specifically, Section 20 directs election officials to count any mail ballot postmarked on or before election day, and Section 20(2) clarifies that ballots without clear postmarks shall be considered timely if they are received within three days of election day. Plaintiffs argue that this standard for judging the timeliness of mail ballots is preempted by federal laws setting the dates of elections. *See* Am. Compl. ¶¶ 104–23.

Count I should be dismissed for two reasons. First, Plaintiffs have not and cannot plead standing either in a representational capacity or in their own right to challenge Section 20(2). Second, federal law in no way directs how states should judge the timeliness of ballots, and therefore Plaintiffs' preemption argument fails as a matter of law.

### A.  Plaintiffs lack standing to bring Count I.

Plaintiffs generally allege two bases for standing in their Complaint: (1) representational standing and (2) direct organizational standing. *See* Am. Compl. ¶¶ 11, 16–17, 20. Critically, however, their amended complaint does not and cannot allege that Section 20(2)'s standard for determining the timeliness of mail ballots makes it harder for any of their supporters to vote or have their votes counted. Nor could Plaintiffs allege that the policy otherwise impacts their own expenditure of resources in any way. These fundamental flaws preclude any finding of standing for Count I.

### 1.  Plaintiffs do not have representational standing.

Plaintiffs do not have standing to represent the interests of their voters because those voters themselves would not have standing to challenge Section 20(2). "The possibility of [] representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Sedlin*, 422 U.S. 490, 511 (1975). Plaintiffs "must allege that [their supporters] are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the [supporters] themselves brought suit." *Id.*; *see also Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020) ("An organization has standing to sue on behalf of its members when 'its members would otherwise have standing to sue in their own right.'" (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996))), *petition for cert. filed*, No. 20-138 (U.S. Aug. 7, 2020); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Unlike in [other cases], there is simply no indication that any of [the plaintiff's] members will be a voter affected by the challenged law.").

Here, Plaintiffs do not allege that Section 20(2) harms their voters in any way. This is for

good reason: Section 20(2) creates a presumption that *benefits* all voters—Republican, Democratic, and otherwise—whose properly voted ballots, through no fault of their own, do not receive legible postmarks from the U.S. Postal Service. Any contention that Plaintiffs' supporters are broadly harmed by the alleged failure of Section 20(2) to comply with federal law, moreover, is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that" that is insufficient under Article III. *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also Lujan*, 504 U.S. at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). And to the extent Plaintiffs argue that their voters' standing is premised on the threat of voter fraud—in other words, that ballots cast after election day by nefarious fraudsters might be counted—that theory has been foreclosed by courts, including this one, as unduly speculative and generalized. *See infra* Part V.A.

In short, because Plaintiffs plead no cognizable injury that their supporters could claim to challenge Section 20(2)'s postmark presumption, they lack representational standing to bring Count I.

### 2.    Plaintiffs do not have direct organizational standing.

Plaintiffs have also failed to allege direct organizational injury sufficient to establish standing for Count I. Plaintiffs broadly allege that the challenged provisions of Assembly Bill 4, including Section 20(2), "undermine confidence in the electoral process," thereby requiring Plaintiffs to divert resources. Am. Compl. ¶¶ 17, 20. "[A]n organization may establish" an injury sufficient to support standing "if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question." *Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (second alteration in original) (quoting *Smith v. Pac. Props & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)). But crucially, Plaintiffs never actually explain how or why they would need to expend resources in response to

a postmark presumption applied by election officials after voters have cast ballots. Diversion of resources can be a cognizable Article III injury when, for example, a law prohibiting third-party ballot collection "require[s] Democratic organizations . . . to retool their [get-out-the-vote] strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots," *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc), or when a party must "devote resources to getting to the polls those of its supporters who would otherwise be discouraged . . . from bothering to vote" by a photo ID law. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). These types of laws directly impact voter behavior and thus plausibly require an expenditure of resources to overcome their effects on voter participation. Section 20(2), by contrast, has no effect on voter behavior and implicates only the actions of election officials after the votes are cast. Because Plaintiffs fail to allege why or how they would need to divert resources to address Section 20(2), they fall well short of "clearly . . . alleg[ing] facts demonstrating" a cognizable organizational injury. *Williams*, 2018 WL 3484042, at *3 (first alteration in original) (quoting *Spokeo*, 136 S. Ct. at 1547).

Ultimately, Plaintiffs' entire theory of organizational standing essentially repackages a legal theory that has been repeatedly rejected as a basis for Article III standing by federal courts, including this one: that any change in the election laws that Republicans do not care for will lead to voter fraud and undermine confidence in elections. *See, e.g.*, *Paher v. Cegavske* (*Paher II*), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (no standing where plaintiffs failed to "state a particularized injury" and "to more than speculatively connect the specific conduct they challenge . . . and the claimed injury [of] vote dilution"); *see also infra* Part V.A. Their diversion of resources theory thus rests on a set of circumstances—increased voter fraud and decreased confidence in the election—that is both "'conjectural' [and] 'hypothetical,'" rather than "actual" or "imminent," *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)), and a "generalized grievance" indistinguishable from the

9

1   public interest. *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex.

2   2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized

3   grievance about the government than an injury in fact."). Accordingly, Plaintiffs have not

4   demonstrated direct organizational standing for Count I.

5          **B.      Count I fails to state a claim upon which relief can be granted.**

6          Even if Plaintiffs had standing to bring Count I, their claim that Section 20(2) is

7   preempted by federal statute fails as a matter of law. "Preemption is a question of law."

8   *Yamagata v. Reckitt Benckiser LLC*, 445 F. Supp. 3d 28, 33 (N.D. Cal. 2020) (citing *Merck*

9   *Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1676, 1680 (2019)). Because there is no

10  conflict between Section 20(2) and federal law, Count I should be dismissed.

11          "[A] state's discretion and flexibility in establishing the time, place and manner of

12  electing its federal representatives has" one—and *only* one—"limitation: the state system cannot

13  directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v.*

14  *Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). But while "Congress has the authority to compel

15  states to hold [federal] elections on the dates it specifies," *Voting Integrity Project, Inc. v.*

16  *Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001)—specifically, "the Tuesday next after the first

17  Monday in November." 3 U.S.C. § 1; *accord* 2 U.S.C. §§ 1, 7, nothing in Assembly Bill 4 alters

18  the timing of the November Election, or any affected election, to a date other than that prescribed

19  by Congress. Indeed, Section 20 *requires* local election officials to count only ballots

20  postmarked by election day; ballots postmarked after election day are *not* counted. *See* A.B. 4

21  § 20. All Section 20(2) does is provide a presumption for election officials to use to determine

22  whether a mail ballot was "postmarked on or before the day of the election," *id.* § 20(2)—in

23  other words, the date mandated by Congress.

24          The Elections "Clause is a default provision; it invests the States with responsibility for

25  the mechanics of congressional elections, *but only so far as Congress declines to preempt state*

26  *legislative choices*." *Foster v. Love*, 522 U.S. 67, 69 (1997) (emphasis added) (citation omitted).

27  Intervenors are not aware of, and Plaintiffs have not pointed to, any law by Congress that dictates

28

to a state how to determine the postmark date of mail ballots. Because Congress has *not* codified a postmark presumption that competes with Nevada's, there is no "actual conflict between federal and state law" that would lead to preemption of Section 20(2). *Pub. Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 649–50 (9th Cir. 2004) (quoting *Gadda v. Ashcroft*, 363 F.3d 861, 871 (9th Cir. 2004)); *see also Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (no preemption where "compliance with both [the challenged law] and the federal election day statutes does not present 'a physical impossibility'") (citation omitted) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963))).[3]

This case is therefore readily distinguishable from *Foster*, the leading case on which Plaintiffs rely in Count I. There, the U.S. Supreme Court considered "Louisiana's 'open primary' statute," which "provide[d] an opportunity to fill the offices of United States Senator and Representative during the previous month" before the date mandated by Congress, "without any action to be taken on federal election day." 522 U.S. at 68–69. The Court concluded that this system "runs afoul of the federal statute" because it permitted federal elections to be entirely consummated before the statutorily mandated election day. *Id.* at 69, 72. Here, by contrast, nothing in Assembly Bill 4 sets a competing date on which "a contested selection of candidates for a [federal] office [] is concluded as a matter of law." *Id.* at 72. Quite the contrary, Section 20 mandates that ballots be postmarked by election day, and the presumption in Section 20(2) effectuates this requirement. Courts have consistently held that the procedures and standards established by states to facilitate the federal election date do not alter the date prescribed by Congress. *See, e.g.*, *Millsaps*, 259 F.3d at 549 ("[T]here is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for

---

[3] Under traditional preemption principles, courts "must be cautious about conflict preemption where a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers." *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010). Given that "[u]nless Congress acts, [the Constitution] empowers *the States* to regulate the conduct of [federal] elections," *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972) (emphasis added), courts should be particularly wary of preempting a state election law where, as here, it neither interferes nor conflicts with federal law.

holding federal elections."); *Keisling*, 259 F.3d at 1175 (emphasizing that *Foster* did not "present the question whether a State must always employ the conventional mechanics of an election" (quoting *Foster*, 522 U.S. at 72 n.4)).

As one post-*Foster* appellate court decision concluded, "we cannot conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote." *Bomer*, 199 F.3d at 777; *accord Millsaps*, 259 F.3d at 545 ("[A]ll courts that have considered the issue have viewed statutes that facilitate the exercise of the fundamental right of voting as compatible with the federal statutes."). Section 20(2) facilitates Nevadans' ability to have their votes counted by creating a presumption that certain ballots were cast *on the election day prescribed by Congress*. It thus "further[s] the important federal objective of reducing the burden on citizens to exercise their right to vote . . . without thwarting other federal concerns," *Bomer*, 199 F.3d at 777, by ensuring that voters who cast ballots on or before election day are not arbitrarily disenfranchised simply because the postal service, through no fault of the voter, fails to affix a legible postmark. Conspicuously, Plaintiffs cite no cases where postmark presumptions or similar regulations were found to conflict with federal law.[4] This is not surprising; Section 20(2), like other similar postmark presumptions nationwide,[5] is wholly consistent with federal law because it merely sets a standard for election officials to determine whether ballots were cast on election day. Therefore, Section 20(2) is not preempted, and absent a cognizable claim, Count I should be dismissed.

## II.    Count II should be dismissed for lack of standing and failure to state a claim.

Count II asserts an equal protection challenge to Sections 11 and 12 of Assembly Bill 4, which set the minimum number of vote center polling places that each county must offer. Under

---

[4] Notably, in *Gallagher v. New York State Board of Elections*, a federal court—far from invalidating a postmark law like Section 20(2)—actually *embraced* a presumption "that absentee ballots received [within days of election day] were [] timely cast despite the absence of a postmark." No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *22 & n.5 (S.D.N.Y. Aug. 3, 2020).

[5] *See, e.g.*, Cal. Elec. Code § 4103(b)(2); 10 Ill. Comp. Stat. 5/19-8(c); Md. Code Regs. 33.11.03.08(B)(3)(b)(ii); Wash. Rev. Code § 29A.40.110(4).

Sections 11 and 12, more populous counties are required to offer more polling locations, while the least populous counties are required to offer only a single polling place. Plaintiffs allege that allocating polling locations based on total population is unconstitutional, and that the Nevada Legislature was required to allocate polling locations based on the number of registered voters in each county. But Plaintiffs lack standing to bring this claim and fail to state a claim upon which relief can be granted.

**A.      Plaintiffs lack standing to bring Count II.**

Plaintiffs lack standing to pursue Count II because they do not allege that Sections 11 or 12 of Assembly Bill 4 cause them or their voters to suffer an injury that is redressable by the relief sought in this suit. As an initial matter, Plaintiffs never plausibly allege that the rural counties selectively highlighted in their amended complaint are allocated *too few* polling locations under Assembly Bill 4. For example, they do not allege that a smaller county's decision to provide only a single polling location would lead to longer lines or crowded conditions such that anyone's right to vote would be burdened. Indeed, not four months ago, Plaintiffs Republican National Committee and Nevada Republican Party argued that Nevada's "decision to limit in-person voting [in the primary] to one polling place per county in the midst of a pandemic does not violate anyone's right to vote." Intervenor-Defendants' Opposition to Motion for Preliminary Injunction at 11, *Corona v. Cegavske*, No. 20-OC-00064-1B (Nev. Dist. Ct. May 4, 2020).

But even if they had made such an allegation, Plaintiffs would still lack standing because they have not asked this Court to require rural counties to provide additional polling locations. *See* Am. Compl. at 28; *id.* ¶ 138. Instead, they seek to strip away minimum polling location requirements for *all* of Nevada's counties, including the rural counties. *See* Am. Compl. at 28; *see also id.* ¶ 138 (requesting that "Defendant [be] enjoined from implementing and enforcing Sections 11 and 12 of AB4"). Not only would this relief fail to redress the alleged harm to rural county voters, it would inflict greater harm on *all* voters by removing any threshold requirement for in-person voting opportunities.

13

"The proposition that plaintiffs must seek relief that actually improves their position is a well-established principle." *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013). In *Townley*, the plaintiffs alleged harm based on the Secretary's refusal to give legal effect to ballots cast for the "None of These Candidates" ("NOTC") option allowed under Nevada law. *Id.* at 1130–31. But rather than "ask that, as the remedy for this injury, the Secretary of State be ordered to give legal effect to such ballots," they "demand[ed] that the option of casting a ballot for NOTC be entirely removed from the Nevada election system." *Id.* at 1134. The Ninth Circuit held that the plaintiffs lacked Article III standing because their requested relief would not redress the injury they asserted. *Id.* at 1133–35 ("[I]f plaintiffs were to prevail in this lawsuit, . . . voters would no longer have the opportunity to affirmatively express their opposition at the ballot box at all. The relief plaintiffs seek will therefore *decrease* their (and other voters') expression of political speech rather than increase it, worsening plaintiffs' injury rather than redressing it."). So too here. Even if Plaintiffs had alleged that the Nevada Legislature must require all counties to provide multiple polling locations in order to avoid burdening their residents' right to vote, Plaintiffs have not asked this Court to provide that relief. Instead, they seek only to strip away minimum protections from more populous counties. Accordingly, any injury is not redressable by the relief sought, and Plaintiffs have no standing to bring Count II.

### B.   Count II fails to state a claim upon which relief can be granted.

Count II fails as a matter of law because Plaintiffs possess no constitutional entitlement to having polling locations allocated on their preferred metric: registered voters.[6] Plaintiffs rely on *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), and *Reynolds v. Sims*, 377 U.S. 533 (1964), as

---

[6] The amended complaint repeatedly refers to registered voters as the appropriate metric for analyzing Sections 11 and 12. *See, e.g.*, Am. Compl. ¶ 130 ("[D]ata from the Secretary of State shows that there are 319,212 *registered voters* in Washoe County." (emphasis added)); *id.* ¶ 131 ("Several rural counties—where AB4 authorizes only 1 polling place each—have substantially higher numbers of *registered voters* per polling place." (emphasis added)); *id.* ¶ 132 ("Similarly, AB4 authorizes a minimum of 25 vote centers in Washoe County, or at least 1 vote center for every 12,768 *registered voters*." (emphasis added)).

the bases for their equal protection claim in Count II. *See* Am. Compl. ¶¶ 125, 135. But even if those cases could support Plaintiffs' challenge here,[7] Plaintiffs do not allege that there is any significant relationship between the number of registered voters in a county and the need for polling locations such that the use of total population to set polling location thresholds reflects "arbitrary and capricious action" on the part of the Legislature, *Reynolds*, 377 U.S. at 557, or that the allocation of polling places according to total population fails to meet the "rudimentary requirements of equal treatment and fundamental fairness." *Bush*, 531 U.S. at 109. On the contrary—as Plaintiffs acknowledge, *see* Am. Compl. ¶ 100—Sections 11 and 12 establish a clear and uniform standard for allocation of polling locations according to population. A.B. 4 §§ 12(2)(a), 13(3).

The Nevada Legislature had numerous plausible policy reasons to allocate polling places in Assembly Bill 4 according to each county's total population—including that Nevada' same-day registration law means that polling locations serve *all* potential voters, not just those who are registered. *See* N.R.S. 293.5842. While Plaintiffs may prefer a different metric as a policy matter, they allege no plausible claim that the Nevada Legislature acted arbitrarily or unreasonably in establishing minimum thresholds according to total population.[8] Accordingly,

---

[7] While Plaintiffs pluck out-of-context language from *Reynolds*, that case concerned legislative apportionment and fair representation, not the conduct of elections. And *Bush* ultimately concerned the "minimal procedural safeguards" needed to ensure uniformity in counting ballots. 531 U.S. at 109. It is therefore inapposite to an evaluation of Sections 11 and 12, which provide clear, nonarbitrary guidance for allocating polling places.

[8] Indeed, *Reynolds* itself embraced total population as the appropriate metric on which to allocate voting power and political representation in the apportionment context consistent with the Equal Protection Clause. *See* 377 U.S. at 567 ("*Population* is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." (emphasis added)); *id.* at 568 ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be *apportioned on a population basis*." (emphasis added)); *id.* at 560–61 ("[T]he fundamental principle of representative government in this country is one of equal representation for *equal numbers of people*, without regard to race, sex, economic status, or place of residence within a State." (emphasis added)); *see also Garza v. County of Los Angeles*, 918 F.2d 763, 776 (9th Cir. 1990) (requiring districting "on the basis of voting capability" rather than population "would constitute a denial of equal protection").

1    Plaintiffs fail to state a claim on which relief can be granted, and Count II should be dismissed.

2    *See Newlands Asset Holding Tr.*, 2017 WL 5559956, at *2 (dismissal appropriate where claim

3    lacks "a cognizable legal theory" (quoting *Balistreri*, 901 F.2d at 699)).

4    **III.**    **Count III should be dismissed for lack of standing and failure to state a claim.**

5            With Count III, Plaintiffs argue that Section 22 of Assembly Bill 4 violates the Equal

6    Protection Clause by failing to provide "guidance or guardrails" to local election officials

7    charged with "establish[ing] procedures for the processing and counting of mail ballots." Am.

8    Compl. ¶¶ 139–52. This claim suffers from both its failure to allege any plausible injury to

9    Plaintiffs and its myopic reading of Section 22 to the exclusion of the standards provided by the

10    remainder of Nevada's election code. For both reasons, Count III should be dismissed.

11            **A.**    **Plaintiffs lack standing to bring Count III.**

12            Plaintiffs lack standing because Section 22 in no way makes it harder to vote or increases

13    the likelihood that Plaintiffs' supporters' ballots will not be counted. Section 22 is simply a

14    housekeeping provision that allows local election officials to develop standards for *how* to

15    process ballots, not *which* ballots to count. *See supra* Part III.B. Neither Plaintiffs nor their

16    supporters have any unique interest in how local election officials process ballots. Accordingly,

17    their interest in the enforcement or nonenforcement of Section 22 is nothing more than a

18    generalized grievance insufficient to support standing. *See Lance*, 549 U.S. at 442. Even if

19    Plaintiffs' desire for statewide standards governing how ballots are processed by local election

20    officials were a cognizable interest under Article III, they would still lack standing because the

21    relief they have requested—an injunction against enforcement of Section 22, Am. Compl.

22    ¶ 152—would not redress this harm; striking a provision that allegedly provides insufficient

23    standards would *not* somehow create a set of standards that Plaintiffs would find sufficient. *See*

24    *supra* Part II.A.

25            **B.**    **Count III fails to state a claim upon which relief can be granted.**

26            Plaintiffs fail to state a claim that Assembly Bill 4 violates the Equal Protection Clause

27    because of the discretion granted to local election officials in Section 22. Count III rests heavily

28

on the U.S. Supreme Court's decision in *Bush*, Am. Compl. ¶¶ 140–49, but that case provides no support for Plaintiffs' claim. In *Bush*, the U.S. Supreme Court considered "whether the use of standardless manual recounts" by some, but not all, Florida counties in the aftermath of the 2000 presidential election violated the Equal Protection Clause of the U.S. Constitution. 531 U.S. at 103. The Court specifically clarified that it was *not* deciding "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* at 109. Instead, it was addressing a situation where the counting of ballots lacked even "minimal procedural safeguards." *Id.* Here, by contrast, both Assembly Bill 4 and Nevada's preexisting election code provide the very standards that Plaintiffs claim are lacking from Section 22—a glaring fact that Count III wholly ignores.

While Section 22 does not, by its terms, spell out the standards for processing and counting ballots, other parts of Assembly Bill 4 *do*. For instance, Section 17 requires local election officials to secure identification from certain voters before counting their mail ballots, A.B. 4 § 17; Section 20 requires local election officials to reject untimely mailed ballots, *id.* § 20; Section 23 requires local election officials to verify the signature on a ballot return envelope before counting a mail ballot, *id.* § 23; and Section 26 requires local election officials to ensure that voters did not vote in person before counting their mail ballots, *id.* § 26. Assembly Bill 4 also explicitly adopts the full panoply of Nevada's election laws governing who is eligible to vote and which votes should be counted, including the Secretary's guidance and interpretations. *See id.* § 9 ("The provisions of any other statute or charter, ordinance, interpretation, regulation or rule governing the election which do not conflict with the provisions of sections 2 to 27, inclusive, of this act must be applied to the [affected] election."); *see also, e.g.*, N.R.S. 293.317–293.340 (outlining standards for collecting and counting absent ballots). And Section 22 itself specifically requires local election officials to follow the rules incorporated by Section 9. *See id.* § 22(b) ("The procedures established . . . [m]ust not conflict with the provisions of sections 2 to 27, inclusive, of this act.").

In short, Section 22 adopts Nevada's other election laws by reference, and therefore

1  provides sufficient standards and guidance for election officials—a conclusion that is apparent

2  based on even a cursory examination of Assembly Bill 4 and the State's election laws. Given that

3  Plaintiffs have not stated a cognizable equal protection claim under *Bush* or any other precedent,

4  Count III should be dismissed.

5  **IV.   Count IV should be dismissed for lack of standing.**

6       Count IV challenges Section 25 of Assembly Bill 4, which provides in part that "[i]f two

7  or more mail ballots are found folded together to present the appearance of a single ballot" and

8  "a majority of the inspectors are of the opinion that the mail ballots folded together were voted

9  by one person, the mail ballots must be rejected." A.B. 4 § 25(2). Plaintiffs allege that this

10  provision violates the Equal Protection Clause because it "provides no guidance or guardrails of

11  any kind for the establishment of standards 'a majority of inspectors' should apply to determine

12  whether 'the mail ballots folded together were voted by one person.'" Am. Compl. ¶¶ 153–64.

13  But they again lack standing to bring this claim. The only conceivable injury Plaintiffs could

14  claim for Count IV is that their supporters will be disenfranchised—in other words, that their

15  otherwise-valid ballots will be rejected because "Section 25 provides no 'minimal procedural

16  safeguards' to protect against the 'unequal evaluation' of multiple ballots within a single

17  envelope." *Id.* ¶ 160 (quoting *Bush*, 531 U.S. at 109).[9] But even though disenfranchisement is a

18  cognizable injury in fact, Plaintiffs fail to demonstrate how the relief they seek—invalidating this

19  and other sections of Assembly Bill 4—will redress the injury.

20       "Under Article III, constitutional standing requires plaintiff to show . . . that it is 'likely'

21  as opposed to 'merely speculative' that a favorable decision by the court will provide redress for

22  the injury." *Garcia v. Credit One Bank, N.A.*, No. 2:18-CV-191 JCM (EJY), 2020 WL 4431679,

23  at *3 (D. Nev. July 31, 2020) (quoting *Lujan*, 504 U.S. at 561). Simply stated, enjoining Section

24

25  _____

    [9] If Plaintiffs intend to suggest that Section 25(2) will lead to another injury—namely, that
26  *ineligible* ballots will be *counted* due to the absence of meaningful standards—then that is
    precisely the sort of generalized grievance that "does not state an Article III case or controversy."
27  *Lujan*, 504 U.S. at 573–74; *see also supra* Part V.A.

28

25(2) will not remedy Plaintiffs' purported injury and ensure that their supporters' ballots are counted even if they are bundled with other ballots in a single envelope, because absent Section 25(2), election officials will still be unable to count multiple ballots. Each mail ballot requires a corresponding signature. *See* A.B. 4 § 18(1) ("[I]n order to vote a mail ballot for any affected election, the voter must . . . [a]ffix his or her signature on the return envelope."); *see also, e.g.*, N.R.S. 293.325 (requiring signature verification for absent ballots). Where officials receive two ballots in the same envelope, this mandate cannot be effectuated, because the envelope would contain only one signature for two ballots. Without the ability to determine whether the mail ballots folded together were voted by the voter who signed the envelope, officials essentially have no recourse other than to discard *both* ballots, particularly since, under Nevada law, it is a felony to "vote or attempt to vote more than once at the same election." N.R.S. 293.780(1). Put another way, the default procedure *without* Section 25(2) would result in across-the-board rejection of mail ballots folded together, amplifying the very harm Plaintiffs seek to avoid by challenging that provision. Because enjoining Section 25(2) would not redress any injury claimed in Count IV, Plaintiffs lack standing to assert it, and the claim must be dismissed. *See Townley*, 722 F.3d at 1134–35 ("Because the relief plaintiffs seek would worsen the position of voters . . . rather than redress the injury they assert, . . . plaintiffs lack[] standing.").

**V.    Count V should be dismissed for lack of standing and failure to state a claim.**

Finally, Count V challenges the four provisions of Assembly Bill 4 described in Counts I through IV—plus Section 21, which Plaintiffs claim "authorizes ballot harvesting"[10]—claiming that together they "make[] voter fraud and other ineligible voting inevitable." Am. Compl. ¶¶ 166–67. This claim, a conclusory allegation of fraud unsupported by even a modicum of persuasive explanation, must be dismissed. Plaintiffs again lack standing to bring what is

---

[10] Section 21 provides that "at the request of a voter whose mail ballot has been prepared by or on behalf of the voter for an affected election, a person authorized by the voter may return the mail ballot on behalf of the voter by mail or personal delivery to the county or city clerk." A.B. 4 § 21(1).

ultimately a speculative, generalized claim. And even if they had standing, Count V fails as a matter of law because it relies on a theory of vote dilution that has been roundly rejected by federal courts, including this one. *See Newlands Asset Holding Tr.*, 2017 WL 5559956, at *2 (dismissal appropriate where claim lacks "a cognizable legal theory" (quoting *Balistreri*, 901 F.2d at 699)).

### A.   Plaintiffs lack standing to bring Count V.

The only injury claimed in Count V is the alleged "[d]ilution" of Nevadans' "honest, lawful votes" by "the casting of fraudulent or illegitimate votes." Am. Compl. ¶¶ 168–69. But courts have held that this injury of vote dilution from the threat of potential voter fraud does not confer Article III standing, as it is both unduly speculative and impermissibly generalized. *See, e.g.*, *Martinez-Rivera*, 166 F. Supp. 3d at 789 ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."); *cf. Fair Elections Ohio*, 770 F.3d at 461 ("Harm to abstract social interests cannot confer Article III standing."); *United States v. Florida*, No. 4:12cv285-RH/CAS, 2012 WL 13034013, at *1 (N.D. Fla. Nov. 6, 2012) (rejecting motion to intervene under Rule 24 based on theory of vote dilution because applicant's "asserted interests are the same . . . as for every other registered voter in the state"). As this Court recently explained when confronted with a similar claim:

> Plaintiffs' argument is difficult to track and fails to even minimally meet the first standing prong. The theory of Plaintiffs' case . . . is that the [challenged election plan] will lead to an increase in illegal votes thereby harming them as rightful voters by diluting their vote. But Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury. This is not a pioneering finding. Other courts have similarly found the absence of an injury-in-fact based on claimed vote dilution.

*Paher v. Cegavske* (*Paher I*), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020) (citations omitted); *accord Paher II*, 2020 WL 2748301, at *4 (no standing where "Plaintiffs fail to show a nexus between the alleged violations and their claimed injury" because they "fail to more than speculatively connect the specific conduct they challenge . . . and the claimed injury [of] vote dilution"). Such is the case here. In addition to being a wholly

1    speculative and hypothetical injury premised on independent actions taken by third parties—

2    specifically, purposed fraudsters, the existence of whom is alleged by Plaintiffs only with

3    references to past fraud in jurisdictions outside Nevada—any dilution somehow caused by

4    Assembly Bill 4 would affect *all* Nevada voters, not merely those who support Plaintiffs. *See*

5    *Citizens for Fair Representation v. Padilla*, 815 F. App'x 120, 123 (9th Cir. 2020) (no standing

6    where "the growing size of California's electoral districts values—or in Plaintiffs' view,

7    devalues—every vote equally"). Accordingly, the injury claimed in Count V is an impermissibly

8    generalized grievance and cannot support Article III standing. *See Lujan*, 504 U.S. at 573–74

9    (holding that plaintiff "claiming only harm to his and every citizen's interest in proper

10   application of the Constitution and laws . . . does not state an Article III case or controversy").

11   **B.    Count V fails to state a claim upon which relief can be granted.**

12   Even if Count V provided anything deeper than a wholly conclusory and generalized

13   suggestion that Assembly Bill 4 will lead to voter fraud and consequent vote dilution, federal

14   courts do not recognize such a cause of action. Vote dilution is a viable basis for federal claims

15   in certain contexts, such as when laws are crafted that structurally devalue one community's

16   votes over another's. *See, e.g.*, *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 406–07

17   (E.D. Pa. 2016); *see also Reynolds*, 377 U.S. at 568 ("Simply stated, an individual's right to vote

18   for state legislators is unconstitutionally impaired when its weight is in a substantial fashion

19   diluted when compared with votes of citizens living in other parts of the State."). In these cases,

20   which are grounded in the Equal Protection Clause, plaintiffs allege that their votes are devalued

21   as compared to similarly situated voters in other parts of the state. *See Reynolds*, 377 U.S. at

22   567–68. Plaintiffs here, by contrast, have not alleged an equal protection claim suggesting that

23   Assembly Bill 4 values some other group of votes over their own, and so they have failed at the

24   most basic step of pleading a vote dilution claim.

25   Ultimately, "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v.*

26   *Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cty. Election Bd.*, 788

27   F.2d 1270, 1271 (7th Cir. 1986)). There is simply no authority for transmogrifying the vote

28

dilution line of cases into a weapon that voters may use to enlist the federal judiciary to make it *more difficult* for millions of their fellow citizens to vote, based entirely on unfounded and speculative fears of voter fraud. *Cf. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution."). To the contrary, courts have routinely—and appropriately—rejected such efforts. *See Minn. Voters All.*, 720 F.3d at 1031–32 (affirming Rule 12(b)(6) dismissal of vote dilution claim); *see also Cortés*, 218 F. Supp. 3d at 406–07 (rejecting claim of vote dilution "based on speculation that fraudulent voters may be casting ballots elsewhere in the" state on motion for preliminary injunction). Because Plaintiffs have failed to allege facts that give rise to a plausible claim for relief, or even alleged a cognizable legal theory, Count V should be dismissed.

**VI.    Section (b) of the prayer for relief should be dismissed or, in the alternative, stricken.**

Section (b) of Plaintiffs' prayer for relief asks this Court to permanently enjoin the Secretary from "implementing and enforcing AB4." Am. Compl. at 28. Plaintiffs' amended complaint, however, only addresses a handful of provisions in Assembly Bill 4, and does not address the vast majority of the provisions relating to affected elections or any of the permanent changes made in Sections 28 through 88 of the law. Because an injunction barring the unchallenged portions of Assembly Bill 4 "has no essential or important relationship to the claim for relief," Plaintiffs' request for relief should be dismissed or, in the alternative, stricken under Rule 12(f) as immaterial. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271 (N.D. Cal. 2015) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)); *see also Guerrero v. Halliburton Energy Servs., Inc.*, 231 F. Supp. 3d 797, 809 (E.D. Cal. 2017) (dismissing request for injunctive relief instead of granting motion to strike); *Cleverley v. Ballantyne*, No. 2:12-CV-00444-GMN, 2014 WL 294519, at *3 (D. Nev. Jan. 24, 2014) (noting that "prayer for relief" can "be stricken as immaterial, impertinent, or scandalous" where it "seek[s] remedies that are precluded by the Court's previous orders"); *Sanders v. Church Mut. Ins. Co.*, No. 2:12-CV-

01392-LRH-WGC, 2013 WL 663022, at *4 (D. Nev. Feb. 21, 2013) (implying that court can "dismiss the punitive damages prayer for relief on the grounds that the Complaint does not allege facts supporting such damages"). Plaintiffs cannot bootstrap their desired relief—that the Court strike down Assembly Bill 4 in its entirety—onto their narrow and baseless claims which implicate just six isolated provisions of the law.

## CONCLUSION

For the reasons stated above, Plaintiffs' complaint should be dismissed.

DATED this 3rd day of September, 2020

**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**

By: _____*/s/ Bradley Schrager*_____
    Bradley S. Schrager, Esq., SBN 10217
    Daniel Bravo, Esq., SBN 13078
    3556 E. Russell Road, Second Floor
    Las Vegas, Nevada 89120

    Marc E. Elias, Esq.*
    Courtney A. Elgart, Esq.*
    Henry J. Brewster, Esq.*
    **PERKINS COIE LLP**
    700 Thirteenth Street NW, Suite 800
    Washington, D.C. 20005-3960

    Abha Khanna, Esq.*
    Reina A. Almon-Griffin, Esq.*
    Jonathan P. Hawley, Esq.*
    **PERKINS COIE LLP**
    1201 Third Avenue, Suite 4900
    Seattle, Washington 98101-3099

    *Attorneys for Proposed Intervenor-Defendants DNC Services Corporation/Democratic National Committee, DCCC, and Nevada State Democratic Party*

    *Admitted pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 3rd of September, 2020 a true and correct copy of **INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** was served via the United States District Court's CM/ECF system on all parties or persons requiring notice.

By:   */s/ Christie Rehfeld*
Christie Rehfeld, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP