CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ, (1216)
djc@cwlawlv.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@cwlawlv.com
700 South 7th Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

CONSOVOY MCCARTHY PLLC
WILLIAM S. CONSOVOY, ESQ.*
Virginia Bar No. 47704
will@consovoymccarthy.com
THOMAS R. MCCARTHY, ESQ.*
Virginia Bar No. 47145
tom@consovoymccarthy.com
TYLER R. GREEN, ESQ.*
Utah Bar No. 10660
tyler@consovoymccarthy.com
CAMERON T. NORRIS, ESQ.*
Virginia Bar No. 91624
cam@consovoymccarthy.com
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Telephone: (703) 243-9423
*Attorneys for Plaintiffs*
**Admitted pro hac vice*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; AND NEVADA REPUBLICAN PARTY,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,<br><br>Defendant,<br><br>and | No. 2:20-cv-01445-JCM-VCF<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES** |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5 | DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE, DCCC, and NEVADA STATE DEMOCRATIC PARTY,<br><br>     Intervenor-Defendants. |

In accordance with Federal Rule of Civil Procedure 56(a) and LR 56-1, Plaintiffs Donald J. Trump for President, Inc., the Republican National Committee, and the Nevada Republican Party move for partial summary judgment on Count I of their Amended Complaint.

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS .......................................................................... 1

    A.   Congress has established one uniform, national Election Day for members of Congress and for presidential and vice-presidential electors. ............................................... 2

    B.   Before 2020, Nevada law precluded voters from voting after Election Day. .................. 3

    C.   Two Nevada laws effective in 2020 authorize accepting and counting votes cast after Election Day. ............................................................................................................. 4

    D.   Ballots mailed on the Wednesday or Thursday after Election Day will arrive at election offices by the next Friday—and some of those will not have postmarks. ............................... 6

SUMMARY JUDGMENT STANDARD ............................................................................... 9

ARGUMENT .......................................................................................................................... 9

I.   Section 20.2 violates federal law by authorizing elections for members of Congress and for presidential electors to continue after Election Day. ............................................... 9

    A.   Federal law requires elections for federal office to be consummated on Election Day ... 9

    B.   Section 20.2 allows ballots cast after Election Day to be counted ................................ 11

    C.   Because §20.2 conflicts with federal law, it is invalid ................................................... 12

CONCLUSION ...................................................................................................................... 14

CERTIFICATE OF SERVICE .............................................................................................. 15

iii

# INTRODUCTION

May a state count a ballot for a congressional candidate or presidential elector it receives *after* Election Day if there is no proof that a voter cast that ballot *on or before* Election Day? Nevada law says yes. It deems unpostmarked ballots that are received by mail before 5:00 p.m. on the Friday after Election Day as having been cast on or before Election Day *as a matter of law*. Assembly Bill 4, §20.2.

That conflicts with federal law. Exercising its constitutional powers under the Elections Clause and Electors Clause, Congress established one day as the uniform, national "day for the election" for members of Congress and presidential and vice-presidential electors. Those laws require the combined acts of voters and election officials necessary to finally select those officials to be consummated on Election Day. Nothing about those federal laws tolerates a state's mere presumption that voters have timely taken those required acts.

Supreme Court precedent makes plain the remedy when federal and state election laws conflict like this. "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879). So it is here. Section 20.2 must be struck down because, on its face, it purports to alter (by extending) the time Congress established for federal elections. Since that conflict is plain on the face of the conflicting statutes, the Court should grant Plaintiffs summary judgment on Count I of their Amended Complaint.

# STATEMENT OF UNDISPUTED FACTS

As in prior cases addressing the interplay between federal and state election laws, the "issue here [i]s a narrow one turning entirely on the meaning of th[os]e state and federal statutes." *Foster v. Love*, 522 U.S. 67, 71 (1997). So Plaintiffs first discuss those statutes—federal law setting a uniform, national Election Day for members of Congress and the President; prior Nevada law requiring those elections to be consummated on Election Day; and a new Nevada law allowing those elections to continue after that—before explaining why the new Nevada law must fall.

**A.     Congress has established one uniform, national Election Day for members of Congress and for presidential and vice-presidential electors.**

Though the Elections Clause grants states power to set the time, place, and manner of congressional elections, U.S. Const. art. I, §4, cl. 1, it also subordinates that power to federal law. The Clause expressly reserves to "Congress" the power to "at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id.* Congress also bears similar power under the Electors Clause to "determine the Time of chusing the Electors" for the offices of President and Vice President. *Id.* art. II, §1, cl. 4. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 399 (1932).

Plaintiffs' claim here arises from federal statutes embodying a crucial exercise of those powers: Congress's decision to establish "the Tuesday next after the 1st Monday in November" as the uniform, national "day for the election" of members of Congress, 2 U.S.C. § 7; *see id.* §1, and for appointing electors for President and Vice President, 3 U.S.C. §1. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. And they are valid exercises of Congress's power. "By establishing a particular day as 'the day' on which these actions must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Id.* at 71-72; *see also Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001) ("Without question, Congress has authority to compel states to hold these elections on the dates it specifies.").

Those statutes serve sound policy goals. A uniform, national Election Day prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. Before Congress adopted a uniform Election Day during the Reconstruction era, the "diversity of" federal election dates gave "'some states'" and "'some parties'" an "'undue advantage'"; as one Senator from Maine put it

2

when opposing a uniform Election Day, "'we want in the future, as we have had in the past, the position of indicating to the country the first sentiment on great political questions.'" *Keisling*, 259 F.3d at 1173. Beyond that, a uniform, national Election Day "'interpose[s] a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for the Representatives undisturbed by considerations which they ought not to take at all into account.'" *Id.* at 1174.

### B. Before 2020, Nevada law precluded voters from voting after Election Day.

The Nevada Legislature has exercised its power under the Elections Clause to regulate other aspects of the time, place, and manner of elections for federal officers from Nevada. *See, e.g.*, NRS Chapters 293, 298, 304. As relevant here, Nevada law establishes at least five different ways that Nevadans may vote in a general election: by in-person voting at the polls, NRS 293.270-293.307; by provisional ballot, NRS 293.3078-293.3086; by absent ballot voting, NRS 293.3088-293.340; by voting in mailing precincts, NRS 293.343-293.355; and by early in-person voting, NRS 293.356-293.361. Nevada law also establishes how ballots are to be counted and the returns are to be canvassed. NRS 293.3625-293.397.

Among those voting options, Nevadans historically have chosen overwhelmingly to vote in person. In fact, the Secretary of State's own data show that 9 of every 10 ballots cast in Nevada's general elections are in-person votes. Consider Nevada's 2012 and 2014 general elections. In 2012, 91.57% of ballots cast were in-person votes; absent ballots made up the remaining 8.43%. Office of Nev. Sec'y of State Ross Miller, 2012 General Election Turnout, Final Results, https://bit.ly/2YCIZ40 (attached as Ex. 1). In 2014, the numbers tilted even more toward in-person voting (92.48%) than to absent ballots (7.52%). Office of Nev. Sec'y of State Ross Miller, 2014 General Election Turnout (Dec. 11, 2014), https://bit.ly/3jnG87f (attached as Ex. 2).

Those trends held for Nevada's 2016 general election. There, 93.02% of the total ballots cast were in-person votes cast during early voting (62.41% of total ballots) or on Election Day (30.61% of total ballots). Absent ballots constituted just 6.41% of total ballots cast, and the remaining 0.57% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara

K. Cegavske, 2016 General Election Turnout (Feb. 10, 2017), https://bit.ly/3a0U9nS (attached as Ex. 3).

So too for Nevada's 2018 general election. There, 91.04% of the total ballots cast were in-person votes cast during early voting (56.80% of total ballots) or on Election Day (34.24% of total ballots). Absent ballots constituted just 8.57% of total ballots cast, and the remaining 0.39% of total ballots cast were mailing ballots. Office of Nev. Sec'y of State Barbara K. Cegavske, 2018 General Election Turnout (Nov. 20, 2018), https://bit.ly/31kS81E (attached as Ex. 4).

Of course, all of those in-person votes were cast on or before Election Day. Not one was cast after it. So during the last decade, there has been no basis to question whether more than 90 percent of the votes cast in Nevada's general elections were timely.

Nor was there a basis to question the timeliness of absent ballots cast in Nevada. Until this year, Nevada law imposed the same day-of-election voting deadline on absent ballots as it did on in-person ballots. Nevada law effective through the end of December 2019 provided that "[a]bsent ballots, including special absent ballots, received by the county or city clerk after the polls are closed on the day of election are invalid." NRS 293.317 (repealed Jan. 1, 2020).

The upshot of those combined laws is that, before 2020, every Nevadan—the roughly 90 percent who voted in-person and the roughly 10 percent who voted absentee—had to cast their ballot on or before Election Day. In-person or absent ballots cast after Election Day were invalid and would not be counted.

### C. Two Nevada laws effective in 2020 authorize accepting and counting votes cast after Election Day.

All that changed in 2020. Two new Nevada laws allow absent ballots to be cast after Election Day *and still be counted*.

The first of those laws, which took effect on January 1, 2020, replaces NRS 293.317's old close-of-polling ballot-receipt deadline with three new receipt deadlines. Two of those occur after Election Day. First, ballots are timely if voters hand deliver them to the county clerk before polls close. NRS 293.317(1)(a). Second, ballots are timely if they are postmarked on or before election day and the county clerk receives them within seven days of Election Day. *Id.* 293.317(1)(b). Third,

ballots are timely if county clerks receive them "not more than 3 days after the day of the election and the postmark cannot be determined." *Id.* 293.317(2). In those circumstances, the law "deem[s]" the ballot "to have been postmarked on or before the day of the election." *Id.* Because this law took effect last January, it has not yet applied to a general election. So no ballots cast under this regime have been counted (or rejected) in any federal election.

And because of the pandemic, amended NRS 293.317 will not apply to the November 2020 general election, either. The second new 2020 law—Assembly Bill 4—displaces it. The Nevada Legislature passed AB4 in its 32nd Special Session, a weekend session held early last month. The Democratic majority in the Nevada Assembly introduced AB4 on a Friday afternoon and passed it on a straight party-line vote mere hours later. AB4 then went to the Nevada Senate, which considered it near midnight on Friday and again on Saturday before passing it on Sunday, August 2, 2020, also on a straight party-line vote. Governor Sisolak signed AB4 into law the next day.

AB4 contains 88 sections. *See* AB4, Nev. Legis., 32nd Spec. Sess. (2020), https://bit.ly/2Qyk6SA (attached as Ex. 5). Sections 2 through 29 enact entirely new provisions in the Nevada Revised Statutes. Within those, Sections 2 through 27 create a new framework for primary or general elections held during a declared emergency or state of disaster, defined under AB4 as an "affected election." AB4, §§5, 8. Governor Sisolak declared a state of emergency in Nevada due to COVID-19 on March 12, 2020. Nev. Exec. Dep't, Declaration of Emergency Directive 009 (Revised) (Mar. 12, 2020), https://bit.ly/3fSD28W (attached as Ex. 6). That makes Nevada's 2020 general election an "affected election" that must be run in accordance with Sections 2 through 27.

Those sections establish three rules relevant here. First, under AB4, county clerks must "prepare and distribute to each active registered voter in the county … a mail ballot for the election." AB4, §15.1. Second, along with those ballots, county clerks must distribute a "return envelope," *id.* §16.1(b), which "must include postage prepaid by first-class mail," *id.* §16.3. Third, to be timely, ballots must be received by one of three deadlines. Ballots returned in person must be received before polls close on Election Day. *Id.* §2.1(a). Ballots returned by mail and "[p]ostmarked on or before the day of the election" are timely if received before 5:00 p.m. on the seventh day after the

election. *Id.* §20.1(b). And ballots "received by mail not later than 5 p.m. on the third day following the election" are timely if "the date of the postmark cannot be determined." *Id.* §20.2. In those circumstances, Nevada law "deem[s]" the unpostmarked ballot "to have been postmarked on or before the day of the election." *Id.*

In other words, under §20.2, ballots mailed on Wednesday or Thursday *after* Election Day are timely *as a matter of law* as long as (1) there is no proof they were mailed on Wednesday or Thursday, and (2) they're received by 5:00 p.m. on Friday after Election Day. All ballots fitting that description will be counted.

### D. Ballots mailed on the Wednesday or Thursday after Election Day will arrive at election offices by the next Friday—and some of those will not have postmarks.

Section 20.2's very existence confirms that Nevada policymakers expect ballots with no postmarks to be received after Election Day. Plaintiffs share those expectations.

As noted, AB4 requires county clerks to send mail ballots to voters along with "a return envelope" that "must include postage prepaid by first-class mail." AB4, §16.3. The U.S. Postal Service's general policy is not to apply postmarks to postage prepaid envelopes. *See* U.S. Postal Serv., §1-1.3 Postmarks ("Postmarks are not required for mailings bearing a permit, meter, or precanceled stamp for postage, nor to pieces with an indicia applied by various postage evidencing systems."), https://bit.ly/3kftt7l (attached as Ex. 7). But USPS guidance states an exception to that general no-postmarking policy for election mail. Under that guidance, in place since 2018, "all ballots should be postmarked by machine or by hand." Office of Inspector Gen., U.S. Postal Serv., *Management Alert: Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area*, Report No. 20-235-R20, 3 (July 7, 2020), https://bit.ly/2YbjBT0 (attached as Ex. 8).

But the 2020 election cycle has confirmed that—despite its policy—USPS does not postmark all ballots. USPS itself acknowledges that "there can be breakdowns or exceptions to this process which could prevent a ballot from receiving a postmark." *Id.* at 7. That happened in Wisconsin's April 2020 primary election, when the Milwaukee Election Office received "about 390 voter completed ballots with varying postmark issues including illegible postmarks, lack of a postmark, undated postmarks, or hand-stamped postmarks." *Id.* at 5. USPS explained that those problems could

have resulted from ballots being "double fed on a machine," or when the "machines applying postmarks … run out of ink," or from ballots being "comingled with certain mail that is not processed on machinery that applies a postmark." *Id.* at 7.

Similar problems plagued New York's June 2020 primary election. Six weeks after the primary election between Rep. Carolyn Maloney and Suraj Patel for New York's 12th District, results remained unknown, so a federal district judge in New York "ordered the counting of certain mail ballots that arrived after Election Day but without a postmark to prove when they were sent." *An Autopsy of New York's Mail-Vote Mess*, Wall St. J. (Aug. 7, 2020), https://on.wsj.com/3kT7d3y (attached as Ex. 9). In that race, "1,135 of 8,285 absentee ballots received by the NYCBOE within a week of Election Day—more than 13%—were not postmarked," while the number of unpostmarked ballots in another New York primary race was "nearly 10%." *Gallagher v. N.Y. State Bd. of Elec.*, — F. Supp. 3d —, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020).

It is still not known why absentee ballots were delivered without a postmark to election officials in New York even though the Postal Service's "policy is to postmark all ballots, and the city was assured it would happen." *An Autopsy of New York's Mail-Vote Mess*, *supra*, Ex. 9. But a manager at a New York postal service processing facility testified during the lawsuit over the absentee ballots and "offered two possibilities." *Id.* "First, postmarking machines can reject mail if, for example, it isn't 'folded over properly.' On Election Day, USPS staff were ready to grab bypassed ballots and postmark them by hand." *Id.* That happened "'for thousands of ballots'" on Election Day, but the manager "wasn't sure…if this happened before June 23." *Id.* Second, "most prepaid mail usually skips postmarking altogether and goes 'directly to a sortation machine.'" *Id.* "On Election Day, USPS staff overrode that procedure and forced everything through the postmarking system. But again, [the manager] wasn't sure about before June 23, saying it was 'very possible' that some ballots went straight to sorting." *Id.* News reports do not disclose whether USPS would invoke those manual-override procedures on days *after* Election Day to ensure postmarks were affixed both to improperly folded mail and to prepaid ballots placed in the mail *after* the election.

Still, the lack of a postmark would be irrelevant if ballots mailed on the Wednesday or

Thursday after Election Day never arrived before 5:00 pm on the Friday after Election Day. After all, both preconditions—no postmark *and* receipt before Friday by 5:00 pm—must exist before §20.2 deems those ballots timely. But "all Election Mail (including ballots) mailed from individual voters to state or local election officials *must* be sent by First-Class Mail," Ltr. From Thomas J. Marshall, Gen. Counsel, U.S. Postal Serv., *Re: Election Mail*, 1 (May 29, 2020), https://bit.ly/2QvyBqw (attached as Ex. 10), and at least *some* first-class mail sent in Nevada on a Wednesday *will* arrive at another Nevada address on or before the next Friday. To confirm those delivery times, a representative of the committee to reelect President Trump recently mailed 10 letters via First-Class mail from five Las Vegas post offices to two addresses in Las Vegas. Nine of those 10 letters were delivered the next day. *See* Decl. of Jesse Law, ¶¶ 1-10 (attached as Ex. 11). Those outcomes comport with USPS's standard for delivering first-class mail within "2-5 days," Marshall Ltr., *supra*, at 1, Ex. 10, and with USPS's representation that "[i]n some instances (short distance between ZIP Codes), it is possible for [first-class] delivery to occur in one day," U.S. Postal Serv., *FAQs: What are the Types of First-Class Mail?*, Article No. 000003138 (Jan. 26, 2020), https://bit.ly/2EyfERB (attached as Ex. 12).

By allowing ballots to be cast after Election Day, §20.2 facilitates the precise behavior that the federal Election Day statutes were enacted to prevent—avoiding improper influences on elections and letting early returns give certain candidates or parties an advantage. And the facts after Nevada's June 2020 primary election show just how likely AB4 will be to facilitate those issues. That primary election occurred as an all-mail election as ordered by the Secretary of State. News reports state that a staggering number of mail ballots never reached the voters listed on them. For example, Clark County mailed out 1,325,934 ballots. Of that total, 223,469 were returned as undeliverable. Rory Appleton, *More than 223k mailed ballots returned undeliverable in primary*, Las Vegas Rev.-J. (Aug. 14, 2020), https://bit.ly/3kWeEXB (attached as Ex. 13). And of those 223,469 undeliverable ballots, 58 percent belonged to inactive voters. But "93,585 undeliverable ballots belonged to voters classified as active in Clark County's voter rolls." *Id.* Clark County will mail general-election ballots to those more than 93,000 active registered voters even though their primary-election ballots were returned to Clark County as undeliverable. Email from Joseph P.

Gloria, Clark County Registrar of Voters, to Jeremy Hughes (Aug. 10, 2020) (attached as Ex. 14). It's unclear whether those more than 93,000 ballots include ballots from the 2,200 people who are deceased but still on Clark County's voter rolls. *223k mailed ballots returned*, *supra*, Ex. 13.

Beyond those more than 93,000 ballots actually returned to Clark County, news reports documented photographic evidence of an untold number of primary ballots "tossed in trash cans and littering apartment mailbox areas" in Clark County during the week after they were mailed. Rory Appleton, *Primary Underway, But Argument Over Mail-In Election Continues*, Las Vegas Rev.-J. (May 19, 2020), bit.ly/2z3DHVV (attached as Ex. 15). The number of those kinds of ballots—which also should have been returned as undeliverable, but were not—will never be known.

## SUMMARY JUDGMENT STANDARD

Plaintiffs are entitled to summary judgment when they "show[] that there is no genuine dispute as to any material fact and" they are "entitled to judgment as a matter of law." Fed. R Civ. P. 56(a). Like *Keisling*, "[t]his case concerns only legal issues, and no facts are in dispute." 259 F.3d at 1170. Rather, the "issue here is a narrow one turning entirely on the meaning of the state and federal statutes." *Foster*, 522 U.S. at 71. And "[w]hether a statute is facially unconstitutional is a matter of law." *Lind v. Grimmer*, 30 F.3d 1115, 1121 (9th Cir. 1994). Under those standards, §20.2's validity can (and must) be decided before Election Day, for "[t]he issue is not how many" ballots have been submitted contrary to federal law, "but rather the extent to which" §20.2 "may potentially impair" candidates' rights under federal law to have their election consummated on Election Day. *Id.* at 1121 n.6.

## ARGUMENT

**I.  Section 20.2 violates federal law by authorizing elections for members of Congress and for presidential electors to continue after Election Day.[1]**

**A.  Federal law requires elections for federal office to be consummated on Election Day.**

Congress has passed a trio of federal statutes that "mandates holding all elections for

---

[1] In their Amended Complaint, Plaintiffs also allege violations of the Fourteenth Amendment. Plaintiffs stand by those claims but, for the sake of efficiency, seek partial summary

Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. The "Tuesday next after the 1st Monday in November" is the uniform, national "day for the election" of members of the House of Representatives, 2 U.S.C. §7, and of the Senate, id. §1, and for choosing presidential and vice-presidential electors, 3 U.S.C. §1.

What constitutes "the election" those statutes mandate? That term "refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. Put differently, it "means a 'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175. Voters' role in that process includes not just marking a ballot but also "having it delivered to the election officials and" timely "deposited in the ballot box." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944). For "[i]t is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or voting." *Id*. After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Id*.

Given those "binding" federal requirements, *Foster*, 522 U.S. at 69, state election regimes violate federal law if "the combined actions of voters and officials meant to make a final selection of an officeholder" occur "prior to federal election day." *Id*. at 71, 72 n.4. That is why the Supreme Court unanimously invalidated a Louisiana election regime holding congressional elections in October. Louisiana law deemed any candidate who won a majority in that October vote to be "elected," with "no further act … done on federal election day to fill the office in question." *Id*. at 70. Only "[i]f no candidate for a given office receive[d] a majority" in the October vote did Louisiana hold another election, dubbed a "run-off," on Election Day. *Id*. Louisiana's regime was thus constitutionally flawed because it established "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress." *Id*. at 468. That "clearly violates [2 U.S.C.] §7." *Id*.

Two conclusions follow from that holding. First, state regimes that count ballots cast before

---

judgment only on their claims under the Elections and Electors Clauses.

Election Day do not violate federal law, *Keisling*, 259 F.3d at 1175-76; *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775-77 (5th Cir. 2000); *Millsaps v. Thompson*, 259 F.3d 535, 543-46 (6th Cir. 2001), but only because early voting by itself does not consummate the election before Election Day. Early absentee voting merely complements other "voting" that "still takes place on" Election Day. *Keisling*, 259 F.3d at 1176; *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day.").

Second, state regimes that count ballots cast *after* Election Day *do* violate federal law. State election regimes can no more require "the combined actions of voters and officials meant to make a final selection of an officeholder" to stop "prior to federal election day" than they can allow those combined actions to continue after it. *Foster*, 522 U.S. at 71, 72 n.4. Either type of regime "purport[s] to affect the timing of federal elections"— an October election "requires no further act by anyone to seal the election" on Election Day, *id*. at 73, and accepting ballots cast after Election Day expressly contemplates "further act[s]" (late-cast votes) intended to influence the final result. Thus both types of election systems contravene Congress's "final say" about when federal elections must occur and "clearly violate[] [2 U.S.C.] §7," 2 U.S.C. §1, and 3 U.S.C. §1. *Id.* at 72.

**B.    Section 20.2 allows ballots cast after Election Day to be counted.**

"[A]s a matter of law," §20.2 of AB4 allows "a contested selection of candidates for a congressional office"—and for presidential and vice-presidential electors—to continue after "the federal election day." *Foster*, 522 U.S. at 72. Under §20.2, if a ballot is received by mail before 5:00 p.m. on the Friday after Election Day "and the date of the postmark cannot be determined, the mail ballot shall be deemed to have been postmarked on or before the day of the election." That requires elections officials to count mail ballots that were mailed on the Wednesday or Thursday *after* Election Day—as long as they arrive by Friday at 5:00 p.m. and bear no postmark (or an undiscernible one). On its face, that morphs the singular "day for the election," 2 U.S.C. §7, into the plural "Election Day—and a few days after it."

Nor is there a dispute about whether ballots satisfying both conditions will in fact arrive (and thus be counted). USPS's own statements confirm as much: it acknowledges that "there can be

breakdowns or exceptions to this process which could prevent a ballot from receiving a postmark," *Management Alert*, *supra*, at 7 (Ex. 8), and that "[i]n some instances (short distance between ZIP Codes), it is possible for [first-class] delivery to occur in one day," *What are the Types of First-Class Mail?*, *supra*, Ex. 12. Undisputed on-the-ground facts tell the same story: The letters sent from Las Vegas by first-class mail were received in Las Vegas the day after they were mailed, confirming USPS's First-Class overnight-delivery capabilities in Nevada. *See* Law Decl., Ex. 11. And the undisputed historical record of unpostmarked ballots received in Wisconsin's and New York's 2020 primary elections—constituting as many as 13% of ballots received for some New York races, *Gallagher*, — F. Supp. 3d —, 2020 WL 4496849, at *16—show USPS's commendable honesty by admitting to the inevitable inconsistencies in its postmarking process.

### C. Because §20.2 conflicts with federal law, it is invalid.

Section 20.2 deems some ballots cast after Election Day timely as a matter of law. That irreconcilably conflicts with Congress's decisions in 2 U.S.C. §§1, 7 and 3 U.S.C. §1 to require that "the combined actions of voters and officials meant to make a final selection of an officeholder" be "consummated" on one uniform, national Election Day. *Foster*, 522 U.S. at 71, 72 n.4. Indeed, Plaintiffs are not the only ones to have identified this irreconcilable conflict so readily apparent in the statutes' plain text. *E.g.*, David B. Rivkin Jr. & Lee A. Casey, *Mail-In Voting Could Deliver Chaos*, Wall St. J. (Aug. 25, 2020) ("no ballot cast after Nov. 3 is constitutionally valid," and "counting unpostmarked mailed ballots that arrive after Election Day would be unconstitutional, as there would be no way to tell if they were cast in time"), https://on.wsj.com/3jLMbT7 (attached as Ex. 16).

Supreme Court precedent leaves no doubt about the necessary remedy here. Given §20.2's facial "conflict[] with federal law," it "is void." *Foster*, 522 U.S. at 74. For "the regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. at 384.

Voiding §20.2 furthers Congress's reasons for establishing a uniform, national Election Day for members of Congress and the President. Recall Congress's "concern[]" that when voting occurred on multiple days, "the results of an early federal election in one State" would "distort[]

1   … the voting process" and "influence later voting in other States." *Foster*, 522 U.S. at 73. And its
2   recognition that holding an election on one day "'interpose[s] a not inconsiderable check to frauds
3   in elections [and] to double voting.'" *Keisling*, 259 F.3d at 1174. Section 20.2's post-Election Day
4   regime implicates both concerns. Under §20.2, persons dissatisfied with Tuesday night's election
5   returns have an opening to try to distort and improperly influence any races whose preliminary
6   outcomes displease them. And with Clark County alone mailing more than 93,000 ballots this Fall
7   to voters whom County officials know *no longer live at their registered addresses*, opportunities
8   for obtaining and returning ballots after Election Day will not be hard to find.

9   Beyond that, voiding §20.2 will eliminate a potential threat to Nevada's ability to cast its
10  Electoral College votes. Under federal law, the Electoral College meets and votes (this year) on
11  December 14. *See* 3 U.S.C. §7. What if a dispute exists about the appointment of Nevada's electors?
12  If any such dispute exists and is resolved under existing state law before December 8, Congress
13  must conclusively accept Nevada's slate of electors. *Id.* §5. But if any such dispute is *not* resolved
14  by December 8, the Nevada Legislature must decide how to appoint Nevada's electors in time for
15  them to cast votes on December 14. *Id.* §2.

16  Together, those provisions require that disputes about the validity of ballots cast for
17  presidential electors must be resolved under Nevada law by December 8 for Congress to accept
18  Nevada's electors' votes "conclusive[ly]" on December 14. *Id.* §5. December 8 is just 32 days after
19  §20.2's November 6 deadline for unpostmarked ballots. And New York's primary election this year
20  is proof enough that disputes over the validity of unpostmarked ballots can take all of 32 days (and
21  more) to resolve. The primary election between Rep. Carolyn Maloney and Suraj Patel for New
22  York's 12th District remained unresolved for *six weeks* after the election, based in part on disputes
23  over "the counting of certain mail ballots that arrived after Election Day but without a postmark to
24  prove when they were sent." *An Autopsy of New York's Mail-Vote Mess*, *supra*. If it takes six weeks
25  to resolve disputes over unpostmarked absentee ballots counted under §20.2, Nevada will miss its
26  safe-harbor deadline for certifying its electors by 10 days—and with it federal law's "conclusive"
27  guarantee that Nevada's electoral votes will be counted as sent. And if that happens, and Nevada's
28  Electoral College votes are not accepted, it would disenfranchise every voter in Nevada who voted

for a presidential candidate.

Voiding §20.2 avoids those risks. Disputes about unpostmarked ballots received after Election Day will not exist if the law no longer allows counting unpostmarked ballots received after Election Day. The Court should invalidate §20.2 to ensure that only ballots cast on or before Election Day—the deadline federal law sets—will be counted.

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion for partial summary judgment and void §20.2 because it irreconcilably conflicts with federal law.

Respectfully submitted,

Dated: September 4, 2020

/s/ J. Colby Williams
Donald J. Campbell (1216)
J. Colby Williams (5549)
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702) 382-5222
(702) 382-0540 (fax)

William S. Consovoy*
Thomas R. McCarthy*
Tyler R. Green*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Attorneys for Plaintiffs*

*Admitted pro hac vice

14

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this pleading with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel registered in this case.

Dated:   September 4, 2020        /s/ J. Colby Williams
                                  J. Colby Williams

## INDEX OF EXHIBITS

| Document | Page |
|---|---|
| Declaration of Tyler R. Green | |
| Exhibit 1 – Office of Nevada Secretary of State Ross Miller 2012 General Election Turnout, Final Results | 1 |
| Exhibit 2 – Office of Nevada Secretary of State Ross Miller 2014 General Election Turnout (Updated December 11, 2014 | 2 |
| Exhibit 3 – Office of Nevada Secretary of State Barbara K. Cegavske, 2016 General Election Turnout (Updated February 10, 2017) | 3 |
| Exhibit 4 – Office of Nevada Secretary of State Barbara K. Cegavske, 2018 General Election Turnout (Updated November 20, 2018) | 4-5 |
| Exhibit 5 – Assembly Bill 4, Nevada Legislature, 32nd Special Session (2020) | 6-69 |
| Exhibit 6 – Nevada Executive Department, Declaration of Emergency Directive 009 (Revised) | 70-72 |
| Exhibit 7 – U.S. Postal Service §1-1.3 Postmarks | 73 |
| Exhibit 8 – Office of Inspector General, United States Postal Service, *Management Alert: Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area*, Report No. 20-235 (July 7, 2020) | 74-90 |
| Exhibit 9 – *An Autopsy of New York's Mail-Vote Mess*, Wall Street Journal Article (August 7, 2020) | 91-93 |
| Exhibit 10 – Letter from Thomas J. Marshall, General Counsel, United States Postal Service Re: Election Mail (May 29, 2020) | 94-96 |
| Exhibit 11 – Declaration of Jesse R. Law | 97-100 |
| Exhibit 12 – United States Postal Service, *FAQs: What are the Types of First Class Mail?* Article No. 000003138 (January 26, 2020) | 101-109 |
| Exhibit 13 – *More than 223k mailed ballots returned undeliverable in primary,* Las Vegas Review Journal Article by Rory Appleton (August 14, 2020) | 110-113 |
| Exhibit 14 – Email from Joseph P. Gloria, Clark County Registrar of Voters, to Jeremy Hughes (August 10, 2020) | 114 |

| | |
|---|---:|
| Exhibit 15 – *Primary Underway, But Argument Over Mail-In Election Continues*, Las Vegas Review Journal Article by Rory Appleton (May 19, 2020) | 115-118 |
| Exhibit 16 – *Mail-In Voting Could Deliver Chaos*, Wall Street Journal Article (August 25, 2020) | 119-121 |