CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ, (1216)
djc@cwlawlv.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@cwlawlv.com
700 South 7th Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

CONSOVOY MCCARTHY PLLC
WILLIAM S. CONSOVOY, ESQ.*
Virginia Bar No. 47704
will@consovoymccarthy.com
THOMAS R. MCCARTHY, ESQ.*
Virginia Bar No. 47145
tom@consovoymccarthy.com
TYLER R. GREEN, ESQ.*
Utah Bar No. 10660
tyler@consovoymccarthy.com
CAMERON T. NORRIS, ESQ.*
Virginia Bar No. 91624
cam@consovoymccarthy.com
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Telephone: (703) 243-9423
*Attorneys for Plaintiffs*
*Admitted pro hac vice*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; AND NEVADA REPUBLICAN PARTY,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,<br><br>Defendant.<br><br>and | No. 2:20-cv-01445-JCM-VCF<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

|   |   |
|---|---|
| 1 | DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE, DCCC, and NEVADA STATE DEMOCRATIC PARTY, |
| 2 | |
| 3 | |
| 4 | Intervenor-Defendants. |

## INTRODUCTION

Donald J. Trump for President, Inc., the Republican National Committee, and the Nevada Republican Party have challenged the constitutionality of various sections of Assembly Bill 4, a recently and hastily passed 60-page bill that transforms how Nevada will conduct its November 2020 general election. In response, Nevada's Secretary of State repeatedly casts Plaintiffs' claims as little more than a "public policy debate" (ECF No. 37 at 1; *see also id.* at 2, 7, 10, 11, 19, 20, 24), and asks this Court to dismiss the Amended Complaint under Rule 12(b)(1), *see id.* at 9. In particular, the Secretary asserts that Plaintiffs lack standing, that the case is neither ripe nor justiciable, and that Plaintiffs lack a right of action.

To be sure: Plaintiffs have policy disputes with AB4. That's no secret; they alleged as much in the Amended Complaint. (ECF No. 29, ¶ 2.) But just as sure: Plaintiffs' claims target the parts of AB4 that are not merely bad policy but that also transgress federal statutory and constitutional requirements. And for each of those claims, Plaintiffs have adequately alleged multiple independently sufficient grounds for standing and possess a right of action, making this case justiciable. Accordingly, the Court should deny the Secretary's motion to dismiss.

## LEGAL STANDARD

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000) (internal quotation marks omitted). The party invoking federal jurisdiction bears the burden of

establishing these elements. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). "In deciding whether a plaintiff has made this showing," the court must "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)).

## ARGUMENT

Plaintiffs' Amended Complaint adequately alleges facts establishing several independently sufficient injuries to support standing. First, Plaintiffs have direct organizational standing because AB4 compels them to divert their resources. Second, Plaintiffs have direct organizational standing because AB4 harms their ability to achieve electoral success. Third, Plaintiffs have direct organizational standing because AB4 imposes competitive disadvantages upon the Plaintiff organizations. Fourth, Plaintiffs have adequately alleged associational standing to vindicate the competitive harms that AB4 causes their member-candidates. Fifth, Plaintiffs have associational standing to vindicate the harms caused to their voter-members by AB4's dilution of their votes. Sixth, Plaintiffs have associational standing to vindicate the harms caused to their voter-members by AB4's disparate treatment of rural voters. Any one of these independently sufficient grounds establishes Plaintiffs' standing and requires denying the Secretary's motion to dismiss. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) ("For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."); *see also Fair Maps Nevada v. Cegavske*, No. 320CV00271MMDWGC, 2020 WL 2798018, at *6 (D. Nev. May 29, 2020). Additionally, this suit is ripe for review and justiciable. Finally, Plaintiffs possess a right of action under 42 U.S.C. §1983 to pursue their challenges under federal election laws and the Fourteenth Amendment.

**I.       Plaintiffs have adequately alleged facts establishing direct organizational standing.**

An organization satisfies its burden to plead a direct injury in fact when it alleges that unlawful state action will cause it to divert resources. *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) ("We've held that an organization has direct standing to sue [when] it showed a drain on its resources from both a diversion of its

resources and frustration of its mission." (internal quotation marks omitted)). And "[t]he Court has also made clear that a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is broadly alleged." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (internal quotation marks omitted). That is so even if the "added cost has not been estimated and may be slight," because standing "requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (citing *Friends of the Earth, Inc.*, 528 U.S. at 180–84).

Plaintiffs readily clear that threshold. The Amended Complaint alleges that "AB4 forces the RNC to divert resources and spend significant amounts of money educating Nevada voters on those changes and encouraging them to still vote." (ECF No. 29 ¶17.) It also alleges that AB4 "require[s] the committee" to reelect President Trump "to change how it allocates its resources and the time and efforts of its campaign staff, to achieve its electoral and political goals." (*Id.* ¶11.) The Ninth Circuit has consistently held that allegations of these precise resource-allocation harms suffice to establish injury in fact. *See Nat'l Council of La Raza*, 800 F.3d at 1040 ("The complaint specifically alleges that Plaintiffs expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them. … The Supreme Court has made clear that injuries of the sort that Plaintiffs allege are concrete and particular for purposes of Article III."). And the Supreme Court has unambiguously rejected the notion that resource diversion is merely an "abstract" injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Rather, it is long established that a "new law injures" a political party when it compels it "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Crawford*, 472 F.3d at 951. Thus, Plaintiffs have adequately alleged that they will suffer direct injury as a result of AB4 because the measure forces them to divert and reallocate resources toward educating voters and preventing vote dilution. *See Nat'l Council of La Raza*, 800 F.3d at 1040–41; *see also Am. Civil Rights Union v. Martinez-*

Memorandum in Opposition to
Motion to Dismiss

4

1  *Rivera*, 166 F. Supp. 3d 779, 800 (W.D. Tex. 2015) (organization's expenditure of resources to "prevent dilution of legitimate votes by illegal votes" satisfies injury in fact requirement).

A political party also suffers an injury in fact when an election law impedes its ability to elect candidates. Electing candidates is "not merely an ideological interest," *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586–87 (5th Cir. 2006), and losing an election is more than "simply a setback to the organization's abstract social interests," *Coleman*, 455 U.S. at 379, because "[p]olitical victory accedes power to the winning party, enabling it to better direct the machinery of government towards the party's interests," *Benkiser*, 459 F.3d at 587. As noted, Plaintiffs have adequately alleged that AB4 will impede their ability to elect candidates because the law will "confuse" their voters and "create incentive" to stay away from the polls. (ECF No. 29, ¶17.) To counter this injury, Plaintiffs have alleged that they will have to devote additional resources to dispelling this confusion and encouraging its members "to still vote." *Id.* Thus Plaintiffs adequately allege that AB4 causes those harms and that a favorable court order will redress them.

The Secretary's response—that "the thread of causation between AB4 and vote dilution is much too tenuous to support standing," ECF No. 37 at 12—miscomprehends the nature of Plaintiffs' injury. Again, that injury is Plaintiffs' diversion of resources and harm to their electoral interests. To support traceability at the motion to dismiss stage, Plaintiffs must allege only that AB4 will require them to divert resources. *See Nat'l Council of La Raza*, 800 F.3d at 1041 (noting that a state law "requir[ing] the organization to expend resources in facilitating the registration of disabled persons that they otherwise would spend in other ways is sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged illegal action" (quoting *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F.Supp.2d 845, 850 (D.Md. 2001)). The Amended Complaint does just that by alleging that AB4 will create confusion among Plaintiffs' voters and require them to "spend significant amounts of money educating Nevada voters on [AB4's] changes and encouraging them to still vote." (ECF No. 29, ¶17); *cf. Common Cause/New York v. Brehm*, 344 F. Supp. 3d 542, 549 (S.D.N.Y. 2018) ("[A]s far as standing is concerned—there is no requirement that the Court evaluate the substantive merits of Plaintiff's purported reasons for diverting its resources, provided Plaintiff plausibly alleges the diversion

Memorandum in Opposition to
Motion to Dismiss

5

occurred because of Defendants' alleged actions."). Plaintiffs' specific allegation that a state law in conflict with federal law and the Constitution will cause them to expend resources leaves "no difficulty in concluding that [they] have adequately alleged that the injury they suffer is attributable to the State." *Nat'l Council of La Raza*, 800 F.3d at 1041; *see also Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *14 (D. Minn. June 15, 2020) ("[T]he Ballot Order statute causes the primacy effect to benefit one political party over all others—notably, not the DFL—which in turn directly inflicts the injuries each committee contends it will imminently suffer: diversion of resources to counter the statute's effects, and harm to each committee's electoral prospects."). And the allegations here establish redressability because "[i]f the statute here were declared unconstitutional, and an injunction granted, it 'would ensure exactly the relief the [Plaintiffs] request. That is enough to satisfy Article III.'" *Id.* (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019)); *see also Am. Civil Liberties Union v. The Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant."). The Secretary cannot bootstrap arguments about the merits of Plaintiffs' claims into the redressability inquiry because "in determining redressability, courts 'assume that plaintiff's claim has merit." *Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006) (quoting *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004)).

The Secretary's misunderstanding of the nature of Plaintiffs' injury is demonstrated in her reliance upon the recent holding by another Judge in this Court that voters lacked standing to challenge Nevada's all-mail primary election. *See Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC (D. Nev.). *Paher* was a challenge by two individual voters involving only one claimed injury—vote dilution—that was plead in a manner that "may be conceivably raised by any Nevada voter." *Paher*, No. 3:20-CV-00243, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020). By contrast, the Amended Complaint here alleges a significant expenditure of organizational resources in response to AB4, placing this case comfortably within the long-established line of cases discussed above holding that organizations possess standing to challenge state laws that cause them to divert resources. *See, e.g.*, *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1080–81 (D.

Memorandum in Opposition to
Motion to Dismiss

6

Ariz. 2016) ("[T]he ADP alleges that H.B. 2023 will reduce the likelihood that its voters will timely return their ballots, thereby reducing the likelihood that the ADP will be successful in electing Democratic candidates. These allegations are sufficient to establish a concrete and particularized injury in fact that is fairly traceable to H.B. 2023 and likely to be redressed by a favorable ruling on Plaintiffs' preliminary injunction motion." (citing *Crawford*, 472 F.3d at 951)). There is nothing "speculative" about this injury (ECF No. 37 at 2); Plaintiffs have specifically alleged that "AB4 *forces the RNC* to divert resources and spend significant amounts of money," (ECF No. 29, ¶17) (emphasis added), and requires Donald J. Trump for President, Inc. to "change how it allocates its resources," *id.* ¶11. As the Democratic Party argued when it sued to force Nevada to adopt the reforms that eventually became AB4, "the Organizational Plaintiffs … have alleged … that they have suffered and will continue to suffer a diversion of their resources …, which is itself a harm sufficient to confer standing [] under Article III." Pltfs.' Cons. Opp. to Mots. to Dismiss 17, *Corona v. Cegavske*, No. 20 OC 00064 1B (Nev. 1st Dist. Ct. July 17, 2020) (collecting cases).

Beyond that, the Secretary's arguments attempt to change Plaintiffs' pleading standard. The Secretary repeatedly asks the Court to dismiss the Amended Complaint because Plaintiffs have not attached "evidence" to their complaint. (ECF No. 37 at 3, 5, 11, 12.) But at the pleading stage a court must "presum[e]" that Plaintiffs' "general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Council of La Raza*, 800 F.3d at 1040 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Indeed, the Ninth Circuit has faulted district courts for employing precisely the type of heightened standard the Secretary proposes. *See Nat'l Council of La Raza*, 800 F.3d at 1039–41; *see also Common Cause*, 344 F. Supp. 3d at 549 ("Defendants argue that Plaintiff's diversion of resources claims are generalized and conclusory. [] However, Defendants place too high of a burden on Plaintiff at this stage. Plaintiff need only 'allege facts' sufficient to demonstrate an injury-in-fact at the motion to dismiss stage." (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)).[1] What's more, "standing does not 'uniformly require plaintiffs to

---

[1] For the same reasons, the Secretary's attempt to disaggregate Donald J. Trump for President, Inc.'s injuries from the other Plaintiffs' injuries must fail. (ECF No. 37 at 13–16.) The Amended Complaint specifically alleges that AB4 will "require the committee to change how it allocates its resources and the time and efforts of its campaign staff, to achieve its electoral and political goals."

Memorandum in Opposition to              7
Motion to Dismiss

demonstrate that it is literally certain that the harms they identify will come about.' Instead, proving a 'substantial risk' of injury is sufficient." *Nelson v. Warner*, No. CV 3:19-0898, 2020 WL 4582414, at *4 (S.D. W. Va. Aug. 10, 2020) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Because Plaintiffs have adequately alleged that AB4 causes them to divert their resources and undermines their ability to achieve electoral success, they have pleaded an injury in fact caused by the state and redressable by a favorable court. *See Nat'l Council of La Raza*, 800 F.3d at 1039–41.

**II.     Plaintiffs have adequately alleged direct and associational standing to vindicate competitive injuries imposed by AB4.**

Alternatively, Plaintiffs have also adequately alleged that they possess direct standing to vindicate competitive harms to the national and state Republican parties—and associational standing to vindicate identical harms suffered by their candidates. In the election context, the Ninth Circuit has long recognized that a political party has standing to obtain redress for harms to the electoral prospects of its candidates. *See Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011); *Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir. 1981) (recognizing standing when candidates "and the Republic Committee members seek to prevent their opponent from gaining an unfair advantage in the election process through abuses of mail preferences which 'arguably promote his electoral prospects'"). A plaintiff establishes "competitive standing" by alleging that a state action will lead to the "potential loss of an election." *Drake*, 664 F.3d at 783 (quoting *Owen*, 640 F.2d at 1132–33). For example, in *Owen*, the Ninth Circuit found sufficient for standing purposes that the plaintiffs alleged that "abuses of mail preferences" aided their opponents, 640 F.2d at 1133, and specifically rejected the argument "that the potential loss of an election due to an unfair advantage for the opponent was an 'injury [that was] too remote, speculative and unredressable to confer standing.'" *Drake*, 664 F.3d at 732 (quoting *Owen*, 640 F.2d at 1132).

Here, Plaintiffs "seek to vindicate the rights of [their] … candidates" by alleging that AB4 will undermine "the ability of Republican voters to cast and Republican candidates to receive, effective votes in Nevada" by "confus[ing] voters, undermin[ing] confidence in the electoral

---

(ECF No. 29, ¶11.)

Memorandum in Opposition to                                8
Motion to Dismiss

1  process, and creat[ing] incentives to remain away from the polls." (ECF No, 29, ¶¶16-17.)
2  "[O]verwhelming precedent" holds "that a candidate and his or her party can show an injury-in-
3  fact if the defendant's actions harm the candidate's chances of winning." *Nelson v. Warner*, No.
4  CV 3:19-0898, 2020 WL 4582414, at *4 (S.D.W. Va. Aug. 10, 2020); *see also Drake*, 664 F.3d at
5  732; *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020); *Green Party*
6  *of Tenn. v. Hargett*, 767 F.3d 533, 538 (6th Cir. 2014); *Tex. Democratic Party v. Benkiser*, 459
7  F.3d 582, 587–88 (5th Cir. 2006); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990); *Schulz*
8  *v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994). The Amended Complaint contains detailed factual
9  allegations demonstrating the harms to candidates caused by the increased risk of voter fraud. (*E.g.,*
10  ECF No, 29, ¶¶ 53–80.) Accordingly, Plaintiffs' allegations of competitive harms resulting from
11  AB4 establishes direct organizational standing.

12  Apart from direct standing, Plaintiffs have adequately alleged that they have associational
13  standing to vindicate competitive harms to their members. "[A]n association has standing to bring
14  suit on behalf of its members when: (a) its members would otherwise have standing to sue in their
15  own right; (b) the interests it seeks to protect are germane to the organization's purpose; and
16  (c) neither the claim asserted nor the relief requested requires the participation of individual
17  members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).
18  Plaintiffs brought this suit both to "vindicate [their] own rights," and "in a representational capacity
19  to vindicate the rights of [their] members, affiliated voters, and candidates." (ECF No. 29, ¶16.)
20  For the reasons discussed above, individual candidate-members of the RNC possess standing in
21  their own right to challenge AB4 on the basis of its harm to their electoral prospects. *See Drake*,
22  664 F.3d at 783 ("[T]he potential loss of an election [is] an injury-in-fact sufficient to give a local
23  candidate and Republican party officials standing." (quotation marks omitted)). Additionally, the
24  candidates' interests are germane to the organizations' interests because the organizations have "a
25  vital interest in protecting the ability of … Republican candidates to receive [] effective votes in
26  Nevada elections." (ECF No. 29, ¶16.) Because "it is relatively clear, rather than merely
27  speculative, that one or more members have been or will be adversely affected by a defendant's
28  action," Plaintiffs have adequately alleged associational standing on behalf of their member

Memorandum in Opposition to
Motion to Dismiss

9

candidates. *Nat'l Council of La Raza*, 800 F.3d at 1041.

## III. Plaintiffs have associational standing on behalf of their Nevada voter-members to vindicate their rights under the Constitution and federal election law.

Plaintiffs also have standing to vindicate the voting rights of their members. An organization has associational standing to bring suit on behalf of its members when they would have standing in their own right, the members' interests are germane to the organization's, and the members are not necessary parties to the suit. *See Hunt*, 432 U.S. at 343. Plaintiffs fit that bill: they brought this suit in their "representational capacity to vindicate the rights of [their] … affiliated voters," "including three [RNC] members who are registered voters in Nevada" and the "over 600,000 registered Republican voters in Nevada" represented by the NVGOP. (ECF No. 29, ¶¶14, 19-20.) Plaintiffs have adequately pleaded facts that, accepted as true, establish injury in fact to these voter-members' right to vote. As the Amended Complaint explains, a voter has an individual "right under the Constitution to have his vote fairly counted, without being distorted by fraudulently cast votes." ECF No. 29, ¶33 (quoting *Anderson v. United States*, 417 U.S. 211, 227 (1974)). And under the Equal Protection Clause, states have a judicially enforceable "obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush v. Gore*, 531 U.S. 98 (2000)). Plaintiffs have alleged specific facts establishing that AB4 causes those harms to the rights of their voter-members.

First, Plaintiffs have adequately alleged that their members' votes will be diluted as a result of AB4. As an initial matter, the Secretary does not seem to seriously contest that vote dilution is a cognizable injury in fact or that it can be remedied by an injunction. *See Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018) ("The right to vote is individual and personal in nature, and voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." (internal quotation marks and citations omitted)); *see also Fair Maps Nevada*, 2020 WL 2798018, at *17 ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). Rather, her main point of contention is that the injury is not traceable to AB4 (ECF No. 37 at 11–13) and "highly speculative" (*Id.* at 23). But the Amended Complaint contains extensive factual allegations demonstrating that AB4's implementation of a

1  universal vote by mail system for the 2020 election greatly increases the risk of fraudulent voting.
2  For example, it explains how specific provisions of AB4, such as its "deeming" rule, will interact
3  with United States Postal Service postmarking policies to increase the likelihood that untimely and
4  illegal ballots will be counted in violation of the Elections Clauses, constitutional voting rights, and
5  the Equal Protection Clause. (ECF No. 29, ¶¶90-97.) Those allegations alone suffice to survive the
6  Secretary's motion to dismiss. The Amended Complaint, however, goes beyond the pleading
7  requirements and buttresses its allegations with facts surrounding problems arising from recent
8  vote-by-mail elections in Wisconsin, New Jersey, Connecticut, and New York. (*Id.* ¶¶63–90.)
9  Taken as true, those allegations establish that provisions of AB4 create a "substantial risk" of
10 counting illegal votes and thereby diluting the votes of Plaintiffs' members. That is all that is
11 required for purposes of standing at the pleading stage. *See Clapper*, 568 U.S. at 414 n.5 (plaintiffs
12 are not required "to demonstrate that it is literally certain that the harms they identify will come
13 about. … we have found standing based on a substantial risk that the harm will occur, which may
14 prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm" (internal quotation marks
15 omitted)).

16    The Secretary's reliance on Nevada's prior use of a limited absentee-ballot and vote-by-
17 mail system (ECF No. 37 at 7) does not undermine Plaintiffs' allegations. As discussed, the
18 Amended Complaint extensively details why AB4's shift to a full vote-by-mail system, coupled
19 with its "deeming" provision, substantially increases the risk of harm to Plaintiffs' members' right
20 to vote. (ECF No. 29, ¶¶53–81; 90–97.) *Cf. Susan B. Anthony List*, 573 U.S. at 158. Because "voting
21 fraud impairs the right of legitimate voters to vote by diluting their votes" and "dilution [is]
22 recognized to be an impairment of the right to vote," and the plaintiffs have alleged specific facts
23 demonstrating that AB4 creates a substantial risk of vote dilution, they have adequately alleged
24 they possess standing on behalf of their members to vindicate their right to vote. *See Crawford*, 472
25 F.3d at 952.

26    *Paher* is not to the contrary. There, the plaintiffs pursued a theory of vote dilution that "may
27 be conceivably raised by any Nevada voter." *Paher*, 2020 WL 2089813, at *5. In contrast, the
28 Amended Complaint here specifically alleges Sections 11 and 12 of AB 4 will have a disparate

1  impact on rural voters because it requires the establishment of more polling centers per capita for
2  urban voters than for rural voters. (ECF No. 29, ¶¶100, 124–38.) Additionally, AB4's three-day,
3  post-election receipt deadline for non-postmarked ballots—coupled with its deeming rule, the faster
4  average mailing time in urban districts such as Clark County, and the postal service's practice of
5  not postmarking prepaid mail—will likely result in significantly more untimely ballots being
6  counted from urban areas. The complaint adequately alleges that an untimely ballot postmarked in
7  Clark County is far more likely to be received within three days and therefore "deem[ed]" timely
8  than one sent from a rural district. *Id.* ¶¶95–96. Such allegations of disparate impacts on specifically
9  identifiable groups were absent in *Paher*. Thus, AB4 does not "devalue [] every vote equally," and
10 increases the risk that rural voters' votes in particular will be diluted. *Cf. Citizens for Fair*
11 *Representation v. Padilla*, No. 18-17458, 2020 WL 2510747, at *1 (9th Cir. May 15, 2020)
12 (unpub).

13         Second, Plaintiffs have adequately alleged that AB4 deprives its members of the equal
14 protection of the laws. The Amended Complaint alleges that specific provisions of AB4 will
15 disadvantage the voting rights of an identifiable community of voters—those living in rural
16 districts. (ECF No. 29, ¶¶124–38.) This allegation is not speculative but the direct function of
17 Sections 11 and 12 of AB4, which "discriminate against voters in rural counties by authorizing
18 more polling places and vote centers per capita in urban areas." *Id.* ¶129. This type of
19 discriminatory treatment of an identifiable community is a judicially cognizable injury directly
20 traceable to AB4. *See Gill*, 138 S. Ct. at 1929–30. Beyond that, Plaintiffs' allegations adequately
21 establish the absence of uniform standards in Sections 22 and 25 of AB4 that by definition will
22 result in each county processing and counting ballots—including multiple ballots in the same
23 envelope—differently. (ECF No. 29, ¶¶ 101–02, 139–64.) Indeed, that lack of uniform standard is
24 apparent on the face of the statutory text. The Secretary denigrates those allegations as a mere
25 "policy preference for top-down administration," (ECF No. 37 at 20), but it is the Equal Protection
26 Clause—not Plaintiffs' policy preferences—that imposes a "minimum requirement for nonarbitrary
27 treatment of voters" and forbids voting systems and practices that distribute election resources in
28 "standardless" fashion, without "specific rules designed to ensure uniform treatment." *Bush v.*

Memorandum in Opposition to
Motion to Dismiss                        12

*Gore*, 531 U.S. 98, 105–06 (2000). In any case, even if those claims were based on "assumption[s]" or predictions about what "local elections officials" might do (ECF No. 37 at 20), that is permissible at the pleading stage, and Plaintiffs' allegations must be accepted as true. *See Nat'l Council of La Raza*, 800 F.3d at 1040. The Secretary's demand for certainty thus conflicts not just with standing requirements, *see Clapper*, 568 U.S. at 414 n.5, but also with pleading standards, *see Nat'l Council of La Raza*, 800 F.3d at 1040.

### IV.  This Case is justiciable and ripe.

The Secretary also suggests that this case is not justiciable because of federalism concerns. That argument cannot be reconciled with a host of federal cases adjudicating claims under the Election Clauses and about voting rights. *See, e.g.*, *Foster v. Love*, 522 U.S. 67 (1997) (adjudicating Elections Clause dispute); *Gill*, 138 S. Ct. 1916 (2018) (adjudicating vote dilution claim); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001) (adjudicating dispute regarding federal statute setting the uniform election day); *Fair Maps Nevada*, 2020 WL 2798018, at *6 (adjudicating COVID-19 related voting dispute). In fact, a federal district court recently rejected a nearly identical argument, noting that although "[t]he local administration of elections under our federalist system vitalizes democracy by allow[ing] for greater individual input and accountability while avoiding control by a distant bureaucracy that appears out of reach and out of touch," "these concerns do not … make this case nonjusticiable." *Nelson*, No. CV 3:19-0898, 2020 WL 4582414, at *18 & n.9 (internal quotation marks omitted). Far from being a novel attempt to commandeer Nevada's state government, "this case involves the sort of routine dispute that federal courts regularly review." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018); *see also Pavek*, 967 F.3d at 907 ("[The plaintiffs] allege a cognizable and redressable injury fairly traceable to section 204D.13(2)—namely, that the statute violates the Fourteenth Amendment insofar as it unequally favors supporters of other political parties. We have adjudicated the merits of such claims before and have comfortably employed judicially manageable standards in doing so." (internal citation omitted)).

And the Secretary's suggestion that this case is not ripe has no basis in law. The injuries to Plaintiffs and their members have already either begun to occur (diversion of resources) or are

certainly impending (competitive disadvantage, vote dilution, and disparate treatment). The Secretary seems to suggest that Plaintiffs must wait until after the election to bring their suit. (ECF No. 37 at 23.) But plaintiffs alleging such harms have never been required to wait until after an election to bring challenges in federal court. Indeed, if Plaintiffs wait until after the election, they risk their claims becoming moot. *Drake*, 664 F.3d at 784 ("Plaintiffs' competitive interest in running against a qualified candidate had lapsed."). As the Democrats put it in the parallel state litigation, "The inevitable logical terminus of [this] argument would leave any plaintiff who challenges election-related laws stuck between a legal rock and a prudential hard place: such claims would be barred at all times either as speculative (before the election) or moot (after the election). For this reason, courts across the country … have rejected such arguments. Pltfs.' Opp., *supra*, at 15 (citing *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1267-68 (N.D. Ga. 2018)).

### V.        Plaintiffs possess a right of action.

Finally, the Secretary's argument that Plaintiffs lack a private right of action to pursue their claims alleging violations of federal laws that set one uniform, national Election Day is directly foreclosed by *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001). That case involved "a federal civil rights suit for declaratory and injunctive relief," brought by an organization and several individuals "to establish that an Oregon statute that allows Oregonians to vote-by-mail for a substantial period prior to or as well as on this federal election day violates the federal election laws." *Id.* at 1170. The court proceeded to the merits of the challenge after holding that it was properly brought "pursuant to 42 U.S.C. § 1983, which provides for suits in federal court for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Id.* at 1170 n.2. So too here. Plaintiffs seek to vindicate rights secured under precisely the same laws and constitutional provisions at issue in *Keisling*, and thus have an identical right of action under Section 1983. *See id.*; *see also Foster v. Love*, 522 U.S. 67, 69 (1997) (reaching merits of dispute alleging violation of federal laws setting date of biennial elections).

# **CONCLUSION**

For these reasons, the Court should deny the defendant's motion to dismiss.

Respectfully submitted,

Dated: September 8, 2020

*/s/ J. Colby Williams*
Donald J. Campbell (1216)
J. Colby Williams (5549)
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702) 382-5222
(702) 382-0540 (fax)

William S. Consovoy*
Thomas R. McCarthy*
Tyler R. Green*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
*Attorneys for Plaintiffs*

*Admitted pro hac vice

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this pleading with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel registered in this case.

Dated:   September 8, 2020                        <u>/s/ J. Colby Williams</u>
                                                  J. Colby Williams