CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ, (1216)
djc@cwlawlv.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@cwlawlv.com
700 South 7th Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

CONSOVOY MCCARTHY PLLC
WILLIAM S. CONSOVOY, ESQ.*
Virginia Bar No. 47704
will@consovoymccarthy.com
THOMAS R. MCCARTHY, ESQ.*
Virginia Bar No. 47145
tom@consovoymccarthy.com
TYLER R. GREEN, ESQ.*
Utah Bar No. 10660
tyler@consovoymccarthy.com
CAMERON T. NORRIS, ESQ.*
Virginia Bar No. 91624
cam@consovoymccarthy.com
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Telephone: (703) 243-9423
*Attorneys for Plaintiffs*
*Admitted pro hac vice*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; AND NEVADA REPUBLICAN PARTY,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,<br><br>Defendant.<br><br>and | No. 2:20-cv-01445-JCM-VCF<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS** |

1
2
3

DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE, DCCC, and NEVADA STATE DEMOCRATIC PARTY,

4

Intervenor-Defendants.

5

6

## **INTRODUCTION**

7
8
9
10
11
12
13
14
15
16
17

Donald J. Trump for President, Inc., the Republican National Committee, and the Nevada Republican Party have challenged the constitutionality of various sections of Assembly Bill 4, a recently and hastily passed 60-page bill that transforms how Nevada will conduct its November 2020 general election. In response, several entities associated with the Democratic Party (collectively "Intervenors") have moved to dismiss Plaintiffs' amended complaint, asserting that Plaintiffs' claims assert no judicially cognizable harms supporting standing and fail to state claims that survive Rule 12(b)(6)'s pleading standards. But Plaintiffs' claims target the parts of AB4 that transgress long-established federal statutory and constitutional requirements. And for each of those claims, Plaintiffs have adequately alleged multiple independently sufficient grounds for standing and sufficient facts establishing violations of their constitutionally protected rights. Accordingly, the Court should deny Intervenors' motion to dismiss.

18

## **LEGAL STANDARD**

19
20
21
22
23
24
25
26
27

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000) (internal quotation marks omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). "In deciding whether a plaintiff has made this showing," the court must "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party." *Nat'l Council of*

28

Memorandum in Opposition to
Motion to Dismiss

2

1    *La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (quoting *Maya v. Centex Corp.*, 658

2    F.3d 1060, 1068 (9th Cir. 2011)).

3         Additionally, a complaint survives a motion to dismiss if it contains "sufficient factual

4    matter to state a claim to relief that is plausible on its face. A claim has facial plausibility when the

5    plaintiff pleads factual content that allows the court to draw the reasonable inference that the

6    defendant is liable for the misconduct alleged." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136,

7    1140 (9th Cir. 2012) (cleaned up).

8                                        **<u>ARGUMENT</u>**

9         Plaintiffs' Amended Complaint adequately alleges facts establishing several independently

10   sufficient injuries to support standing. First, Plaintiffs have direct organizational standing because

11   AB4 compels them to divert their resources. Second, Plaintiffs have direct organizational standing

12   because AB4 harms their ability to achieve electoral success. Third, Plaintiffs have direct

13   organizational standing because AB4 imposes competitive disadvantages upon the Plaintiff

14   organizations. Fourth, Plaintiffs have adequately alleged associational standing to vindicate the

15   competitive harms that AB4 causes their member-candidates. Fifth, Plaintiffs have associational

16   standing to vindicate the harms caused to their voter-members by AB4's dilution of their votes.

17   Sixth, Plaintiffs have associational standing to vindicate the harms caused to their voter-members

18   by AB4's disparate treatment of rural voters. Any one of these independently sufficient grounds

19   sufficiently establishes Plaintiffs' standing and requires denying Intervenors' motion to dismiss.

20   *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) ("For a legal dispute to qualify

21   as a genuine case or controversy, at least one plaintiff must have standing to sue."); *see also Fair*

22   *Maps Nevada v. Cegavske*, No. 320CV00271MMDWGC, 2020 WL 2798018, at *6 (D. Nev. May

23   29, 2020). Additionally, this suit is ripe for review and justiciable. Further, Plaintiffs possess a right

24   of action under 42 U.S.C. §1983 to pursue their challenges under federal election laws and the

25   Fourteenth Amendment. Finally, Plaintiffs' amended complaint adequately alleges facts

26   establishing violations of the Equal Protection Clause, the constitutional right to vote, and federal

27   election laws setting one uniform federal Election Day.

28

Memorandum in Opposition to                          3
Motion to Dismiss

1    **I.      Plaintiffs have standing to pursue Count I and have adequately alleged a violation of**

2            **federal election laws.**

3            Plaintiffs have standing to challenge §20.2 of AB4, which allows votes cast after the

4    uniform, national Election Day to be counted. Additionally, Plaintiffs have established that this

5    provision is preempted by federal law.

6            **A. Plaintiffs have representational and organizational standing to bring Count I.**

7                    **1. Representational Standing**

8            Intervenors' assertion that Plaintiffs lack standing to challenge Nevada's violation of federal

9    election laws cannot be squared with courts' longstanding adjudication of claims that state laws

10   conflict with the federal laws setting the uniform Election Day. For example, in *Foster v. Love*, the

11   Court reached the merits of and affirmed injunctive relief for "Louisiana voters who sued … the

12   State's Governor and secretary of state, challenging the open primary as a violation of federal law."

13   522 U.S. 67, 70 (1997). Similarly, in *Voting Integrity Project, Inc. v. Keisling*, the Ninth Circuit

14   reached the merits of a suit brought by an organization and individual voters seeking "declaratory

15   and injunctive relief" under §1983 "to establish that an Oregon statute that allows Oregonians to

16   vote by mail for a substantial period prior to or as well as on this federal election day violates the

17   federal election laws." 259 F.3d 1169, 1174 (9th Cir. 2001). Indeed, to Plaintiffs' knowledge, no

18   court has dismissed for lack of standing a suit alleging that a State law conflicts with the federal

19   laws setting the uniform Election Day. *See Millsaps v. Thompson*, 259 F.3d 535, 536 (6th Cir. 2001)

20   (reaching merits of §1983 suit "alleging that Tennessee's early voting system conflicts with federal

21   statutes that establish" the uniform Election Day); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d

22   773, 774 (5th Cir. 2000) (reaching merits of §1983 suit alleging "sections of the Texas Election

23   Code, which permit unrestricted early voting in federal elections, are preempted by federal election

24   statutes" setting uniform Election Day).

25           The federal judiciary's consistent adjudication of such suits under §1983 confirms that state

26   laws that conflict with federal legislation setting the time of federal elections endanger the

27   fundamental right to vote—an injury that is judicially redressable. Federal laws establishing a

28   uniform Election Day are "safeguards which experience shows are necessary in order to enforce

the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 399 (1932). It is simply not the case that laws allowing ballots cast after the uniform Election Day to be counted "benefit[] all voters." (ECF No. 40 at 8.) Instead, such laws violate a key congressionally mandated safeguard of the right to vote. As the Supreme Court and Ninth Circuit have recognized, Congress adopted the uniform Election Day during Reconstruction to address the well-known disenfranchisement, hardship on voters, and fraud that was caused by the practice of multi-day voting. *See Foster*, 522 U.S. at 73-74; *Keisling*, 259 F.3d 1169 at 1174 ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872))). It is thus unsurprising that no court has questioned voters' standing to challenge state laws violating the uniform federal Election Day statutes because those provisions have always been understood as congressional protections for the fundamental right to vote.

Because Plaintiffs' voter-members possess standing, Plaintiffs also have representational standing to vindicate the injury to their fundamental right to vote caused by the State's infringement of the uniform Election Day laws. An organization has associational standing to sue on behalf of its members when they would have standing in their own right, the members' interests are germane to the organization's, and the members are not necessary parties to the suit. *See Hunt*, 432 U.S. at 343. Plaintiffs fit that bill: they brought this suit in their "representational capacity to vindicate the rights of [their] … affiliated voters," "including three [RNC] members who are registered voters in Nevada" and the "over 600,000 registered Republican voters in Nevada" represented by the NVGOP. (ECF No. 29, ¶¶14, 19-20). Accordingly, Plaintiffs have adequately pleaded that the State has infringed its members right to vote by violating the uniform Election Day statutes.

### 2. Organizational Standing

Plaintiffs also possess organizational standing. An organization satisfies its burden to plead a direct injury in fact when it alleges that unlawful state action will cause it to divert resources. *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir.

2012) ("We've held that an organization has direct standing to sue [when] it showed a drain on its resources from both a diversion of its resources and frustration of its mission." (internal quotation marks omitted)). And "[t]he Court has also made clear that a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is broadly alleged." *Nat'l Council of La Raza*, 800 F.3d at 1040 (internal quotation marks omitted). That is so even if the "added cost has not been estimated and may be slight," because standing "requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (citing *Friends of the Earth, Inc.*, 528 U.S. at 180–84).

Plaintiffs readily clear that threshold. The Amended Complaint alleges that "AB4 forces the RNC to divert resources and spend significant amounts of money educating Nevada voters on those changes and encouraging them to still vote." (ECF No. 29 ¶ 17.)  It also alleges that AB4 "require[s] the committee" to reelect President Trump "to change how it allocates its resources and the time and efforts of its campaign staff, to achieve its electoral and political goals." (*Id.* ¶ 11.) The Ninth Circuit has consistently held that allegations of these precise resource-allocation harms suffice to establish injury in fact. *See Nat'l Council of La Raza*, 800 F.3d at 1040 ("The complaint specifically alleges that Plaintiffs expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them. … The Supreme Court has made clear that injuries of the sort that Plaintiffs allege are concrete and particular for purposes of Article III."). And the Supreme Court has unambiguously rejected the notion that resource diversion is merely an "abstract" injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Rather, it is long established that a "new law injures" a political party when it compels it "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Crawford*, 472 F.3d at 951. Thus, Plaintiffs have adequately alleged that they will suffer direct injury as a result of AB4 because the measure forces them to divert and reallocate resources toward educating voters about the effects of AB4's

new deeming rules, and acceptance of non-postmarked ballots, on their right to vote. *See Nat'l Council of La Raza*, 800 F.3d at 1040–41.

Intervenors' reliance on *Paher* (ECF No. 40 at 9) is also misplaced. *Paher* had nothing to do with organizational standing involving resource diversion. Instead the court had before it a complaint that vaguely alleged injuries that "may be conceivably raised by any Nevada voter." *Paher v. Cegavske*, No. 3:20-cv-00243, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020). By contrast, the Amended Complaint here alleges changes to significant expenditures of organizational resources in response to AB4, placing this case comfortably within the long-established line of cases discussed above holding that organizations possess standing to challenge state laws that cause them to divert resources. *See, e.g.*, *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1080–81 (D. Ariz. 2016) ("[T]he ADP alleges that H.B. 2023 will reduce the likelihood that its voters will timely return their ballots, thereby reducing the likelihood that the ADP will be successful in electing Democratic candidates. These allegations are sufficient to establish a concrete and particularized injury in fact that is fairly traceable to H.B. 2023 and likely to be redressed by a favorable ruling on Plaintiffs' preliminary injunction motion." (citing *Crawford*, 472 F.3d at 951)). There is nothing "speculative" about this injury (ECF No. 40 at 9); Plaintiffs have specifically alleged that "AB4 *forces the RNC* to divert resources and spend significant amounts of money," (ECF No. 29, ¶17) (emphasis added), and requires Donald J. Trump for President, Inc. to "change how it allocates its resources," *id.* ¶11.

Beyond that, Intervenors' arguments attempt to change Plaintiffs' pleading standard by demanding specific proof of Plaintiffs' resource diversion and discounting courts' recognition of standing for impending harms. At the pleading stage a court must "presum[e]" that Plaintiffs' "general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Council of La Raza*, 800 F.3d at 1040 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Indeed, the Ninth Circuit has faulted district courts for employing precisely the type of heightened standard Intervenors propose. *See Nat'l Council of La Raza*, 800 F.3d at 1039–41; *see also Common Cause v. Brehm*, 344 F. Supp. 3d 542, 549 (S.D.N.Y. 2018) ("Defendants argue that Plaintiff's diversion of resources claims are generalized and conclusory. [] However, Defendants place too

high of a burden on Plaintiff at this stage. Plaintiff need only 'allege facts' sufficient to demonstrate an injury-in-fact at the motion to dismiss stage." (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975))). What's more, "standing does not 'uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.' Instead, proving a 'substantial risk' of injury is sufficient." *Nelson v. Warner*, No. 3:19-cv-0898, 2020 WL 4582414, at *4 (S.D. W. Va. Aug. 10, 2020) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Because Plaintiffs have adequately alleged that AB4 causes them to divert their resources and undermines their ability to achieve electoral success, they have pleaded an injury in fact caused by the state and redressable by a favorable court decision. *See Nat'l Council of La Raza*, 800 F.3d at 1039–41.

**B. Plaintiffs have established, as a matter of law, that AB4 violates federal laws setting one uniform Election Day.**

As an initial matter, Intervenors' contentions that Count I should be dismissed for failure to state a claim (ECF No. 40 at 10–11) appear to misunderstand the nature of the preemption inquiry for Plaintiffs' claim under the Election Clauses. Intervenors ask the Court to be "particularly wary" about finding preemption here and quote a Supremacy Clause case admonishing courts to be "cautious about conflict preemption where a federal statute is urged to conflict with state law regulations within the traditional scope of a State's police powers." (ECF No. 40 at 11) (cleaned up). But as the Ninth Circuit has recognized, states have no police powers to regulate federal elections: "In contrast to the Supremacy Clause, which addresses preemption in areas within the states' historic police powers, the Elections Clause affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." *Gonzalez v. Arizona*, 677 F.3d 383, 392–93 (9th Cir. 2012) *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013). In consequence, "the 'presumption against preemption' and 'plain statement rule' that guide Supremacy Clause analysis are not transferable to the Elections Clause context." *Id.* (quoting *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir.2008)).

Beyond that, under established Elections Clause and Electors Clause principles, Plaintiffs'

allegations in Count I adequately state a claim. In fact, Plaintiffs are entitled to judgment as a matter of law on Count I for the reasons described in their motion for motion for partial summary judgment, *see* ECF No. 41, and reiterated below.

**1. Federal law requires elections for federal office to be consummated on Election Day**

Though the Elections Clause grants states power to set the time, place, and manner of congressional elections, U.S. Const. art. I, §4, cl. 1, it also subordinates that power to federal law. The Clause expressly reserves to "Congress" the power to "at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id*. Congress also bears similar power under the Electors Clause to "determine the Time of chusing the Electors" for the offices of President and Vice President. Id. art. II, §1, cl. 4. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U.S. at 399.

Exercising those powers, Congress has passed a trio of federal statutes that "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. The "Tuesday next after the 1st Monday in November" is the uniform, national "day for the election" of members of the House of Representatives, 2 U.S.C. §7, and of the Senate, id. §1, and for choosing presidential and vice-presidential electors, 3 U.S.C. §1. "By establishing a particular day as 'the day' on which these actions must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Id*. at 71-72; *see also Keisling*, 259 F.3d at 1170 ("Without question, Congress has authority to compel states to hold these elections on the dates it specifies."). Congress's choice to adopt one uniform federal Election Day is both "binding on the States" and superior to conflicting state law: "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1879)).

These statutes serve sound policy goals. A uniform, national Election Day prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. Before Congress adopted a uniform Election Day during the Reconstruction era, the "diversity of" federal election dates gave "'some states'" and "'some parties'" an "'undue advantage'"; as one Senator from Maine put it when opposing a uniform Election Day, "'we want in the future, as we have had in the past, the position of indicating to the country the first sentiment on great political questions.'" *Keisling*, 259 F.3d at 1173. Beyond that, a uniform, national Election Day is a "check to frauds in elections, to double voting, to the transmission of voters from one State to another, and … allow[s] the people to vote for the Representatives undisturbed by considerations which they ought not to take at all into account.'" *Id*. at 1174.

What constitutes "the election" those statutes mandate? That term "refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. Put differently, it "means a 'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175. Voters' role in that process includes not just marking a ballot but also "having it delivered to the election officials and" timely "deposited in the ballot box." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944). For "[i]t is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or voting." *Id*. After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Id*.

Given those "binding" federal requirements, *Foster*, 522 U.S. at 69, state election regimes violate federal law if "the combined actions of voters and officials meant to make a final selection of an officeholder" occur "prior to federal election day." *Id*. at 71, 72 n.4. That's why the Supreme Court unanimously invalidated a Louisiana election regime holding congressional elections in October. Louisiana law deemed any candidate who won a majority in that October vote to be "elected," with "no further act … done on federal election day to fill the office in question." *Id*. at 70. Only "[i]f no candidate for a given office receive[d] a majority" in the October vote did Louisiana hold another election, dubbed a "run-off," on Election Day. *Id*. Louisiana's regime was

1   thus constitutionally flawed because it established "a contested selection of candidates for a

2   congressional office that is concluded as a matter of law before the federal election day, with no

3   act in law or in fact to take place on the date chosen by Congress." *Id*. at 468. That "clearly violates

4   [2 U.S.C.] §7." *Id*.

5        Two conclusions follow from that holding. First, state regimes that count ballots cast before

6   Election Day do not violate federal law, *Keisling*, 259 F.3d at 1175-76; *Bomer*, 199 F.3d at 775-

7   77; *Millsaps*, 259 F.3d at 543-46, but only because early voting by itself does not consummate the

8   election before Election Day. Early absentee voting merely complements other "voting" that "still

9   takes place on" Election Day. *Keisling*, 259 F.3d at 1176; *see also Bomer*, 199 F.3d at 776

10  ("Allowing some voters to cast votes before election day does not contravene the federal election

11  statutes because the final selection is not made before the federal election day.").

12       Second, state regimes that count ballots cast *after* Election Day *do* violate federal law. State

13  election regimes can no more require "the combined actions of voters and officials meant to make

14  a final selection of an officeholder" to stop "prior to federal election day" than they can allow those

15  combined actions to continue after it. *Foster*, 522 U.S. at 71, 72 n.4. Either type of regime

16  "purport[s] to affect the timing of federal elections"— an October election "requires no further act

17  by anyone to seal the election" on Election Day, *id*. at 73, and accepting ballots cast after Election

18  Day expressly contemplates "further act[s]" (late-cast votes) intended to influence the final result.

19  Thus, both types of election systems contravene Congress's "final say" about when federal

20  elections must occur and "clearly violate[] [2 U.S.C.] §7," 2 U.S.C. §1, and 3 U.S.C. §1. *Id*. at 72.

21       Other statutes confirm that Congress did not intend voting to continue after Election Day.

22  Federal law specifically enumerates only two instances in which an election for federal office can

23  be held at a later date: "(1) in states that required a majority vote for election, a runoff could be held

24  between federal election day and January when officials take office; and (2) an election could be

25  held on a different date if a vacancy occurred in the office." *See Love v. Foster*, 90 F.3d 1026, 1029

26  (5th Cir. 1996), *aff'd*, 522 U.S. 67 (citing 3 U.S.C. §8). Nevada is not free to create a third "COVID"

27  exception. That is Congress's job. *See Foster*, 522 U.S. at 71-72; *see also Keisling*, 259 F.3d at

28  1170 ("Without question, Congress has authority to compel states to hold these elections on the

1   dates it specifies."). Additionally, the Reconstruction Congress enacted Act of May 23, 1872 to

2   appease concerns that Texas could not logistically hold an election on one day given its size and

3   lack of established precincts. It was "a one-time exception to the statutory and constitutional

4   requirement for a uniform day for selection of electors to address the circumstances of

5   Reconstruction-era Texas." *Millsaps*, 259 F.3d at 542 (citing Cong. Globe, 42d Cong., 2d Sess.

6   3407-08). This provision's existence *assumes* that votes cannot be cast under any circumstances

7   after the uniform Election Day, which cannot be "continued for more than one day" by a State

8   without congressional permission. *Id.* If votes could be validly cast after the uniform Election Day,

9   this provision would be a nullity. *Id.*

10      **2. Section 20.2 allows ballots cast after Election Day to be counted.**

11      "[A]s a matter of law," §20.2 of AB4 allows "a contested selection of candidates for a

12   congressional office"—and for presidential and vice-presidential electors—to continue after "the

13   federal election day." *Foster*, 522 U.S. at 72. Under §20.2, if a ballot is received by mail before

14   5:00 p.m. on the Friday after Election Day "and the date of the postmark cannot be determined, the

15   mail ballot shall be deemed to have been postmarked on or before the day of the election." That

16   requires elections officials to count mail ballots that were mailed on the Wednesday or Thursday

17   *after* Election Day—as long as they arrive by Friday at 5:00 p.m. and bear no postmark (or an

18   undiscernible one). On its face, that morphs the singular "day for the election," 2 U.S.C. §7, into

19   the plural "Election Day—and a few days after it."

20      Nor is there a dispute about whether ballots satisfying both conditions will in fact arrive (and

21   thus be counted). USPS's own statements confirm as much: it acknowledges that "there can be

22   breakdowns or exceptions to this process which could prevent a ballot from receiving a postmark,"

23   ECF No. 41-9 at 7, and that "[i]n some instances (short distance between ZIP Codes), it is possible

24   for [first-class] delivery to occur in one day," ECF No. 41-13. Undisputed on-the-ground facts tell

25   the same story: Letters sent from Las Vegas by First-Class mail were received in Las Vegas the day

26   after they were mailed, confirming USPS's First-Class overnight-delivery capabilities in Nevada.

27   *See* ECF No. 41-12. And the undisputed historical record of unpostmarked ballots received in

28   Wisconsin's and New York's 2020 primary elections—constituting as many as 13% of ballots

received for some New York races, *Gallagher v. N.Y. State Bd. of Elec.*, — F. Supp. 3d —, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020)—show USPS's commendable honesty by admitting to the inevitable inconsistencies in its postmarking process.

### 3. Because §20.2 conflicts with federal law, it is invalid.

Section 20.2 deems some ballots cast after Election Day timely as a matter of law. That irreconcilably conflicts with Congress's decisions in 2 U.S.C. §§1, 7 and 3 U.S.C. §1 to require that "the combined actions of voters and officials meant to make a final selection of an officeholder" be "consummated" on one uniform, national Election Day. *Foster*, 522 U.S. at 71, 72 n.4. Indeed, Plaintiffs are not the only ones to have identified this irreconcilable conflict so readily apparent in the statutes' plain text. *E.g.*, David B. Rivkin Jr. & Lee A. Casey, *Mail-In Voting Could Deliver Chaos*, Wall St. J. (Aug. 25, 2020) ("no ballot cast after Nov. 3 is constitutionally valid," and "counting unpostmarked mailed ballots that arrive after Election Day would be unconstitutional, as there would be no way to tell if they were cast in time"), https://on.wsj.com/3jLMbT7 (ECF No. 41-17).

Supreme Court precedent leaves no doubt about the necessary remedy here. Given §20.2's facial "conflict[] with federal law," it "is void." *Foster*, 522 U.S. at 74. For "the regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. at 384.

Voiding §20.2 furthers Congress's reasons for establishing a uniform, national Election Day for members of Congress and the President. Recall Congress's "concern[]" that when voting occurred on multiple days, "the results of an early federal election in one State" would "distort[] … the voting process" and "influence later voting in other States." *Foster*, 522 U.S. at 73. And its recognition that holding an election on one day "'interpose[s] a not inconsiderable check to frauds in elections [and] to double voting.'" *Keisling*, 259 F.3d at 1174. Section 20.2's post-Election Day regime implicates both concerns. Under §20.2, persons dissatisfied with Tuesday night's election returns have an opening to try to distort and improperly influence any races whose preliminary outcomes displease them. And with Clark County alone mailing more than 93,000 ballots this Fall to voters whom County officials know *no longer live at their registered addresses*, opportunities

1    for obtaining and returning ballots after Election Day will not be hard to find.

2          Beyond that, voiding §20.2 will eliminate a potential threat to Nevada's ability to cast its

3    Electoral College votes. Under federal law, the Electoral College meets and votes (this year) on

4    December 14. *See* 3 U.S.C. §7. What if a dispute exists about the appointment of Nevada's electors?

5    If any such dispute exists and is resolved under existing state law before December 8, Congress

6    must conclusively accept Nevada's slate of electors. *Id.* §5. But if any such dispute is *not* resolved

7    by December 8, the Nevada Legislature must decide how to appoint Nevada's electors in time for

8    them to cast votes on December 14. *Id.* §2.

9          Together, those provisions require that disputes about the validity of ballots cast for

10   presidential electors must be resolved under Nevada law by December 8 for Congress to accept

11   Nevada's electors' votes "conclusive[ly]" on December 14. *Id.* §5. December 8 is just 32 days after

12   §20.2's November 6 deadline for unpostmarked ballots. And New York's primary election this year

13   is proof enough that disputes over the validity of unpostmarked ballots can take all of 32 days (and

14   more) to resolve. The primary election between Rep. Carolyn Maloney and Suraj Patel for New

15   York's 12th District remained unresolved for *six weeks* after the election, based in part on disputes

16   over "the counting of certain mail ballots that arrived after Election Day but without a postmark to

17   prove when they were sent." *An Autopsy of New York's Mail-Vote Mess*, Wall St. J. (Aug. 7, 2020),

18   https://on.wsj.com/3kT7d3y (ECF No. 41-10). If it takes six weeks to resolve disputes over

19   unpostmarked absentee ballots counted under §20.2, Nevada will miss its safe-harbor deadline for

20   certifying its electors by 10 days—and with it federal law's "conclusive" guarantee that Nevada's

21   electoral votes will be counted as sent. And if that happens, and Nevada's Electoral College votes

22   are not accepted, it would disenfranchise every voter in Nevada who voted for a presidential

23   candidate.

24         Voiding §20.2 avoids those risks. Disputes about unpostmarked ballots received after

25   Election Day will not exist if the law no longer allows counting unpostmarked ballots received after

26   Election Day. The Court should invalidate §20.2 to ensure that only ballots cast on or before

27   Election Day—the deadline federal law sets—will be counted.

28

**II.    Plaintiffs have standing to pursue Count II and have adequately alleged facts establishing a violation of the Equal Protection Clause.**

Plaintiffs have adequately alleged facts to establish standing to challenge Sections 11 and 12 of AB4, which allocate voting centers and polling places on the basis of population rather than number registered voters. Additionally, they have pleaded facts establishing that these provisions disparately burden rural voters in violation of the Equal Protection Clause.

**A. Standing**

The Amended Complaint here specifically alleges that §§11–12 of AB 4 will have a disparate impact on rural voters because they require the establishment of more polling centers per capita for urban voters than for rural voters. (ECF No. 29, ¶¶100, 124–38.) These sections do not "value … every vote equally." *Citizens for Fair Representation v. Padilla*, No. 18-17458, 2020 WL 2510747, at *1 (9th Cir. May 15, 2020) (unpub). Rather, they specifically harm rural voters by employing a formula that favors urban voters. *Cf. id*. This allegation is not speculative but the direct function of §§11–12, which "discriminate against voters in rural counties by authorizing more polling places and vote centers per capita in urban areas." *Id.* ¶129. Plaintiffs extensively document how these sections work together to systematically underserve rural areas as compared to urban areas. *Id.* ¶¶126–34. This type of discriminatory treatment is a judicially cognizable injury directly traceable to AB4. *See Gill*, 138 S. Ct. at 1929–30.

The Court can quickly dismiss Intervenors' argument that enjoining §§11–12 would actually make Plaintiffs worse off and therefore this injury is not redressable. Plaintiffs seek an injunction against Nevada's use of a county-population-based formula that results in disparate treatment for rural areas. A voter unmistakably has standing to vindicate his "right to cast [his] vote[] effectively." *Rodriguez v. Newsom*, No. 18-56281, 2020 WL 5361884, at *8 (9th Cir. Sept. 8, 2020) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106, 1109 (9th Cir. 2011)). Plaintiffs extensively allege that the formula employed to distribute polling and voting centers "denie[s] [them] an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters." *Id.* Far from "inflicting greater harm on all voters," ECF No. 40 at 13, eliminating those discriminatory provisions would allow the State to employ a non-

discriminatory method of apportioning polling stations in accordance with pre-AB4 law. *E.g.*, NRS §293.3072. That relief would redress the disparate harm faced by rural communities. *Cf. Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006) ("[I]n determining redressability, courts 'assume that plaintiff's claim has merit." (quoting *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004))). Simply put, the current system implemented by §§11–12 results in fewer polling stations per capita in rural areas. Enjoining those sections would mean voting stations are allocated pursuant to a non-discriminatory system. By ensuring that the state establishes voting places in way that does not specifically devalue rural communities, Plaintiffs' requested injunction of §§11–12 would "actually improve[] their position." *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013). That suffices to establish standing.

**B. Plaintiffs have adequately alleged that Sections 11 and 12 violate the Equal Protection Clause.**

Sections 11 and 12 of AB4 violate the "clear and strong command of our Constitution's Equal Protection Clause" that "voters cannot be classified, constitutionally, on the basis of where they live." *Reynolds v. Sims*, 377 U.S 533, 560, 568 (1964). Plaintiffs' factual allegations more than plausibly establish that AB4 discriminates against rural voters. For example, by operation of §11, urban Washoe County has "at least 1 polling place for every 21,281 registered voters," while rural Douglas County has one polling place for every 41,649 registered voters. Am. Compl. ¶¶130, 131. Similarly, by operation of §12, urban Washoe County has "at least 1 vote center for every 12,768 registered voters" while rural Lyon county has only "1 vote center for every 40,816 registered voters." Am. Compl. ¶¶131, 133. Those gross disparities in per-capita polling places—as great as double or triple the amount of polling places per capita for certain urban counties as compared to rural counties—plausibly establish that §§11 and 12 disparately harm rural counties.

Intervenors' argument is less about the law and more about the sufficiency of Plaintiffs' pleadings and allegations. But the "significant relationship between the number of registered voters in a county and the need for polling locations" is self evident. ECF No. 40 at 15.[1] "[A]nalyzing the

---

[1] *Reynolds*' reliance upon population concerned only the actual apportionment of representatives. By contrast, voter registration rather than population is the only reasonably relevant metric when

sufficiency of a complaint's allegations is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1051 (9th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Plaintiffs have adequately alleged facts that registered voters are those most likely to vote and therefore the reliable measure of the need for polling stations. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) ("[T]he only question before us is whether the amended complaint pleads facts, if proven, sufficient to establish that the defendants arbitrarily deny Ohioans the right to vote depending on where they live."). And Plaintiffs claim precisely that "the Nevada Legislature acted arbitrarily or unreasonably in establishing minimum thresholds according to total population." (ECF No. 40 at 15.) More than that, Plaintiffs specifically allege Nevada's use of the population metric has resulted in urban areas being accorded triple the amount of voting centers per capita of those likely to actually vote, resulting in "serous and irreparable harm to" the "constitutional rights" of rural voters. Am. Compl. ¶138. Such allegations of harms from the danger of insufficient polling places have long been understood to suffice to state an Equal Protection Clause claim. *See, e.g.*, *League of Women Voters of Ohio*, 548 F.3d at 478 ("If true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal Protection Clause.").

Contrary to Intervenors' assertion, the State cannot hide behind "policy" discretion to justify its discriminatory policy. Rather, "[j]udicial standards under the Equal Protection Clause are well developed and familiar." *Reynolds*, 377 U.S. at 557 (quoting *Baker v. Carr*, 369 U.S. 186, 226, (1962)). As Intervenors acknowledge, Plaintiffs need only plausibly allege "that the Nevada Legislature acted arbitrarily or unreasonably in establishing minimum thresholds according to total population." (ECF No. 40 at 15.) Plaintiffs have done precisely that and supported their allegation with extensive facts demonstrating that Sections 11 and 12's "discrimination reflects no policy but simply arbitrary and capricious action." *Reynolds*, 377 U.S. at 557 (quoting *Baker*, 369 U.S. at 226). ). These facts "allow[] the court to draw the reasonable inference that the defendant is liable

---

considering how many polling places are actually needed in an area to accommodate the volume of expected turnout.

1  for the misconduct alleged." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

2  Indeed, Plaintiffs' detailed allegations surpass their burden at the motion to dismiss stage of

3  alleging facts "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret*

4  *Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). Accordingly, Plaintiffs have carried their pleading burden.

5  **III.    Plaintiffs have standing to pursue Count III and have adequately alleged facts**

6  **establishing a violation of the Equal Protection Clause.**

7      Plaintiffs have adequately alleged facts supporting standing to challenge §22 of AB4, which

8  authorizes each local clerk to create different "procedures of the processing and counting of

9  ballots." Additionally, Plaintiffs have adequately alleged facts establishing that this provision

10  violates their rights under the Equal Protection Clause.

11      **A. Standing**

12      Plaintiffs have established both representational and direct organizational standing to bring

13  Count III. As explained, an organization can bring claims on behalf of its members if its members

14  themselves would possess standing. Plaintiffs have adequately alleged that their members will be

15  harmed by §22's "unequal, standardless treatment of Nevada voters across counties" in violation

16  of the Equal Protection Clause. Far from alleging a "generalized grievance," Plaintiffs seek to

17  vindicate their individual right to vote, which will be impaired by the lack of "specific rules

18  designed to ensure uniform treatment." *Bush v. Gore*, 531 US. 98, 105-06 (2000). Such injuries are

19  sufficiently definite to support standing. *League of Women Voters of Ohio*, 548 F.3d at 478 (finding

20  organization had standing to vindicate harms arising from arbitrary and standardless voting

21  system). And again, the injury is redressable by an injunction halting the enforcement of this

22  unconstitutional provision. *See Nat'l Council of La Raza*, 800 F.3d at 1041. And if the Court enjoins

23  §22—which supersedes conflicting provision of Nevada election law, AB4 §9—the existing ballot-

24  processing provisions would default back into existence for the 2020 election. *See* NRS §§ 293.317-

25  340, 293B.330-400 ("Processing of Ballots"). Plaintiffs thus seek the standard form of redress for

26  unconstitutional state legislation, which would address their injury stemming from §22.

27

28

**B. Plaintiffs have adequately alleged Section 22 violates their rights under the Equal Protection Clause**

Section 22 violates Plaintiffs' rights under the Equal Protection Clause because it dispenses with "uniform rules" for the processing and counting of ballots in favor of standardless discretion in the hands of local clerks. Plaintiffs have adequately alleged that AB4 "provides no 'minimal procedural safeguards' to protect against the 'unequal evaluation' of mail ballots." ECF No. 29, ¶146.

Intervenors do not really dispute any of this. Instead, they assert that "Nevada's preexisting election code provide[s] the very standards that Plaintiffs claim are lacking from Section 22." ECF No. 40 at 17. But AB4 displaces the "full panoply of Nevada's election laws governing who is eligible to vote and which votes should be counted." ECF No. 40 at 17. Section 9 of AB4 provides that §22 "of this act supersede[s] and "preempt[s] any conflicting provisions of any other statute or charter, ordinance, interpretation, regulation or rule governing the election." Section 22, in turn, delegates the power to "establish procedures for the processing and counting of mail ballots" to "the county or city clerk." And §22 grants the "county or city clerk" power to prescribe such rules so long as they do "not conflict with" AB4—confirming that other election laws do not restrain local officials in establishing election standards. Section 22 thus is incompatible with and supersedes Nevada election law concerning the processing and counting of mail ballots, depriving voters of the uniform standards provided by the "full panoply of Nevada's election laws." ECF No. 40 at 17. Indeed, because §22 requires new county processes not to conflict with AB4, and AB4 makes §22 superior to existing law, AB4 precludes the application of Nevada's former "uniform rules." *Cf. Bush*, 531 U.S. at 106. By precluding reliance on Nevada's existing "specific rules designed to ensure uniform treatment," §22 fails to provide even "minimal procedural safeguards." *Id.* at 105-09; *see also League of Women Voters of Ohio*, 548 F.3d at 478 ("'[T]he use of standardless manual recounts' violates the Equal Protection Clause."). Accordingly, Plaintiffs have adequately alleged that §22 violates their rights under the Equal Protection Clause.

**IV.     Plaintiffs have standing to pursue Count IV.**

Count IV challenges §25 of AB4, which provides that "[i]f two or more mail ballots are found folded together to present the appearance of a single envelope," and "a majority of the inspectors are of the opinion that the mail ballots folded together were voted by one person, the mail ballots must be rejected." Intervenors misunderstand the basis of Plaintiffs' asserted injury in Count IV. Contrary to Intervenors' assertion, Plaintiffs did not allege that "their supporters will be disenfranchised." ECF No. 40 at 18. Instead, Plaintiffs alleged that "Section 25 of AB4 requires county or city clerks to count potentially fraudulent or invalid ballots, thereby diluting the votes of honest citizens and depriving them of their right to vote in violation of the Fourteenth Amendment." Am. Compl. ¶ 102.

Vote dilution is a judicially cognizable injury and Plaintiffs have adequately alleged that their members' votes will be diluted as a result of AB4. *See Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018) ("The right to vote is individual and personal in nature, and voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." (internal quotation marks and citations omitted); *see also Fair Maps Nevada*, 2020 WL 2798018, at *17 ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). And this injury is certainly impending. *See Clapper*, 568 U.S. at 414 n.5. Nothing about it is speculative: §25 provides no guidance whatsoever to local officials on whether folded ballots should be counted or rejected. And Plaintiffs specifically allege facts establishing that §25 will create a "substantial risk that the harm will occur" *Id.* As Plaintiffs allege, "Section 25 [does not] require inspectors to reject either of two or more ballots folded together when a majority of the inspectors are of the opinion that the mail ballots were voted by *more than* one person. In that case, Section 25 appears to contemplate that inspectors will count *all* of the ballots, even though at least one of the voters has not complied with the bill's signature-verification process. This loophole invites fraud, coercion, theft, or otherwise illegitimate voting that dilutes the votes of honest citizens and deprives them of their right to vote in violation of the Fourteenth Amendment." Am. Compl. ¶102. By enjoining this loophole, the risk of voter fraud and vote dilution will be substantially reduced. Accordingly, Plaintiffs have easily met their burden of

1   alleging a judicially redressable injury in fact.

2   **V.     Plaintiffs have standing to pursue Count V and have adequately alleged facts**
3   **establishing a violation of the constitutional right to vote.**

4        Plaintiffs have adequately alleged facts establishing standing to challenge various
5   provisions of AB 4 as diluting the votes of its members. Plaintiffs have also adequately alleged that
6   those provisions violate equal protection, federal election laws, and the constitutional right to vote.

7        **A. Standing**

8        Plaintiffs have adequately alleged that their members' votes will be diluted as a result of
9   AB4. As an initial matter, Intervenors cannot seriously contest that vote dilution is a cognizable
10  injury in fact. *See Gill*, 138 S. Ct. at 1920 ("The right to vote is individual and personal in nature,
11  and voters who allege facts showing disadvantage to themselves as individuals have standing to
12  sue to remedy that disadvantage." (internal quotation marks and citations omitted); *Bush*, 531 U.S.
13  at 105 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's
14  vote just as effectively as by wholly prohibiting the free exercise of the franchise." (quoting
15  *Reynolds*, 377 U.S. at 555)); *see also Fair Maps Nevada*, 2020 WL 2798018, at *17 ("Abridgement
16  or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").

17       Rather, the center of gravity of Intervenors' argument is that Plaintiffs' vote dilution claim
18  is "unduly speculative and impermissibly generalized." ECF No. 40 at 20. But the Amended
19  Complaint contains extensive factual allegations demonstrating that AB4's implementation of a
20  universal vote-by-mail system for the 2020 election greatly increases the risk of fraudulent voting.
21  For example, it explains how specific provisions of AB4, such as its "deeming" rule, will interact
22  with United States Postal Service postmarking policies to increase the likelihood that untimely and
23  illegal ballots will be counted in violation of the Elections Clauses and constitutional voting rights.
24  (ECF No. 29, ¶¶90-97.) Those allegations alone suffice to survive Intervenors' motion to dismiss.
25  The Amended Complaint, however, goes beyond the pleading requirements and buttresses its
26  allegations with facts surrounding problems arising from recent vote-by-mail elections in
27  Wisconsin, New Jersey, Connecticut, and New York. (*Id.* ¶¶63–90.) Taken as true, as those
28  allegations must be at this stage, those allegations more than suffice to establish that provisions of

AB4 create a "substantial risk" of counting illegal votes and thereby diluting the votes of Plaintiffs' members. That is all that is required for purposes of standing at the pleading stage. *See Clapper*, 568 U.S. at 414 n.5 (plaintiffs are not required "to demonstrate that it is literally certain that the harms they identify will come about. … we have found standing based on a substantial risk that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm" (internal quotation marks omitted)).

*Paher* is not to the contrary. There, the plaintiffs pursued a theory of vote dilution that "may be conceivably raised by any Nevada voter." *Paher*, 2020 WL 2089813, at *5. In contrast, the Amended Complaint here specifically alleges §§11–12 of AB 4 will have a disparate impact on rural voters because they require the establishment of more polling centers per capita for urban voters than for rural voters. (ECF No. 29, ¶¶100, 124–38.) And Plaintiffs have specifically alleged that §20.2's deadline disparately harms rural voters relative to urban voters. Additionally, another element is present here that was lacking in *Paher*—organizational standing. Plaintiffs not only have representational standing on behalf of their voters, but direct organizational standing to vindicate the harm caused by the diversion of resources to educate their members about how to comply with AB4. *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 800 (W.D. Tex. 2015) (organization's expenditure of resources to "prevent dilution of legitimate votes by illegal votes" satisfies injury in fact requirement).

In sum, "voting fraud impairs the right of legitimate voters to vote by diluting their votes" and "dilution [is] recognized to be an impairment of the right to vote." *Crawford*, 472 F.3d at 952l Plaintiffs have alleged specific facts demonstrating that AB4 creates a substantial risk of vote dilution. They have thus adequately alleged they possess standing on behalf of their members to vindicate their right to vote.

**B. Plaintiffs have adequately alleged that AB4 infringes their voting rights.**

Intervenors press only one argument that Plaintiffs have failed to state a claim under the Equal Protection Clause: "Plaintiffs … have not alleged an equal protection claim suggesting that Assembly Bill 4 values some other group of voters over their own." ECF No. 40 at 21. But that is precisely what Plaintiffs set out to do throughout the Amended Complaint. For example, Plaintiffs

1    allege that AB4's three-day, post-election receipt deadline for non-postmarked ballots—coupled

2    with its deeming rule, the faster average mailing time in urban districts such as Clark County, and

3    the USPS's practice of not postmarking prepaid mail—will likely result in significantly more

4    untimely ballots being counted from urban areas, violating federal election laws designed to protect

5    the fundamental right to vote. *See* ECF No. 29, ¶¶92-97; *cf. Smiley*, 285 U.S. at 399. The amended

6    complaint adequately alleges that a ballot mailed after Election Day in Clark County is far more

7    likely to be received within three days and therefore "deem[ed]" timely than one sent from a rural

8    district. ECF No. 29,  ¶¶95–96. Thus, AB4 does not "devalue [] every vote equally," and increases

9    the risk that rural voters' votes in particular will be diluted. *Cf. Padilla*, 2020 WL 2510747, at *1

10   (unpub).

11         Additionally, §§11–12, as discussed more extensively above, impose severe burdens on the

12   rights of rural voters to vote by providing them with significantly fewer polling places and voting

13   centers per capita relative to urban voters. Indeed, the Sixth Circuit has specifically held that

14   allegations of insufficient polling places in an area are sufficient to state a claim for violation of

15   both the Equal Protection Clause and constitutional right to vote. *See League of Women Voters of*

16   *Ohio*, 548 F.3d at 477 ("If true, these allegations could establish that Ohio's voting system deprives

17   its citizens of the right to vote or severely burdens the exercise of that right depending on where

18   they live in violation of the Equal Protection Clause."); *see also Ury v. Santee*, 303 F. Supp. 119,

19   124 (N.D. Ill. 1969) (noting "the assignment of excessive numbers of registered voters to the

20   precincts" can "hinder[] their right to cast ballots by reason of the excessively crowded conditions

21   at the polling places and their environs").

22         Plaintiffs have thus more than adequately alleged that AB4 violates its members'

23   "constitutionally protected right to participate in elections on an equal basis with other citizens in

24   the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also Rodriguez v. Newsom*, No.

25   18-56281, 2020 WL 5361884, at *8 (9th Cir. Sept. 8, 2020) ("[E]ach and every citizen has an

26   inalienable right to full and effective participation in the political process. That includes the right

27   to cast one's votes effectively, which requires that no voter be denied an opportunity to cast a ballot

28   at the same time and with the same degree of choice among candidates available to other voters."

1  (cleaned up)).

2  **VI.     Section (b) of the prayer for relief should not be dismissed or stricken.**

3          If the Court holds that one or more of the challenged provisions must be enjoined, it must

4  proceed to conduct a severability analysis to determine if the remainder of AB4 must be enjoined.

5  A state statute's severability is "a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139, 116

6  S. Ct. 2068, 2069, 135 L. Ed. 2d 443 (1996). Nevada courts have adopted a two-part test for

7  severability: "a statute is severable only if the remaining portion of the statute, standing alone, can

8  be given legal effect, and if the Legislature intended for the remainder of the statute to stay in effect

9  when part of the statute is severed." *Flamingo Paradise Gaming, LLC v. Chanos*, 217 P.3d 546,

10  555 (Nev. 2009). This decision thus must be made on the merits and cannot be avoided by striking

11  portions of the Amended Complaint under procedural rules.

12  **CONCLUSION**

13          For these reasons, the Court should deny the Intervenors' motion to dismiss.

14

15                                             Respectfully submitted,

16

17  Dated: September 17, 2020                  */s/ J. Colby Williams*
                                              Donald J. Campbell (1216)
18                                             J. Colby Williams (5549)
                                              CAMPBELL & WILLIAMS
19                                             700 South 7th Street
                                              Las Vegas, Nevada 89101
20                                             (702) 382-5222
                                              (702) 382-0540 (fax)
21
22                                             William S. Consovoy*
                                              Thomas R. McCarthy*
23                                             Tyler R. Green*
                                              Cameron T. Norris*
24                                             CONSOVOY MCCARTHY PLLC
                                              1600 Wilson Boulevard, Suite 700
25                                             Arlington, VA 22209
                                              (703) 243-9423
26                                             *Attorneys for Plaintiffs*
27
28                                             **Admitted pro hac vice*

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that I electronically filed this pleading with the Clerk of the Court using the

3 CM/ECF system, which will send notice of such filing to all counsel registered in this case.

4

5

6    Dated: September 17, 2020      */s/ J. Colby Williams*
                        J. Colby Williams

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28