1
2
3
4                        UNITED STATES DISTRICT COURT
5                             DISTRICT OF NEVADA
6                                    * * *
7   DONALD J. TRUMP FOR PRESIDENT, INC.,        Case No. 2:20-CV-1445 JCM (VCF)
    et al,
8                                                            ORDER
                                    Plaintiff(s),
9
10         v.
11  BARBARA CEGAVSKE,
12                                 Defendant(s).

13          Presently before the court is defendant Barbara Cegavske, Nevada Secretary of State's,
14  motion to dismiss the first amended complaint.  (ECF No. 37).  Plaintiffs Donald J. Trump for
15  President, Inc. ("Trump campaign"), the Republican National Committee, and the Nevada
16  Republican Party responded.  (ECF No. 42).  Defendant replied.  (ECF No. 45).
17  I.      Background
18          On August 3, 2020, Nevada joined the growing ranks of states that have expanded mail-
19  in voting due to the COVID-19 pandemic.[1]  *See* Assembly Bill No. 4 of the 32nd Special Session
20  (2020) of the Nevada Legislature, Act of August 3, 2020, ch. 3, 2020 Nev. Stat. 18, §§ 1–88
21  ("AB 4").  The Nevada State Legislature passed Assembly Bill 4 ("AB 4"), which codified
    procedures for elections impacted by emergencies or disasters.[2]  Specifically, the law directs city
22
23  _____
24          [1] Prior to the COVID-19 pandemic, Nevada voters could request an absentee ballot
25  without providing an excuse or justification, and certain voters in rural areas could be grouped
    together in "mailing precincts" and "automatically mailed their paper ballots."  (*See* ECF No. 37
26  at 7 (citing NRS §§ 293.3038-.340; 293.343-.355)).

27          [2] "[I]f a state of emergency or declaration of disaster is proclaimed by the Governor or by
    resolution of the Legislature pursuant to NRS 414.070 for the entire State of Nevada, the
28  following elections are deemed to be affected elections."  AB 4 at § 8.  Governor Steve Sisolak
    declared a state of emergency due to the COVID-19 pandemic on March 12, 2020.  (ECF No. 29
    at ¶ 103).

James C. Mahan
U.S. District Judge

1   and county election officials to mail paper ballots to all active registered voters in Nevada.  AB 4
2   at § 15.

3   The next day, plaintiffs filed this instant suit.[3]  (ECF No. 1).  They challenge several key
4   provisions of AB 4:

5   Section 20(2) of AB 4 establishes a presumption that a ballot was cast in time, as long as
6   it is received by election officials before 5 p.m. on the third day after the election, even if it lacks
7   a postmark.[4]  AB 4 at § 20(2).  Plaintiffs allege that section 20(2) is preempted by federal laws
8   that set the date of the general election,[5] because the provision allegedly permits election
9   officials to count ballots cast after election day.  (ECF No. 29 at ¶¶ 104–123).  Plaintiffs theorize
10  that, due to the speed of the United States Postal Service, a ballot mailed in Clark or Washoe
11  county "in a state-provided, postage prepaid first-class envelope on the Wednesday or Thursday
12  after Election Day will likely be received [by election officials] before 5:00pm on the Friday
    after the election" and "almost certainly will arrive without bearing a postmark."  (*Id.* at ¶ 96).

13  Sections 11 and 12 of AB 4 require election officials to establish a minimum number of
14  in-person voting locations for early voting and election-day voting, respectively.  AB 4 at §§ 11,
15  12.  A county with a population of "700,000 or more" must establish at least 100 voting centers
16  for election day.  *Id.* at § 12.  A county with a population of "100,000 or more but less than
17  700,000" must establish at least 25 voting centers.  *Id.*  And a county with a population of "less
18  than 100,000" may establish one or more voting center.  *Id.*  Plaintiffs allege that sections 11 and
19  12 authorize the disparate treatment of rural voters in violation of the Equal Protection Clause,
20  because there will be "more in-person voting places per capita for voters in urban counties than
    in rural counties."  (ECF No. 29 at ¶ 100).  Plaintiffs speculate that rural Nevada counties will

---

[3] This suit is one of several that the Trump campaign has filed challenging expansions of
mail-in voting during the COVID-19 pandemic.  *See Donald J. Trump for President, Inc. v.
Bullock*, No. CV 20-6-H-DLC (D. Mont. filed Sept. 2, 2020); *Donald J. Trump for President,
Inc. v. Murphy*, No. 3:20-cv-10753 (D.N.J. filed Aug. 18, 2020); *Donald J. Trump for President,
Inc. v. Boockvar*, No. 2:20-cv-00966 (W.D. Pa. filed Jun. 29, 2020).  This court only takes notice
of the existence of these lawsuits, and not the disputed facts therein.  Fed. R. Evid. 201.

[4] Section 20(2) of AB 4 duplicates NRS § 293.317, a statute that has been in effect since
January 1, 2020, but makes it applicable to affected elections.  (ECF No. 37 at 8, 15).

[5] U.S. Const. art. I, §4, cl. 1 (Elections Clause); U.S. Const. art. II, §1, cl. 4 (Electors
Clause); U.S. Const. art. VI, §2 (Supremacy Clause); 3 U.S.C. § 1 ("Time of appointing
electors"); 2 U.S.C. § 7 ("Time of election"); 2 U.S.C. § 1 ("Time for election of senators").

James C. Mahan
U.S. District Judge

have substantially higher numbers of registered voters per in-person voting location than urban counties such as Washoe.  (*Id.* at ¶¶ 130–138).

Section 22 of AB 4 requires election officials to establish "procedures for the processing and counting of mail ballots" for any affected election.[6]  AB 4 at § 22.  Section 25 provides that "if two or more mail ballots are found folded together to present the appearance of a single ballot" and "a majority of the inspectors are of the opinion that the mail ballots folded together were voted by one person, the mail ballots must be rejected."[7]  AB 4 at § 25(2).  Plaintiffs allege that sections 22 and 25 violate the Equal Protection Clause, because they authorize "'standardless' procedures" across counties and cities for processing, inspecting, and counting mail ballots with no "specific rules designed to ensure uniform treatment" and no "'minimal procedural safeguards.'"  (ECF No. 29 at ¶¶ 145, 159 (quoting *Bush v. Gore*, 531 U.S. 98, 105–106 (2000) (per curiam)).

And finally, plaintiffs allege that all of the aforementioned provisions of AB 4, along with section 21,[8] "facilitate fraud and other illegitimate voting practices" and "dilute the value of honest, lawful votes" in violation of the Fourteenth Amendment.  (ECF No. 29 at ¶ 169).

On August 20, 2020, plaintiffs amended their complaint without altering the parties or their claims.  (ECF No. 29).  Defendant now moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).  (ECF No. 37).

## II.    Legal Standard

Federal courts are courts of limited jurisdiction.  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  "A federal court is presumed to lack jurisdiction in a particular case

---

[6] Section 22 is read together with other provisions in AB 4 that establish procedures for processing and counting mail ballots.  For example, section 17 requires election officials to secure proof of identification from certain first-time voters before counting their mail ballots. AB 4 at § 17.  Section 23 requires election officials to verify the signature on mail ballots.  *Id.* at § 23.  Section 26 requires election officials to verify that the voter did not vote in person before counting the mail ballot.  *Id.* at § 26.  And Section 22(b) forbids election officials from establishing any procedures that conflict with sections 2 to 27 of AB 4.  *Id.* at § 22.

[7] Section 25 of AB 4 duplicates NRS § 293.363, a statute that has been in effect since 1960, but makes it applicable to affected elections.  (ECF No. 37 at 9, 21).

[8] Section 21 allows for "a person authorized by the voter may return the mail ballot on behalf of the voter by mail or personal delivery to the county or city clerk, as applicable, or any ballot drop box established in the county or city, as applicable."  AB 4 at § 21.

James C. Mahan
U.S. District Judge

unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes of Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows defendants to seek dismissal of a claim or action for a lack of subject matter jurisdiction. Dismissal under Rule 12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on its face sufficient to establish subject matter jurisdiction. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008).

Plaintiffs bear the burden of proving that the case is properly in federal court to survive a Rule 12(b)(1) motion. *McCauley v. Ford Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). They must plead "the existence of whatever is essential to federal jurisdiction, and, if [plaintiffs] do[] not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Smith v. McCullough*, 270 U.S. 456, 459 (1926).

### B. Article III Standing

Standing to sue is a "doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576–77 (1992).

To establish standing, plaintiff must plead three elements: (1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. The party invoking federal jurisdiction bears the burden of demonstrating that it has standing to sue. *Id.* at 561. "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing. *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent[.]'"

James C. Mahan
U.S. District Judge

- 4 -

1    *Spokeo*, 136 S. Ct. at 1548.  Moreover, a concrete injury must actually exist and affect the

2    plaintiff in a personal and individual way.  *Id.*  As the Supreme Court noted in *Spokeo*:

3          Congress' role in identifying and elevating intangible harms does not mean that a
           plaintiff automatically satisfies the injury-in-fact requirement whenever a statute
4          grants a person a statutory right and purports to authorize that person to sue to
           vindicate that right. Article III standing requires a concrete injury even in the
5          context of a statutory violation. For that reason, [plaintiff] could not, for example,
           allege a bare procedural violation, divorced from any concrete harm, and satisfy
6          the injury-in-fact requirement of Article III.

7    *Id.* at 1549 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) ("[D]eprivation

8    of a procedural right without some concrete interest that is affected by the deprivation . . . is

9    insufficient to create Article III standing.")).

10   **III.      Discussion**

11         Defendant argues that plaintiffs do not have standing to bring their claims for relief.

12   (ECF Nos. 37, 45).  This court agrees.

13         Plaintiffs attempt to establish standing in three ways: (1) associational standing to

14   vindicate harms to their member voters, (2) direct organizational standing due to their need to

15   divert resources, and (3) direct and associational standing to vindicate competitive injuries to

16   their candidates.  (ECF No. 42).

17         This court will address each of plaintiffs' theories in turn.

     **A.  Associational Standing for Voters**

18         Plaintiffs argue that they have associational standing to vindicate the injuries caused to

19   their member voters by AB 4.  (ECF No. 42 at 10–13).  These injuries are two-fold: an individual

20   "right under the Constitution to have [your] vote fairly counted, without being distorted by

21   fraudulently cast votes"—vote dilution—and an "arbitrary and disparate treatment of the

22   members of its electorate"—violations of the Equal Protection Clause.  (ECF No. 29 at ¶¶ 33,

23   35).

24         An entity may establish associational standing to bring suit on behalf of its members

25   when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the

26   interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim

27   asserted nor the relief requested requires the participation of individual members in the lawsuit."

28   *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

**James C. Mahan**
**U.S. District Judge**

- 5 -

1

2

3

4

5

6

7

8

This court finds that the Trump campaign fails to satisfy the second prong of associational standing: the interests of the voters are not "germane to the organization's purpose." *Id.* The Trump campaign does not represent Nevada voters. The Trump campaign represents only Donald J. Trump and his "electoral and political goals" of reelection. (ECF No. 29 at ¶ 11). By statutory definition, a federal election candidate's "principal campaign committee" is simply a reserve of funds set aside for that campaign. *See* 52 U.S.C. § 30102 ("Organization of political committees"). Although the Trump campaign may achieve its "organization's purpose" through Nevada voters, the individual constitutional interests of those voters are wholly distinct. (ECF No. 29 at ¶ 11).

9

10

11

12

13

14

15

16

17

18

19

In contrast to the Trump campaign, the Republican National Committee and Nevada Republican Party satisfy the second prong; the interests of their member voters are germane to their "organization's purpose." *See Hunt*, 432 U.S. at 343. Still, however, plaintiffs' member voters would not "otherwise have standing to sue in their own right." *Id.* Plaintiffs' alleged injury of vote dilution is impermissibly "generalized" and "speculative" at this juncture. *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011). To establish these future injuries, plaintiffs must plead facts that establish a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Plaintiffs' allegations of equal protection violations are also generalized and speculative. However, plaintiffs' claim against sections 11 and 12 fail to satisfy redressability as well—"a likelihood that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560.

20

21

22

23

24

To demonstrate the substantial risk of voter fraud, plaintiffs cite studies and news articles on the subject. (ECF No. 29 at ¶¶ 63–81). The news articles describe a parade of administrative problems in Wisconsin, New Jersey, Connecticut, and New York, states that "hurriedly" implemented mail-in voting for elections during the COVID-19 pandemic. (*Id.* at ¶¶ 63–75). Plaintiffs also point to reported irregularities in Nevada's June 2020 mail-in primary elections. (*Id.* at ¶¶ 57–62).

25

26

27

28

Even if accepted as true, plaintiffs' pleadings allude to vote dilution that is impermissibly generalized. The alleged injuries are speculative as well, *see Lujan*, 504 U.S. at 560, but their key defect is generality. As a court in this district has already recognized, plaintiffs' claims of a substantial risk of vote dilution "amount to general grievances that cannot support a finding of

**James C. Mahan**
**U.S. District Judge**

particularized injury as to [p]laintiffs." *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020).  Indeed, the key provisions of AB 4 apply to all Nevada voters.  Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not.  As with other "[g]enerally available grievance[s] about the government," plaintiffs seek relief on behalf of their member voters that "no more directly and tangibly benefits [them] than it does the public at large."  *Lujan*, 504 U.S. at 573–74; *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485 (1982) ("The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.").  Plaintiffs' allegations are "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that fail to confer Article III standing.  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

As to plaintiffs' equal protection claims, plaintiffs first argue that "[s]ections 11 and 12 of AB4 authorize disparate treatment of voters in rural counties" due to the law's differences in *minimum* number of in-person voting locations across counties and lack of further guidance on how election officials should make their determinations.  (ECF No. 29 at ¶ 126).  However, plaintiffs fail to demonstrate how these harms are redressed by their requested relief.  "The proposition that plaintiffs must seek relief that actually improves their position is a well-established principle."  *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013).  AB 4 simply establishes a minimum number of in-person voting locations.  AB 4 at §§ 11, 12.  Removing this one safeguard does not alleviate plaintiffs' concerns.  In fact, it "worsen[s] plaintiffs' injury rather than redressing it."  *Townley*, 722 F.3d at 1135 ("[I]f plaintiffs were to prevail in this lawsuit, . . . voters would no longer have the opportunity to affirmatively express their opposition at the ballot box at all. The relief plaintiffs seek will therefore *decrease* their (and other voters') expression of political speech rather than increase it, worsening plaintiffs' injury rather than redressing it.").  An injunction against the enforcement of AB 4 would not address plaintiffs' issues with the discretion that Nevada election officials have to establish in-person voting locations.  It would instead eliminate the safeguard of a minimum number of in-person voting locations from all counties.[9]

---

[9] During the pendency of this motion, Nevada election officials established polling places and voting centers for the 2020 general election.  *2020 General Election & Polling Locations*,

Plaintiffs also claim that "AB 4's three-day, post-election receipt deadline for non-postmarked ballots—coupled with its deeming rule, the faster average mailing time in urban districts such as Clark County, and the postal service's practice of not postmarking prepaid mail—will likely result in significantly more untimely ballots being counted from urban areas." (ECF No. 42 at 12). These injuries are too speculative to establish standing. Plaintiffs offer a patchwork theory of harm that does not rely on AB 4, but on the speed of the United States Postal Service, an entity out of defendant's control. (ECF No. 29 at ¶¶ 73–81, 90–97). A "future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158. Even among the segment of voters who vote by mail, plaintiffs offer no indication that the alleged future injury is "certainly impending" or "substantial[ly]" likely. *Id.*

This court finds that plaintiffs do not have associational standing to represent their member voters.

## B.  Direct Organizational Standing

Plaintiffs next allege that they have direct organizational standing to bring their claims. (ECF No. 42 at 3–8). Organizational standing is recognized where the alleged misconduct of the defendant causes "a drain on [plaintiffs'] resources from both a diversion of its resources and frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quotation omitted); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Plaintiffs allege that AB 4 forces them "to divert resources and spend significant amounts of money educating Nevada voters . . . and encouraging them to still vote." (ECF No. 29 at ¶ 17). Plaintiffs also briefly allege a need to divert resources to counteract voter fraud. (ECF No. 42 at 5 (citing *Am. Civil Rights Union v. Martinez Rivera*, 166 F. Supp. 3d 779, 800 (W.D. Tex. 2015)).

This court is unpersuaded by plaintiffs' theory of organizational standing. Plaintiffs argue that AB 4 would "confuse" their voters and "create incentive to remain away from the polls." (ECF No. 29 at ¶ 17). Outside of stating "confus[ion]" and "discourage[ment]" in a

Nevada Secretary of State (2020), https://www.nvsos.gov/sos/elections/election-day-information (presenting this information by county). This does not impact this court's finding on redressability.

James C. Mahan
U.S. District Judge

conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting.  (ECF No. 29); *see Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (holding that a "new law injures" a political party when it compels it "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote.").  If plaintiffs did not expend any resources on educating their voters on AB 4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.  (ECF No. 29 at ¶¶ 43–47).  AB 4 does not abolish in-person voting.  An organization cannot "simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all.  It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).  Plaintiffs make no showing of their voters' confusion.  Indeed, voters exercised their ability to vote by mail in Nevada's 2020 primary election.  NRS §§ 293.343-.355; *see Paher v. Cegavske*, No. 320CV00243MMDWGC, 2020 WL 2089813, at *2 (D. Nev. Apr. 30, 2020) ("[A]ll active registered voters will be mailed an absentee ballot (mail-in ballot) for the primary election.").

In making this fact-intensive finding, this court also notes the substantive differences between AB 4 and the laws challenged in plaintiffs' cited authority.  *Compare* AB 4, *with Pavek v. Simon*, No. 19-CV3000 (SRN/DTS), 2020 WL 3183249, at *14 (D. Minn. June 15, 2020) (finding organizational standing to challenge a state law which "requires that in Minnesota general elections, major political party candidates must be listed, on the ballot, in reverse order based on the average number of votes that their party received in the last state general election"); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc) (finding organizational standing to challenge a state law that prohibits third-party ballot collection); *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018) (finding organizational standing to challenge a state voter identification and registration law); *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1080–81 (D. Ariz. 2016) (finding organizational standing to challenge a state law that "limits who may possess another's early ballot"); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (finding organizational standing to challenge a state voter

identification law).  In these cases with organizational standing, the challenged law has a direct and specific impact on a voter's ability to vote.  Indeed, a diversion of resources for education would be required in such situations.  But here, the challenged law expands access to voting through mail without restricting prior access to in-person voting.  Thus, as detailed above, plaintiffs need not *divert* resources to enable or encourage their voters to vote.

Plaintiffs also briefly argue that they will need to divert resources to fight voter fraud. (ECF No. 42 at 4–5).  This court repeats its prior finding on vote dilution: it is a speculative and "generalized grievance" in this case.  *See Paher*, 2020 WL 2748301, at *4 (finding no standing where plaintiffs failed to "state a particularized injury" and did no more than "speculatively connect the specific conduct they challenge . . . and the claimed injury [of] vote dilution"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").  Plaintiffs note in their response to defendant's motion to dismiss that they will need to divert resources to combat voter fraud.  (ECF No. 42 at 4–5). Plaintiffs cannot divert resources to combat an impermissibly speculative injury.  *See Susan B. Anthony List*, 573 U.S. at 158.  Not only have plaintiffs failed to allege a substantial risk of voter fraud, the State of Nevada has its own mechanisms for deterring and prosecuting voter fraud. *See* NRS §§ 293.700-.840 ("unlawful acts and penalties" in the context of an election).  Here, plaintiffs do not allege that those mechanisms would fail and that they would need to divert resources accordingly.  This court finds that plaintiffs have again failed to show that they would "suffer[] some other injury if [they] had not diverted resources to counteracting the problem." *Valle del Sol*, 732 F.3d at 1018.

### C.  Direct and Associational Standing for Candidates

Finally, plaintiffs argue that they have both direct and associational standing to challenge "competitive harms" to their electoral candidates.  (ECF No. 42 at 8).  "Competitive standing" can exist when a state action will lead to the "potential loss of an election."  *Drake*, 664 F.3d at 783 (quoting *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981)).

Plaintiffs seek to vindicate the rights of their candidates, because AB 4 will undermine the ability of "Republican candidates to receive[] effective votes in Nevada" by "confus[ing] voters, undermin[ing] confidence in the electoral process, and creat[ing] incentives to remain away from the polls."  (ECF No. 29 at ¶¶ 16–17).  The pleadings make no showing of "an unfair

James C. Mahan
U.S. District Judge

- 10 -

1   advantage in the election process." *Drake*, 664 F.3d at 783. Plaintiffs rely on conclusory
2   statements on confusion and disincentives that this court has already found unpersuasive. *See*
3   *supra* III.B. Plaintiffs seek to muster "*competitive* standing," yet their candidates face no harms
4   that are unique from their electoral opponents. *Owen*, 640 F.2d at 1132–33 (finding competitive
5   standing where the postal service gave plaintiff's opponent a preferential mailing rate).

6   　　　As to AB 4's disparate treatment of rural voters, this court repeats its prior findings:
7   plaintiffs' requested relief fails to satisfy redressability and the alleged harm is too speculative.
8   *See supra* III.A. Enjoining Nevada election officials from enforcing AB 4 would not apparently
9   improve the odds for plaintiffs' candidates. *See Drake*, 664 F.3d at 783 (quoting *Owen*, 640 F.2d
10  at 1132–33 (9th Cir. 1981)). Plaintiffs make no such allegations. Election officials would
11  operate without the guidance of AB 4's minimum number of in-person voting locations. On
12  plaintiffs' theory as to Sections 20 and 22 of AB 4, plaintiffs have not established a "substantial
13  risk" that their alleged harm will occur. *Susan B. Anthony List*, 573 U.S. at 158. Thus, neither
14  plaintiffs nor their member candidates "have standing to sue in their own right." *Hunt*, 432 U.S.
    at 343.

15  　　　Ultimately, as plaintiffs concede, they hold "policy disagreements" with proponents of
16  AB 4. (ECF No. 42 at 2). Although they purport to allege constitutional harms that go beyond
17  these policy disagreements, at this juncture, plaintiffs' allegations remain just that. (*Id.*). Since
18  initiating this matter on August 4, 2020, (ECF No. 1), plaintiffs have not requested an injunction
19  or expedited review. Plaintiffs ask for a remedy to cure the "confusion" caused by AB 4, yet
    they have positioned this case for last minute adjudication before the general election.[10]

20  　　　This court grants defendant's motion to dismiss due to plaintiffs' lack of standing. (ECF
21  No. 37). Plaintiffs' amended complaint is hereby dismissed. (ECF No. 29). The remaining
22  motions before the court are denied as moot. (ECF Nos. 10, 40, 41, 43).

23  . . .
24  . . .
25  . . .

26

27  　　　[10] The Supreme Court "has repeatedly emphasized that lower federal courts should
    ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v.*
28  *Democratic Nat'l Comm.*, No. 19A1016, —— U.S. ——, 140 S.Ct. 1205, 2020 WL 1672702, at
    *1 (U.S. Apr. 6, 2020) (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v.*
    *Perry*, 574 U. S. ——, 135 S. Ct. 9 (2014)).

James C. Mahan
U.S. District Judge

- 11 -

**IV.    Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion to dismiss the amended complaint (ECF No. 37) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant's motion to dismiss the original complaint (ECF No. 10) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that intervenor-defendants DNC Services Corporation/Democratic National Committee, Democratic Congressional Campaign Committee, and the Nevada State Democratic Party's motion to dismiss the amended complaint (ECF No. 40) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (ECF No. 41) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that non-parties Walker River Paiute Tribe and Pyramid Lake Paiute Tribe's motion to intervene (ECF No. 43) be, and the same hereby is, DENIED as moot.

The clerk is instructed to close the case.

DATED September 18, 2020.

UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge

- 12 -